**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
COLUMBUS DIVISION**

| | |
|---|---|
| ALAN J. BUTTS, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| CITY OF COLUMBUS, JOHN WEIS, | ) Case No. |
| TIM KELLER, MICHAEL | ) |
| HOLBROOK, MARILYNN | ) |
| SEAMANS, STEVEN EPPERT, | ) |
| WAYNE GOSS, in their individual | ) JURY TRIAL DEMANDED |
| capacities, DR. CHARLES | ) |
| JOHNSON, DR. JONATHAN | ) |
| GRONER, and DR. KARLA | ) |
| HAUERSPERGER, in their | ) |
| individual capacities, PATRIK | ) |
| FARDAL, COUNTY OF FRANKLIN, | ) |
| and COLUMBUS CHILDREN'S | ) |
| HOSPITAL, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

NOW COMES Plaintiff, ALAN J. BUTTS, by his attorneys, LOEVY &

LOEVY, and complains of Defendants the CITY OF COLUMBUS, JOHN WEIS,

TIM KELLER, MICHAEL HOLBROOK, MARILYNN SEAMANS, STEVEN

EPPERT, WAYNE GOSS, in their individual capacities, DR. CHARLES

JOHNSON, DR. JONATHAN GRONER, and DR. KARLA HAUERSPERGER, in

their individual capacities, PATRIK FARDAL, and COUNTY OF FRANKLIN, and

states as follows:

1

## INTRODUCTION

1.     Plaintiff Alan Butts served over 20 years wrongfully imprisoned for a crime he did not commit – a tragic death that was no crime at all.

2.     Twenty-one-year-old Alan loved and treated two-year-old J.U., his girlfriend Beth's son, as though J.U. were his own child. Alan played with J.U., bathed him, fed him, changed his diapers, and consoled him when he was upset. J.U. loved Alan too and called Alan "Dad."

3.     In early February 2002, J.U. began exhibiting signs of what Alan and Beth believed to be a cold. He also began suffering from a series of unexplained falls.

4.     On one occasion, while Beth was bathing J.U., he slipped and fell backwards, hitting his head hard on the bottom of the tub. Though he did not lose consciousness, J.U. appeared disoriented and seemed unable to balance himself for a while thereafter. Afterwards, Alan and Beth noticed a change in his behavior.

5.     Subsequently, J.U. began falling more frequently, without making any effort to catch himself, including a fall at his grandparents' home, causing J.U. to bust his lip. J.U. was lethargic, began to speak and eat less, acted fussy, had a runny nose and congestion, and constantly wanted to be held. Although Alan encouraged Beth to take J.U. to the doctor, Beth treated J.U.'s symptoms with an over-the-counter cold medication.

6.      On February 13, 2002, J.U. fell and appeared to go unconscious. Alan immediately called 911. Tragically, J.U. passed away the following day when removed from life support.

7.      Early on, the Defendant law enforcement officers and medical personnel conspired to frame Alan for J.U.'s death, concocting a false narrative that Alan violently shook and killed J.U., who weighed 30 pounds at the time.

8.      But Alan did not harm J.U. in any way, and Defendants knew that.

9.      Though it was an unimaginable tragedy, J.U.'s death was neither intentional nor criminal.

10.     Despite steadfastly maintaining his innocence, Alan was forced to spend over two decades in prison, away from family, friends, and career as a brick mason, as a direct result of Defendants' efforts to fabricate and suppress evidence to secure his wrongful arrest, prosecution, and conviction.

11.     Although Defendants knew there were natural causes for J.U.'s death, Defendants fabricated false medical evidence and reports implicating Alan in violently shaking the child.

12.     After years of fighting to prove his innocence, Alan was finally exonerated in February 2024.

13.     Alan now brings this action pursuant to 42 U.S.C. § 1983 and Ohio law to seek justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that he endured, and continues to suffer, as a result of Defendants' misconduct.

**JURISDICTION AND VENUE**

14. This action is brought pursuant to 42 U.S.C. § 1983 and Ohio law to redress the Defendants' tortious conduct and their deprivation under color of law of Plaintiff's rights as secured by the U.S. Constitution.

15. This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

16. Venue is proper under 28 U.S.C. § 1391(b) and (c). Plaintiff resides in this judicial district. In addition, Plaintiff's criminal case was investigated, tried, and appealed in this judicial district, such that a substantial part, if not all, the events and omissions giving rise to Plaintiff's claims occurred within this district. In particular, J.U. lived and passed away in Columbus, Ohio, and Plaintiff was tried in 2003 in the Court of Common Pleas, in Franklin County, Ohio.

**THE PARTIES**

17. Plaintiff Alan Butts was just twenty-one-years-old when he was maliciously prosecuted and wrongfully convicted of J.U.'s death. Alan has spent the past 24 years fighting the false charges against him and over two decades falsely imprisoned for the tragic death of a child he loved as his own.

18. At all relevant times, Defendants John Weis, Tim Keller, Michael Holbrook, Marilynn Seamans, Steven Eppert, and Wayne Goss ("Defendant Officers") were officers and employees of the Columbus Police Department.

19.     At all relevant times, Defendant Dr. Charles Johnson was a pediatrician and the Director of the Child Abuse Program at Children's Hospital in Columbus, Ohio, and Defendant Drs. Jonathan Groner and Karla Hauersperger ("Defendant Physicians") were physicians at the Children's Hospital in Columbus, Ohio. The Medical Defendants were state actors insofar as they engaged with the Defendant Officers in conducting the investigation that led to Plaintiff's wrongful arrest, prosecution, and conviction, conspired with the Defendant Officers to secure Plaintiff's wrongful arrest, prosecution, and conviction, and were serving as public function and/or was given the authority by the Defendant Officers to identify a murder caused by "non-accidental head trauma" had been committed for which Plaintiff was wrongfully convicted.

20.     At all relevant times, Defendant Dr. Patrick Fardal was the Chief Pathologist at the Franklin County Coroner's Office, a department of Franklin County, acting within the scope of his employment and under color of law when conducting the autopsy of J.U.

21.     Defendant City of Columbus is an Ohio municipal corporation authorized as such by the laws of the State of Ohio that operates a police department as part of its responsibilities and services. By and through its agents, Defendant City of Columbus, at all relevant times hereto, established, promulgated, and implemented the written and unwritten policies and practices of the Columbus Police Department with regard to hiring, training, supervision, and discipline of its employees, including but not limited to the Defendant Officers. The City of

5

Columbus is liable for all torts committed by the aforementioned Defendant Officers pursuant to the doctrine of *Respondeat Superior*.

22.    Defendant Franklin County is an Ohio municipal corporation authorized as such by the laws of the State of Ohio that operates a Medical Examiner's Office as part of its responsibilities and services. By and through its agents, Defendant Franklin County, at all relevant times hereto, established, promulgated, and implemented the written and unwritten policies and practices of the Franklin County Medical Examiner's Office with regard to hiring, training, supervision, and discipline of its employees, including but not limited to Dr. Fardal.

23.    Defendant Columbus Children's Hospital was the pediatric hospital in Columbus where J.U. was treated, as well as the employer of Defendant Physicians.

### FACTS

24.    Two-year-old J.U. had been ill, acting lethargic and unlike himself, and experiencing a series of unexplained falls for days when on February 13, 2002, he collapsed, fell backwards, and hit his head on the floor.

25.    After falling, J.U. attempted to sit up, but after gulping for air, immediately put his head back down.

26.    Plaintiff instantly went to J.U.'s side, tried to rouse him by talking to him, patting him on the cheek, and "gently shaking him." When he got no response from J.U., Plaintiff called 911 – twice – begging them to hurry with help. Plaintiff's first call to 911 was at 4:36 p.m.

27.     Defendant Columbus Police Officers Tim Keller and Michael Holbrook arrived on scene first and observed Plaintiff standing near J.U., who was lying on the floor. Plaintiff ran to the door and beckoned them in.

28.     Plaintiff was distraught, holding his hands to his head, concerned about J.U.

29.     Plaintiff explained to Defendants Keller and Holbrook that J.U. had fallen, hit his head, and stopped breathing.

30.     Plaintiff told Defendants Keller and Holbrook that J.U. had been standing up when J.U. threw his arms forward, toppled backwards without warning, and hit his head on the floor.

31.     Keller began giving J.U. mouth-to-mouth resuscitation and gave paramedics "the clear" to come into the home at 4:47 p.m. J.U. had no heartbeat and was not receiving oxygen to his brain. The paramedics worked to revive J.U. for 30 minutes.

32.     Plaintiff also said J.U. had been suffering from a minor cold in the previous few days and might have received a small amount of children's cough syrup that morning. Plaintiff searched for the cough medicine bottle, accompanied by Defendant Holbrook.

33.     Neither Keller nor Holbrook noticed any marks or signs of violence on J.U., and neither observed anything out of the ordinary or suspicious in the home.

7

34.     Defendant Holbrook heard Plaintiff tell paramedics multiple times what had happened, each time consistent with what he had explained to Defendants Keller and Holbrook when they first arrived.

35.     J.U. was transported via Lifeflight to the Children's Hospital in Columbus, Ohio.

36.     Eventually, Defendant Columbus Police Homicide Detectives John Weis and Marilynn Seamans arrived at the home.

**Without Evidence, Defendants Immediately
Concluded J.U. had Been Violently Shaken**

37.     En route to the hospital, a registered flight nurse administered CPR and inserted an endotracheal tube to ventilate J.U.'s lungs. J.U.'s pupils were fixed and fully dilated.

38.     J.U. arrived at the hospital at 5:31 p.m., almost an hour after Plaintiff placed the call to 911. Upon arrival, J.U. was in critical condition, comatose, and intubated.

39.     Less than 15 minutes after J.U. had arrived, Defendant Columbus Police Department Homicide Detectives Steven Eppert and Wayne Goss responded to Children's Hospital. There, Dr. Ellen McManus informed the detectives that the "victim had bilateral subdural hemorrhaging indicative of 'shaken baby' syndrome" ("SBS"). Dr. McManus jumped to this conclusion without first conducting any diagnostic testing.

40.     At around the same time, Defendant Dr. Karla Hauersperger—also without diagnostic testing or a full patient history—began to author a "Report of Suspected Physical Abuse."

41.     Defendant Eppert noted that a nurse told him that it was "the opinion of the medical staff that the victim's air supply had been shut off for approximately five (5) minutes before the medics arrived."

42.     Defendants Eppert and Goss interviewed Beth at the hospital. Beth informed the detectives that for the past week, J.U. had been sick, acting dizzy "quite a bit," and had fallen "quite a lot." Beth further told the detectives that she had no reason to think Plaintiff abused J.U.

### Defendants Interrogated Plaintiff, Conspiring to Frame Him for Child Abuse

43.     The Defendant Officers would not allow Plaintiff to go to the hospital. Instead, Keller and Holbrook transported him in the back of a patrol car to the Columbus Police Station.

44.     There, they placed Plaintiff in a concrete room with a concrete bench where Plaintiff remained alone for approximately 20 minutes.

45.     Eventually, Defendants Weis and Holbrook interrogated Plaintiff, who they referred to as "the male suspect" in the "shaken baby case" to dispatch. No lawyer was present.

46.     Plaintiff cooperated and answered all the officers' questions, telling them what he had observed regarding J.U.'s fall, about J.U.'s recent illness, and his efforts to rouse him when he lost consciousness.

47.     At the conclusion of the questioning, Holbrook and Keller took Plaintiff back home. They refused to take him to the hospital or to update him on J.U.'s condition.

48.     At 10:50 p.m., Defendant Weis successfully obtained a search warrant for Plaintiff's apartment, stating in the affidavit that Plaintiff "acknowledged shaking the child 'a little bit.'" In the affidavit, Weis also stated that "Dr. Karla Hauersberger advised J.U.'s CAT scan revealed bilateral subdural hemorrhaging and a percussion injury to the liver, spleen, and kidneys."

### Defendants Prohibited Plaintiff
### From Seeing J.U. at the Hospital

49.     Plaintiff went to the Columbus Children's Hospital as soon as the officers dropped him at his home. There, he met with Beth and a pastor. The three of them prayed together.

50.     Although Plaintiff had voluntarily agreed to go to the Columbus Police Station, Defendants falsely told members of Plaintiff's family that Plaintiff was on the run, leading them to believe Plaintiff was evading the investigation. As a result, Plaintiff's family was angry with him.

51.     Thereafter, a security guard from the hospital told Plaintiff he was not permitted to be there and made him leave the grounds, forbidding him from seeing J.U.

**Defendant Physicians Conspired and Immediately Conclude**
**J.U.'s Injuries were Intentional**

52. When J.U. arrived at Children's Hospital, Defendant Dr. Hauersperger assumed his care in the Emergency Room. J.U. arrived in cardiopulmonary arrest; he had no pulse and was not breathing on his own. He had no spontaneous signs of life.

53. Defendant Hauersperger ordered a CAT scan and found J.U. had retinal hemorrhages, bleeding around the brain, and brain swelling. Accordingly, she determined "right off the bat" that J.U. "sustained a non-accidental head injury, most consistent with shaken baby syndrome." She determined the injuries would be immediately incapacitating. She did so without considering J.U.'s medical history and with being aware, at the time, of alternate causes of the injuries and of research and scientific papers that questioned the validity of such findings in regard to shaken baby syndrome.

54. In Defendant Hauersperger's "Report of Suspected Physical Abuse," she noted the only "history provided" was by paramedics and stated, "unresponsive child, possible fall." Within the report, she documented finding "bilateral subdural hemorrhages" and "percussion injury to liver, spleen, and bilateral kidneys." But this information was false, as determined by the autopsy.

55. Under "Psychosocial History," Defendant Hauersperger wrote: "Unk" and "Dad reports Allen [sic] Butts has prior abuse Hx on [J.U.] = Coshocton Co CPS. Reports MJ abuse by Mr. Butts." Although J.U.'s biological father, Rusty Miller, apparently informed Defendant Hauersperger that Plaintiff had previously abused

11

J.U., this prior allegation by Mr. Miller, who himself had exhibited problematic behavior, was determined to be entirely unsubstantiated by CPS. There had been no findings of abuse by Plaintiff whatsoever.

56.    Because the Defendant Officers and Defendant Physicians immediately determined J.U.'s injuries were intentional, Defendant Dr. Charles Johnson, Child Abuse Pediatrician at the Columbus Children's Hospital's Child Abuse Program, was called in for a consultation.

57.    After reviewing the "abuse report" noting suspicions of abuse in regard to J.U.'s condition and filed with Children's Services and law enforcement, Defendant Johnson immediately concluded that J.U.'s injuries were the result of non-accidental head injury with primarily an acceleration-deceleration component - or a result of shaking. He based that conclusion on J.U.'s retinal and subdural hemorrhages, though he was aware at the time of alternate causes of the injuries and research and scientific papers that questioned the validity of such findings in regard to shaken baby syndrome. He too found that J.U.'s symptoms would have developed within seconds to minutes of his injuries.

58.    On the morning of February 14, 2002, Defendant Johnson conspired with Defendant Weis by sharing his conclusions that J.U. had been shaken, knowing there were other possible causes of J.U.'s injuries, knowing he should have taken J.U.'s history of illness and falls with impact to the head into account, and knowing it was biomechanically impossible to exert enough force to cause such injuries in a 30-pound child by shaking.

59. Defendant Dr. Jonathan Groner, pediatric surgeon and Director of the Trauma Program at Columbus Children's Hospital, reviewed the reports of others, spoke with Dr. Johnson, concluded that J.U.'s final diagnosis was head injury due to SBS, and prepared a discharge summary. Therein, he documented the "principal" diagnosis as "shaken baby syndrome," and the "secondary" diagnosis as "subdural hemorrhage with loss of consciousness…retinal hemorrhages, anoxic brain damage, cerebral edema, cardiac arrest, abuse suspected by boyfriend." He determined the injuries would be immediately incapacitating. He came to these conclusions without considering J.U.'s history of repeated falls, striking his head, recent illness, fussiness, lethargy, lack of appetite, and without ruling out other potential causes of J.U.'s injuries.

## Defendant Dr. Fardal Concludes J.U. Died via Shaking, Confirming What He Had Been Told by Defendants Weis and Johnson

60. J.U. was removed from life support on February 14, 2002 and pronounced dead at 5:10 p.m.

61. Thereafter, Defendant Dr. Patrick Fardal, forensic pathologist at the Franklin County Coroner's Office, conducted J.U.'s autopsy. Defendants Weis and Johnson were present during the autopsy and consulted with Dr. Fardal before the examination, telling him their theory that J.U. died from shaken baby syndrome. But, the Defendants suppressed all evidence of this conversation, which, had it been disclosed, would have provided a basis for Plaintiff to build a defense through the support of expert witnesses.

62. Fardal further obtained J.U.'s "history" by reviewing the police reports in the case.

63. Based on false information, Defendant Fardal concluded that J.U.'s death was a homicide due to non-accidental head trauma. He listed his "final diagnoses" as a) bilateral subdural hemorrhages; b) optic nerve hemorrhage, left eye; c) diffuse cerebral edema; and d) retinal and optic nerve hemorrhage, right eye." Defendant Fardal also noted that J.U. was "allegedly shaken by another person" as "how injury occurred."

64. Defendant Fardal found no injury to J.U.'s neck, liver, spleen, or kidneys, refuting Defendant Hauersberger's findings documented in Defendant Weis' search warrant affidavit. Likewise, he found no injuries on J.U.'s arms, legs, trunk, or ribs.

65. Defendant Fardal found J.U. was suffering from pneumonia. Fardal was aware that acute pneumonia could cause the same symptoms as those of SBS, but he ignored that so he could fabricate a SBS diagnosis. Further, Defendant Fardal was aware of the studies at the time that seriously called into question the validity of an SBS diagnosis altogether.

**Defendants Knew Their Reports Included Fabricated Evidence, Which Would be Used to Prosecute Plaintiff**

66. The Defendant Physicians understood their reports were to assist the Defendant Officers' criminal investigation and to assist in pinpointing Plaintiff as the perpetrator. Their fabricated reports included, among other fabrications, false findings that a) shaking was the only possible cause of J.U.'s injuries; and, b) J.U.'s

14

injuries must have occurred immediately prior to J.U.'s collapse, when in the care of Plaintiff.

67.    The Defendant Physicians knew that J.U.'s injuries could have been caused by a fall or were possibly the result of natural causes and that the injuries were sustained well prior to the afternoon of J.U.'s collapse.

68.    Likewise, the Defendant Officers' reports contained the same, among other, fabricated information as the physicians' reports, repeating the fabricated SBS determination throughout. They too knew their reports would be used to assist in the prosecution of Plaintiff.

### Prior to J.U.'s Fall, Studies Had Shown That Symptoms Like J.U.'s Were Not Immediately Indicative of SBS/AHT

69.    Prior to 2002, numerous scientific studies of children who had died after allegedly being shaken, based on symptoms exactly like J.U.'s, revealed that their brains were nearly indistinguishable from those of children who had died from natural causes.

70.    By the time J.U. was admitted to the ER, extensive scientific research had credibly called into question the association between symptoms like J.U.'s, including the so-called triad of symptoms, as indicative of SBS.

71.    Critically, various studies had debunked the exact fabricated conclusions drawn by Defendant Physicians. This included findings that symptoms of lethal shaking were the same as those associated with innocent falls or other causes.

72. Defendant Physicians knew or should have known that, absent credible evidence, J.U.'s injuries were not immediately indicative of SBS/AHT. This was especially true given that Defendant Physicians failed to consider J.U.'s medical history and potential alternate causes before jumping to conclusions, at the behest of Defendant Officers.

73. Had Defendants taken into account J.U.'s history of sickness and falls, along with the science calling into question their premature diagnosis, Plaintiff would not have been charged.

## Plaintiff's Prosecution

74. Based on the fabricated determination of SBS, which pointed to Plaintiff as the only possible perpetrator, Defendant Weis obtained an arrest warrant for Plaintiff for murder, stating J.U.'s injuries "were not sustained in a fall and occurred within minutes of a 'non-accidental head trauma.'" The warrant cited directly to the fabricated determinations of Defendants Johnson and Fardal.

75. Maintaining his innocence, Plaintiff dutifully turned himself in to authorities on February 18, 2002.

76. On February 21, 2002, Plaintiff was indicted on five (5) counts: murder, involuntary manslaughter, felonious assault, endangering children (F-2) and endangering children (F-3).

77. At trial, the prosecution presented the testimony of Defendants Keller, Holbrook, Johnson, Groner, Fardal, and Hauersperger, among others.

16

78.     As a direct result of Defendants' misconduct, Plaintiff was convicted of murder.

79.     On May 16, 2003, he was sentenced to 15 years to life imprisonment in the Ohio Department of Corrections.

## Plaintiff's Exoneration

80.     On October 10, 2022, Plaintiff was granted a new trial following a six-day evidentiary hearing.

81.     On December 8, 2022, Plaintiff was released on bond after spending over 20 years in prison for a crime that never even occurred, for which he was entirely innocent.

82.     On February 13, 2024, the court, on the State's motion to *nolle prosequi*, entered a *nunc pro tunc* order.

83.     Plaintiff was finally exonerated, exactly 22 years after he called 911 to try to save a child whom he had treated like his own son.

## Plaintiff's Damages

84.     Plaintiff was wrongfully charged on February 21, 2002.

85.     Since then, his life has never been the same.

86.     At the time of charging, Plaintiff had just turned 21 years old.

87.     Due to Defendants' egregious misconduct, Plaintiff languished in prison for over two decades.

88. Plaintiff experienced extreme safety issues while incarcerated. On just the second day of his wrongful imprisonment, Plaintiff was physically attacked. This attack caused Plaintiff physical and psychological injuries.

89. While he was in prison, all four of Plaintiff's grandparents, an uncle, and multiple friends died. He was unable to visit any of them to say goodbye or attend any of their funerals.

90. Plaintiff suffered injuries every day of his wrongful incarceration.

91. Plaintiff's arrest and wrongful conviction caused him to lose his budding career in masonry, and all future job prospects, skills, and income he would have acquired during his wrongful detention and after his release.

92. Plaintiff experienced additional hardship when his family struggled to be able to visit him, hours away in prison. Plaintiff was forced to pay hundreds of dollars a month on phone calls alone to stay in touch with his family.

93. During his wrongful incarceration, Plaintiff was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to grow a family, share holidays, births, funerals, and other life events with loved ones, and the fundamental freedom to live one's life as an autonomous human being.

94. Plaintiff suffered other physical injuries during his incarceration. Those injuries included lack of adequate medical care when Plaintiff contracted COVID-19, the flu, and a severe spider bite, all of which went untreated until

Plaintiff was forced to pay for medication out of his own commissary account. Those struggles caused Plaintiff to suffer on a daily basis.

95.     As a result of his wrongful incarceration, Plaintiff must now attempt to rebuild his life.

96.     Plaintiff has suffered tremendous damage, including loss of liberty, loss of wages, physical sickness and injury, reputational harm, and emotional damages, all proximately caused by Defendants' misconduct.

### Count I - 42 U.S.C. § 1983
### Due Process: Individual Defendants

97.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

98.     As described more fully above, Defendants Weis, Keller, Holbrook, Seamans, Eppert, Goss, Johnson Groner, Hauersperger, and Fardal (together "Individual Defendants"), while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

99.     In the manner described more fully above, the Individual Defendants conducted a reckless investigation, withheld exculpatory evidence, withheld impeachment evidence, destroyed evidence, and fabricated false reports, false statements, false testimony, and other evidence. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

100.    The Individual Defendants' misconduct also directly resulted in the unjust criminal conviction of Plaintiff, thereby denying each of his constitutional

rights to a fair trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

101.    As a result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to emotional distress and pain and suffering, as is more fully alleged above.

102.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

103.    The misconduct described in this Count was undertaken pursuant to a routine practice of the Columbus Police Department to pursue wrongful convictions through reckless and profoundly flawed investigations, creation of false evidence and reports, coerced evidence, and failure to properly supervise employees, knowing that those employees were providing false evidence. In this way, Defendant City of Columbus violated Plaintiff's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

104.    These widespread practices, so well-settled as to constitute *de facto* policy in the Columbus Police Department, were able to exist and thrive because municipal policymakers with authority over the Department exhibited deliberate indifference to these problems, thereby effectively ratifying them.

105.    The widespread practices described in the preceding paragraphs were allowed to flourish because Defendant City of Columbus declined to implement sufficient training and/or enforce legitimate oversight and punishment.

**Count II – 42 U.S.C. § 1983**
**Deprivation of Liberty Without Probable Cause**
**Fourth and Fourteenth Amendments**
**All Individual Defendants**

106.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

107.    As described more fully above, the Individual Defendants, individually, jointly and in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to be free from unlawful prosecution and continued detention without probable cause.

108.    In the manner described more fully above, the Individual Defendants made, influenced and/or participated in the decision to prosecute Plaintiff for these crimes, for which prosecution there was no probable cause, and which caused Plaintiff to suffer a deprivation of liberty. Their misconduct included falsifying evidence and withholding exculpatory evidence.

109.    The Individual Defendants' misconduct directly resulted in the unlawful prosecution and incarceration of Plaintiff, thereby denying each of his constitutional right to liberty in violation of his constitutional rights.

110.    As described more fully above, the prosecution was ultimately resolved in Plaintiff's favor.

111.    Because of this violation of his constitutional rights, Plaintiff suffered injuries, including but not limited to bodily harm and emotional distress, as is more fully alleged above.

112.    The Individual Defendants' misconduct, as described in this Count, was objectively unreasonable and was undertaken intentionally with malice and willful indifference to Plaintiff's constitutional rights.

113.    The misconduct described in this Count was undertaken pursuant to a routine practice of the Columbus Police Department to pursue wrongful prosecutions and wrongful convictions through reckless and profoundly flawed investigations and coerced evidence.  In this way, Defendant City of Columbus violated Plaintiff's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

114.    These widespread practices, so well-settled as to constitute *de facto* policy in the Columbus Police Department, could exist and thrive because municipal policymakers with authority over the Department exhibited deliberate indifference to the problem, thereby effectively ratifying it.

115.    The widespread practices described in the preceding paragraphs could flourish because the Defendant City of Columbus declined to implement sufficient training and/or enforce legitimate oversight and punishment.

### Count III - 42 U.S.C. § 1983
### Failure to Intervene: Individual Defendants

116.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

117.    In the manner described above, during the constitutional violations described above, one or more of the Individual Defendants stood by without

intervening to prevent the misconduct, despite having a reasonable opportunity to do so.

118.    Because of the Individual Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress.

119.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's rights.

120.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Columbus Police Department in the manner described more fully in the preceding paragraphs and was tacitly ratified by policymakers for Defendant City of Columbus with final policymaking authority.

## Count IV - 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights
## Individual Defendants

121.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

122.    After Plaintiff called 911, the Individual Defendants reached an agreement amongst themselves to frame Plaintiff for the crime and to thereby deprive him of his constitutional rights and liberty to be continuously taken away from him, all as described in the various Paragraphs of this Complaint.

123.    In this manner, the Individual Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

23

124. In furtherance of the conspiracy, each of the co-conspirators committed overt acts as described in this Complaint and was an otherwise willful participant in joint activity.

125. As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's rights were violated, and he suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

126. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

127. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Columbus Police Department in the manner described more fully in the preceding paragraphs and was tacitly ratified by policymakers for Defendant City of Columbus with final policymaking authority.

## Count V - 42 U.S.C. § 1983
### *Monell* Claim Against Defendant City of Columbus

128. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

129. The actions of the Columbus Police Department Officers in withholding material exculpatory information from Plaintiff and his counsel were undertaken pursuant to the policies and practices of the Columbus Police Department, described above, which were created, maintained, or ratified by policymakers for the City of Columbus with final policymaking authority.

130. The policies and practices described in this Count were maintained and implemented by the City of Columbus with deliberate indifference to Plaintiff's constitutional rights.

131. As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

132. The City of Columbus is therefore liable for the misconduct committed by its officers.

## STATE LAW CLAIMS

### Count VI
### State Law Claim – Intentional Infliction of Emotional Distress
### Individual Defendants

133. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

134. As described more fully in the preceding paragraphs, by framing Plaintiff for crimes he did not commit, Individual Defendants intended to cause emotional distress or knew or should have known that their actions would result in serious emotional distress.

135. In doing so, the Individual Defendants' conduct was extreme and outrageous, going beyond all possible bounds of decency such that it can be considered completely intolerable in a civilized society, and this conduct caused Plaintiff to suffer serious emotional distress of a nature that no reasonable person could be expected to endure.

136.     As a result of this misconduct, Plaintiff sustained injuries, including emotional pain and suffering, as is more fully alleged above.

**Count VII**
**State Law Claim – *Respondeat Superior* Claim**
**City of Columbus, Franklin County, Columbus Children's Hospital**

137.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

138.     In committing the acts alleged in the preceding paragraphs, the Defendants Weis, Keller, Holbrook, Seamans, Eppert, and Goss were members and agents of the Columbus Police Department, acting at all relevant times within the scope of their employment. Defendant City of Columbus is liable as principal for all state law torts committed by its agents.

139.     In committing the acts alleged in the preceding paragraphs, Defendant Fardal was a member and agent of Franklin County, acting at all relevant times within the scope of his employment. Defendant Franklin County is liable as principal for all state law torts committed by its agents.

140.     In committing the acts alleged in the preceding paragraphs, Defendant Drs. Johnson, Groner, and Hauersperger were employees and agents of Children's Hospital, owned by Defendant Columbus Children's Hospital, acting at all relevant times within the scope of their employment. Defendant Columbus Children's Hospital is liable as principal for all state law torts committed by its agents.

## JURY DEMAND

Plaintiff, ALAN BUTTS, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.


Respectfully submitted,

/s/ Rachel Troutman
*One of Plaintiff's Attorneys*


Jon Loevy*
Amy Robinson Staples* **
Katie Montenegro*
Rachel Troutman
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900
Fax: (312) 243-5902
**\* *Pro Hac Vice Pending*

** 18 Village Plaza, PMB 181
Shelbyville, KY 40065
*Local address*


Rachel Troutman
6515 Longshore Lp
Suite 100
Dublin, OH 43017
(614) 674-3634
rachel@loevy.com