**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ALAN J. BUTTS,** | : | |
| | : | |
| *Plaintiff,* | : | **Case No. 2:26-cv-00051** |
| | : | |
| v. | : | |
| | : | |
| **CITY OF COLUMBUS,** *et al.*, | : | **Judge Edmund A. Sargus, Jr.** |
| | : | **Magistrate Judge Chelsey M. Vascura** |
| *Defendants.* | : | |

**MOTION FOR JUDGMENT ON THE PLEADINGS OF DEFENDANTS COLUMBUS**
**CHILDREN'S HOSPITAL, DR. JONATHAN GRONER, DR. CHARLES JOHNSON,**
**AND DR. KARLA HAUERSPERGER**

**TABLE OF CONTENTS**

I.      INTRODUCTION...................................................................................................... 1

II.     BACKGROUND .................................................................................................... 3

        A.     J.U.'s Death and Hospital Assessments ................................................. 4

        B.     Plaintiff's Criminal Trial ....................................................................... 6

        C.     Plaintiff's Motions for a New Trial ....................................................... 8

        D.     The Franklin County Court's New Trial Order .............................................. 10

        E.     Plaintiff's Federal Lawsuit..................................................................... 11

III.    LEGAL STANDARD ......................................................................................... 12

IV.    LAW AND ARGUMENT.................................................................................... 13

        A.     Judicial estoppel bars Plaintiff from claiming misconduct by Hospital
             Doctors ................................................................................................. 14

Plaintiff's claims against Dr. Hauersperger, Dr. Johnson, and Dr. Groner (the "Hospital Doctors") and Columbus Children's Hospital (together with Hospital Doctors, the "Hospital Defendants") are barred by the doctrine of judicial estoppel because the doctrine bars Plaintiff from "(1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position 'either as a preliminary matter or as part of a final disposition.'" *Browning v. Levy*, 283 F.3d 761, 775 (6th Cir. 2002).

        1.     Plaintiff's current positions are clearly inconsistent with his
             prior positions............................................................................... 15

In 2019, Plaintiff moved for a new criminal trial on the basis that the scientific consensus around shaken baby syndrome ("SBS") changed significantly, undermining his criminal conviction for murder, which was based on an SBS diagnosis. Plaintiff's new position, that the Hospital Doctors falsified their findings and reports diagnosing the victim with SBS as part of a conspiracy to frame him for murder, is clearly inconsistent with his prior positions that the doctors assessed the victim and testified "honestly" and in accordance with then-existing medical standards of care. *See New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).

        2.     The Franklin County Court indisputably relied on Plaintiff's
             prior position to grant Plaintiff a new trial ......................................... 17

The Franklin County Court granted Plaintiff's Motion for New Trial in express agreement with Plaintiff's core argument that new evidence around SBS "would demand the State's experts in a new trial testify differently than they did during [Plaintiff's] 2003 trial, so a jury could return a different verdict." (New Trial Order, p. 18–19.) Plaintiff thus benefitted from

his prior position that the doctors assessed the victim and testified in accordance with then-existing medical standards of care.

3. **Plaintiff should not be permitted to make assertions contrary to what he alleged in the prior proceedings**........................................... 18

Plaintiff's newfound, inconsistent position that Hospital Doctors fabricated their diagnosis of the victim, when contrasted with the public judicial record of past proceedings, shows Plaintiff is "deliberately changing positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 750. Judicial estoppel is designed to prevent such improper maneuvers. *See, e.g.*, *In re Ohio Execution Protocol Litig.*, No. 2:11-cv-1016, 2016 U.S. Dist. LEXIS 174933, at *45 (S.D. Ohio Dec. 19, 2016) (Sargus, J.); *Williamson v. Recovery Ltd. P'ship*, No. 2:06-CV-292, 2011 U.S. Dist. LEXIS 59584, at *62–72 (S.D. Ohio June 3, 2011) (Sargus, J.).

B. **The Hospital Defendants are immune from civil liability**................................ 19

The Hospital Doctors are immune from Plaintiff's state law claims under state law immunity for mandatory reporters of suspected child abuse and are immune from Plaintiff's federal and state law claims for their testimony at trial.

1. **The Hospital Doctors are immune under state law for following mandatory reporting requirements**....................................... 19

Under Ohio law, physicians and other professionals are mandatory reporters of suspected child abuse. R.C. 2151.421(A)(1)(a)–(b). The same statute affords civil immunity to persons who make or participate in such a report as a result of mandatory reporting obligations and does not impose a requirement of good faith. R.C. 2151.421(H)(1)(a)(i). The Hospital Doctors are thus immune from Plaintiff's state law claims because they reported suspected child abuse to law enforcement as required under state law.

2. **The Hospital Doctors are absolutely immune for their trial testimony**................................................................................................ 20

The Hospital Doctors are immune from civil liability for their testimony and statements or reports prepared for trial because "all witnesses—police officers as well as lay witnesses—are absolutely immune from civil liability based on their trial testimony in judicial proceedings." *Briscoe v. LaHue*, 460 U.S. 325, 328 (1983).

C. **Plaintiff's federal constitutional claims all fail as a matter of law**................. 21

Plaintiff fails to state a claim against the Hospital Defendants under 42 U.S.C. § 1983 for violations of the U.S. Constitution because § 1983 claims cannot be brought against non-state actors, and no exception to this rule applies. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001).

1. **The Hospital Doctors are not state actors as a matter of law**............ 21

The Hospital Doctors are not state actors and thus cannot be liable under § 1983. *See Thomas v. Nationwide Children's Hosp.*, 882 F.3d 608, 612 (6th Cir. 2018). "Private action may still count as state action under discrete circumstances, such as when the State exercises 'coercive power' over the private entity, the State provides 'significant encouragement, either overt or covert' to the private entity, or the private actor operates as a 'willful participant in joint activity with the State or its agents.' *Thomas*, 882 F.3d at 612 (quoting Brentwood *Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)). None of these circumstances is present here.

a.      **The Sixth Circuit firmly rejects Plaintiff's theories of state-actor liability** .......................................................................22

As a matter of law, private doctors at a private hospital are not state actors when they (1) act in accordance with medical standards of care, (2) their actions are not the result of state coercion and were legally authorized without police direction, and (3) act in accordance with mandatory reporting requirements. *Thomas*, 882 F.3d at 612–14.

b.      **Plaintiff's conspiracy claim is insufficiently pleaded and does not provide a basis for state-actor liability** .......................25

Plaintiff's conspiracy claim and allegations also do not state a cognizable state-actor theory of liability under § 1983 because the allegations are facially absurd, are internally inconsistent, contradict Plaintiff's previous positions and court records, and lack factual specificity, and because allegations of fabricated evidence are insufficient to plead state action. *See Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987); *Moldowan v. City of Warren*, 578 F.3d 351, 399 (6th Cir. 2009); *Dressler v. Rice*, 739 F. App'x 814, 823 n.6.

2.      **Plaintiff otherwise fails to state any federal claim under § 1983**........ 28

Plaintiff's additional § 1983 claims also fail because Plaintiff insufficiently pleads a conspiracy claim and fails to sufficiently allege an alternative basis of liability for the Hospital Doctors.

a.      **Deprivation of Right to a Fair Trial**...........................................28

Plaintiff fails to state a claim for deprivation of his right to a fair trial (Count I) because he alleges no independent basis for liability of the Hospital Doctors, other than the conspiracy claim that fails as a matter of law. *See Alexander v. Edwards*, No. 2:25-cv-1168, 2026 LX 46247, at *21 (S.D. Ohio Feb. 9, 2026) (Jolson, M.J.) *adopted and aff'd*, 2026 U.S. Dist. LEXIS 55199 (Watson, J.).

b.      **Malicious Prosecution / Deprivation of Liberty without Probable Cause**...........................................................................28

Plaintiff's allegations as to falsified reports made to frame Plaintiff are barred by judicial estoppel. Regardless, their reports to government officials were due to the mandatory suspected child abuse reporting law, which does not convert them into state actors and does not otherwise

state a claim for malicious prosecution. *See Jackson v. City of Cleveland*, 925 F.3d 793, 820 (6th Cir. 2019); *Thomas*, 882 F.3d at 612–13. Additionally, the Franklin County Court held in its Nolle Prosequi order that there was probable cause to prosecute Plaintiff. (Nolle Prosequi Nunc Pro Tunc Order, p 1.)

c.      Failure to Intervene ....................................................30

No legal basis exists for § 1983 liability of private actors based on a failure to intervene theory. *See Hightower v. City of Columbus*, No. 2:12-cv-437, 2013 U.S. Dist. LEXIS 159681, at *39 (S.D. Ohio Nov. 7, 2013).

D.      **Plaintiff's state law claims all fail as a matter of law**....................................... 30

Plaintiff's state law claims for IIED (Count VI) and the dependent *respondeat superior* claim against the Hospital (Count VII) fail as barred by judicial estoppel, on statute of limitations grounds, and as otherwise insufficiently plead.

1.      **Judicial estoppel bars Plaintiff's state law claims**................................ 30

Plaintiff's state law claims are barred by the doctrine of judicial estoppel because Plaintiff cannot claim IIED on the basis that the Hospital Doctors fabricated reports to frame him for murder.

2.      **Plaintiff's IIED claims are barred by the statute of limitations**......... 31

Plaintiff's state law claims are barred because Plaintiff's IIED claims actually sound in a state law claim for malicious prosecution, and the statute of limitations for such a claim expired nearly one year ago. *See Templeton v. Brandt*, No. 1:20-cv-34, 2021 U.S. Dist. LEXIS 67328, at *23 (S.D. Ohio Apr. 7, 2021) (Cole, J.); *Lee v. Lucas*, No. 1:10-cv-151, 2011 U.S. Dist. LEXIS 125756, 2011 WL 5361509, at *4 (N.D. Ohio Oct. 31, 2011); *Ayers v. City of Cleveland*, No. 1:12-cv-753, 2013 U.S. Dist. LEXIS 25992, at *44 (N.D. Ohio Feb. 25, 2013).

3.      **Even if Plaintiff's state law claims are not barred, he fails to plead IIED**.............................................................................................. 34

Plaintiff's allegations as to the Hospital Doctors are insufficient to plead extreme and outrageous conduct. *See Kanu v. Univ. of Cincinnati*, 2018-Ohio-4969, ¶ 13 (10th Dist.); *Dunina v. Stemple*, 2008-Ohio-2064, ¶ 14 (2d Dist.).

V.    **CONCLUSION** ...................................................................................................... 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Edwards*,
 No. 2:25-cv-1168, 2026 U.S. Dist. LEXIS 26201 (S.D. Ohio Feb. 9, 2026) ........................28

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009).................................................................................................................12

*Ayers v. City of Cleveland*,
 No. 1:12-cv-753, 2013 U.S. Dist. LEXIS 25992 (N.D. Ohio Feb. 25, 2013)....................32, 33

*Barany-Snyder v. Weiner*,
 539 F.3d 327 (6th Cir. 2008) ..................................................................................................12

*Barbara Mills v. City of Westlake*,
 2016-Ohio-5836 (8th Dist.) .....................................................................................................31

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007).................................................................................................................12

*Blue v. Lane*,
 767 F. Supp. 2d 860 (S.D. Ohio 2011) ....................................................................................25

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
 531 U.S. 288, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001).........................................................21

*Briscoe v. LaHue*,
 460 U.S. 325 (1983).................................................................................................................20

*Browning v. Levy*,
 283 F.3d 761 (6th Cir. 2002) ...................................................................................................14

*Buck v. Thomas M. Cooley Law Sch.*,
 597 F.3d 812 (6th Cir. 2010) .................................................................................3, 12, 22, 23

*Commer. Money Ctr., Inc. v. Ill. Union Ins. Co.*,
 508 F.3d 327 (6th Cir. 2007) .............................................................................................3, 13

*Dressler v. Rice*,
 739 F. App'x 814 (6th Cir. 2018) ............................................................................................26

*Dunina v. Stemple*,
 2008-Ohio-2064 (2d Dist.)......................................................................................................35

*Felder v. Casey*,
 487 U.S. 131 (1988) ................................................................................................19

*Georgin v. Georgin*,
 2022-Ohio-4328 (12th Dist.) ..................................................................................35

*Gillispie v. City of Miami Twp.*,
 No. 3:13-cv-416, 2020 U.S. Dist. LEXIS 172735 (S.D. Ohio Sept. 21, 2020) .......26

*Gutierrez v. Lynch*,
 826 F.2d 1534 (6th Cir. 1987) .................................................................................25

*Han v. Hankook Tire Co.*,
 799 F. App'x 347 (6th Cir. 2020) .............................................................................13

*Hardie v. Shady Hollow Country Club*,
 No. 1995CA00298, 1996 Ohio App. LEXIS 2956 (5th Dist. June 17, 1996) .........35

*Heyne v. Metro. Nashville Pub. Sch.*,
 655 F.3d 556 (6th Cir. 2011) ..................................................................................25

*Hightower v. City of Columbus*,
 No. 2:12-cv-437, 2013 U.S. Dist. LEXIS 159681 (S.D. Ohio Nov. 7, 2013) .........30

*Hooks v. Hooks*,
 771 F.2d 935 (6th Cir. 1985) ..................................................................................25

*Jackson v. City of Cleveland*,
 925 F.3d 793 (6th Cir. 2019) ..................................................................................29

*Jackson v. Metro. Edison Co.*,
 419 U.S. 345, 95 S. Ct. 449, 42 L. Ed. 2d 477 (1974) ............................................21

*Jiangbo Zhou v. Lincoln Elec. Co.*,
 No. 1:20-cv-00018, 2020 U.S. Dist. LEXIS 85796 (S.D. Ohio May 15, 2020) ..................4, 12

*Kanu v. Univ. of Cincinnati*,
 2018-Ohio-4969 (10th Dist.) ..................................................................................34

*Lee v. Lucas*,
 No. 1:10-cv-151, 2011 U.S. Dist. LEXIS 125756 (N.D. Ohio Oct. 31, 2011) ..................31, 32

*Liedtke v. Carrington*,
 145 Ohio App. 3d 396 (8th Dist. 2001) ..................................................................19

*Lorillard Tobacco Co. v. Chester, Willcox & Saxbe, LLP*,
 546 F.3d 752 (6th Cir. 2008) ..................................................................................14

*Marie v. Am. Red Cross*,
　771 F.3d 344 (6th Cir. 2014) .................................................................................22

*Memphis, Tenn. Area Local, Am. Postal Workers Union, AFL-CIO v. City of
　Memphis*,
　361 F.3d 898 (6th Cir. 2004) .................................................................................25

*Mendlovic v. Life Line Screening of Am., Ltd.*,
　2007-Ohio-4674 (8th Dist.) ...................................................................................34

*Mills v. Barnard*,
　869 F.3d 473 (6th Cir. 2017) .................................................................................29

*Moldowan v. City of Warren*,
　578 F.3d 351 (6th Cir. 2009) .....................................................................20, 24, 26

*Morrow v. Reminger & Reminger Co. LPA*,
　2009-Ohio-2665 (10th Dist.) .................................................................................34

*Neterkeht v. Longworth*,
　No. 1:12-cv-695, 2013 U.S. Dist. LEXIS 99788 (S.D. Ohio July 17, 2013)
　(Litkovitz, M.J.), *adopted and affirmed*, 2013 U.S. Dist. LEXIS 114097 (S.D.
　Ohio Aug. 13, 2013) (Dlott, J.)..............................................................................27

*New Hampshire v. Maine*,
　532 U.S. 742 (2001).................................................................................14, 17, 18

*Obermeyer v. McDonough*,
　No. 1:23-cv-711, 2024 U.S. Dist. LEXIS 149621 (S.D. Ohio Aug. 21, 2024) .......................12

*In re Ohio Execution Protocol Litig.*,
　No. 2:11-cv-1016, 2016 U.S. Dist. LEXIS 174933 (S.D. Ohio Dec. 19, 2016)
　(Sargus, J.) ...........................................................................................................18

*Perkins v. Lavin*,
　98 Ohio App. 3d 378..............................................................................................34

*Pierce v. Fordham Univ., Inc.*,
　2016 U.S. Dist. LEXIS 71322, 2016 WL 3093994 (S.D.N.Y June 1, 2016) ...........................4

*Roe v. Amazon.com*,
　170 F. Supp. 3d 1028 (S.D. Ohio 2016) ............................................................3, 13

*Ross v. PennyMac Loan Servs. LLC*,
　761 F. App'x 491 (6th Cir. 2019) ...........................................................................12

*Sensations, Inc. v. City of Grand Rapids*,
　526 F.3d 291 (6th Cir. 2008) .................................................................................12

*Spurlock v. Satterfield*,
    167 F.3d 995 (6th Cir. 1999) ........................................................................20

*Stakich v. Russo*,
    2021-Ohio-1098 (8th Dist.) ........................................................................34

*State v. Butts*,
    2023-Ohio-2670 (10th Dist.) .................................................................. *passim*

*State v. Butts*,
    No. 03AP-495, 2004-Ohio-1136 (10th Dist.) ...................................................3, 5, 7

*State v. Butts*,
    No. 22AP-763 (10th Dist. Dec. 14, 2022) .......................................................7, 9

*Templeton v. Brandt*,
    No. 1:20-cv-34, 2021 U.S. Dist. LEXIS 67328 (S.D. Ohio Apr. 7, 2021)
    (Cole, J.)..................................................................................31, 33

*Thomas v. Nationwide Children's Hosp.*,
    882 F.3d 608 (6th Cir. 2018) ................................................................ *passim*

*Thomas v. Nationwide Children's Hosp.*,
    No. 2:14-cv-01236, 2017 U.S. Dist. LEXIS 79115 (S.D. Ohio May 19, 2017)
    (Sargus, J.) ...............................................................................22

*Watkins v. Columbus City Schs.*,
    No. 2:19-cv-394, 2020 U.S. Dist. LEXIS 47119 (S.D. Ohio Mar. 18, 2020)
    (Sargus, J.) ...............................................................................12

*Wenk v. O'Reilly*,
    783 F.3d 585 (6th Cir. 2015) ........................................................................19

*Weser v. Goodson*,
    965 F.3d 507 (6th Cir. 2020) ....................................................................24, 26

*White v. Sheridan*,
    2022-Ohio-2418 (10th Dist.) ........................................................................33

*Williamson v. Recovery Ltd. P'ship*,
    No. 2:06-CV-292, 2011 U.S. Dist. LEXIS 59584 (S.D. Ohio June 3, 2011)
    (Sargus, J.) ...............................................................................19

*Yeager v. Local Union 20, Teamsters*,
    6 Ohio St.3d 369 (1983)..............................................................................34

**Statutes**

42 U.S.C. § 1983 ................................................................................................................. *passim*

R.C. § 2151.421 ..............................................................................................................6, 24

R.C. § 2151.421(A)(1)(a) ........................................................................................................6

R.C. § 2151.421(A)(1)(b) ......................................................................................................19

R.C. § 2151.421(H)(1)(a)(i) ..................................................................................................19

R.C. § 2151.421(H)(1)(b) ......................................................................................................20

R.C. § 2305.113(A) ................................................................................................................33

R.C. § 2305.113(C) ................................................................................................................33

**Rules**

Fed. R. Civ. P. 7(a) ..................................................................................................................3

Fed. R. Civ. P. 10(c) ..........................................................................................................3, 13

Fed. R. Civ. P. 12(b)(6) ..........................................................................................................12

Fed. R. Civ. P. 12(c) .................................................................................................2, 3, 12, 36

**Constitutional Authorities**

U.S. Const. amend.  IV ...........................................................................................................21

U.S. Const. amend. VI ............................................................................................................33

U.S. Const. amend. XIV ..............................................................................................21, 22, 28

## I.    INTRODUCTION

In March 2003, a Franklin County Ohio Court of Common Pleas jury convicted Plaintiff Alan Butts of murdering his girlfriend's two-year-old child, J.U., by violent shaking. At the time, the scientific and medical consensus on "shaken baby syndrome" ("SBS"), now known as "abusive head trauma" ("AHT"), was clear: a triad of symptoms (retinal hemorrhage, subdural hemorrhage, and cerebral edema) "was, as a matter of science, diagnostic of death caused by SBS." *State v. Butts*, 2023-Ohio-2670, at ¶ 45 (10th Dist.). Over the next two decades, that medical and scientific consensus changed. *Id.* at ¶ 11. Now, there is debate over whether injuries like J.U.'s are diagnostic of AHT. And, unlike in 2003, it is now within the generally accepted medical standard of care to eliminate the possibility of non-abuse causes of similar injuries. *Id.*

In 2023, the Franklin County Court of Common Pleas granted Plaintiff a new criminal trial expressly and exclusively based on his argument that this new scientific understanding of AHT undermined Plaintiff's conviction. (*See* New Trial Order, attached to the Hospital Defendants' Answer as Exhibit 2.) The Franklin County Prosecutor then chose not to re-prosecute Plaintiff, and he was released after spending 20 years in prison. (*See Nolle Prosequi* Nunc Pro Tunc Order, attached to the Hospital Defendants' Answer as Exhibit 3.) No court has ever declared him "exonerated."

Plaintiff now seeks monetary compensation—through baseless constitutional claims and allegations directly contradicted by Plaintiff's previous positions—for what he believes was a wrongful conviction due to the change in medical standards in the past few decades. He brings federal constitutional claims against Columbus Children's Hospital ("Hospital"),[1] Dr. Jonathan

---

[1] The Complaint improperly named as a defendant the entity "Columbus Children's Hospital," the prior corporate name of the relevant hospital entity before 2008. The undersigned counsel appeared

Groner, Dr. Charles Johnson, and Dr. Karla Hauersperger (the Doctors together, the "Hospital Doctors") (together with the Hospital, the "Hospital Defendants"), on an absurd conspiracy theory. Despite contrary earlier representations, Plaintiff now claims that the Hospital Doctors somehow *knew* about, or should have predicted, the *newly discovered* scientific evidence around SBS/AHT back in 2003 (decades before the standard changed in approximately 2018), knowingly manufactured a false SBS diagnosis for J.U. and testified accordingly, and conspired with the City of Columbus ("City") and Franklin County ("County") to frame Plaintiff for murder.

This logical inconsistency twists itself into knots that cannot survive Rule 12(c) scrutiny. Plaintiff is barred by judicial estoppel and common sense from arguing that the Hospital Doctors maliciously conspired 20 years ago to ignore and defy scientific evidence *that he admits did not yet exist* in 2003. This judicial estoppel should end the Court's analysis and the case. But even setting aside the fact that Plaintiff is judicially estopped from making such arguments, as a matter of law, Plaintiff's constitutional claims against the Hospital Defendants must fail because they are not state actors under clear Sixth Circuit authority and because the Hospital Doctors' testimonies are protected by absolute witness privilege. Plaintiff's state law claims of IIED and *respondeat superior* fail for similar reasons and because they are barred by the statute of limitations.

Simply put, the Hospital Defendants did not violate the U.S. Constitution by following the consensus medical standard of care at the time of J.U.'s death. The Hospital Defendants respectfully move this Court for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) and ask this Court to dismiss <u>with</u> prejudice all of Plaintiff's claims against them.

---

on behalf of this entity, which is actually named Nationwide Children's Hospital ("NCH"). NCH expressly preserves and does not waive its ability to challenge its inclusion in this litigation on the basis of this faulty pleading.

## II.    BACKGROUND

The background of this case is documented extensively in Ohio Tenth District Court of Appeals' decisions regarding Plaintiff's criminal trial and the grant of a new trial. *See State v. Butts*, No. 03AP-495, 2004-Ohio-1136 (10th Dist.) (direct appeal, "*Butts I*"); *State v. Butts*, No. 22AP-763, 2023-Ohio-2670 (10th Dist.) (appeal of decision granting new trial, "*Butts II*"). Although the background below relies primarily on the allegations of the Complaint (ECF No. 1), the Tenth District cases are incorporated where relevant and important. Because these judicial decisions are public records of court proceedings that are central to the Complaint, the Court can consider them to decide this Motion, both as relevant judicial records and as part of the pleadings. *Buck v. Thomas M. Cooley Law Sch.*, 597 F.3d 812, 816 (6th Cir. 2010) ("Although typically courts are limited to the pleadings when faced with a motion under [to dismiss], a court may take judicial notice of other court proceedings without converting the motion into one for summary judgment."). The same is true for relevant public records of Plaintiff's state court proceedings that are attached as exhibits to the Hospital Defendants' Answer. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *Roe v. Amazon.com*, 170 F. Supp. 3d 1028, 1032 (S.D. Ohio 2016) ("In considering a motion for judgment on the pleadings, a court considers the pleadings, which consist of the complaint, the answer, and any written instruments attached as exhibits." (citing Fed. R. Civ. P. 12(c); Fed. R. Civ. P. 7(a); Fed. R. Civ. P. 10(c))); *Commer. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007) ("A court may consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment.").

-3-

### A. J.U.'s Death and Hospital Assessments

On February 13, 2002, Plaintiff was watching his girlfriend's two-year-old son, J.U. (Compl., ECF No. 1 at PageID 3, ¶ 6.) Plaintiff alleges J.U. fell suddenly and admits to "gently" shaking him after the fall. (*Id.* at 6, ¶¶ 24–26.) Plaintiff called 911, and police and paramedics arrived. (*Id.* at 6–7, ¶¶ 26–27, 31.) J.U. had no heartbeat, and efforts to revive him were unsuccessful. (*Id.* at 7, ¶ 31.) He was placed on life support and transported to what was then called Columbus Children's Hospital. (*Id.* at ¶ 35.)

At the Hospital, Defendant Dr. Karla Hauersperger assumed emergency care over J.U. (*Id.* at 11, ¶ 52.) She "ordered a CAT scan and found J.U. had retinal hemorrhages, bleeding around the brain, and brain swelling." (*Id.* at 11, ¶ 53.) Accordingly, she concluded J.U. "sustained a non-accidental head injury, most consistent with shaken baby syndrome." (*Id.*) Plaintiff alleges she reached this conclusion "without considering J.U.'s medical history" and "without diagnostic testing." (*Id.*) Plaintiff also alleges, however, that Dr. Hauersperger ordered scans and considered medical history provided by the paramedics.[2] (*Id.* at 11, ¶¶ 53–54.) Plaintiff also alleges Dr. Hauersperger was "aware, at the time, of alternate causes of the injuries and of research and scientific papers that questioned the validity of such findings in regard to shaken baby syndrome." (*Id.* at 11, ¶ 53.) Plaintiff is barred by judicial estoppel from making these and similar assertions, as explained later in this Motion.

---

[2] Given these inconsistencies in Plaintiff's pleading, this Court need not accept those assertions as true because they contradict Plaintiff's other assertions. "It is well established that, where a plaintiff's own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss." *Jiangbo Zhou v. Lincoln Elec. Co.*, No. 1:20-cv-00018, 2020 U.S. Dist. LEXIS 85796, at *11 (S.D. Ohio May 15, 2020) (quoting in parenthetical, *Pierce v. Fordham Univ., Inc.*, 2016 U.S. Dist. LEXIS 71322, 2016 WL 3093994, at *2 n.1 (S.D.N.Y June 1, 2016)).

Based on the findings of retinal and subdural hemorrhages, consulting physician Dr. Charles Johnson also concluded J.U.'s injuries were the result of a non-accidental head injury. (*Id.* at 12, ¶ 57.) According to Plaintiff, Dr. Johnson then allegedly informed a City Police Officer about his findings, "knowing there were other possible causes of J.U.'s injuries." (*Id.* at 12, ¶ 58.)

Dr. Groner reviewed J.U.'s care records and concluded J.U.'s "principal" diagnosis was SBS. (*Id.* at 12, ¶ 59.) There is no allegation Dr. Groner knew about J.U.'s "history of repeated falls" and other alleged history, but Plaintiff nonetheless claims he should have considered such facts. (*Id.*) Plaintiff also alleges Dr. Groner did not "rul[e] out other potential causes of J.U.'s injuries," (*id.*), but Dr. Groner's trial court testimony directly contradicts that allegation. *See Butts I*, 2004-Ohio-1136, at ¶ 9 ("Dr. Groner testified that [J.U.'s] injuries to his brain as seen on his CT scan and injuries to his eyes are not consistent with a fall from standing height.").

Plaintiff further alleges that the Hospital Doctors "understood their reports were to assist with" the criminal investigation of Plaintiff. (Compl., ECF No. 1 at PageID 14, ¶ 66.) And yet at the same time, Plaintiff's Complaint also expressly contradicts this baseless assertion, to wit: Plaintiff also alleges that Dr. McManus (who is deceased and not a defendant here) and Dr. Hauersperger informed detectives of their findings **before City Police Officers began an investigation** (*id.* at 8, 11, ¶¶ 39, 53), not the other way around.

There is no specific factual allegation that any government official ordered, directed, or even requested the Hospital Doctors' medical reviews or the findings of SBS. Rather, as Plaintiff himself stated in prior judicial proceedings, "Dr. Johnson, Dr. Groner, and Dr. Fardal,[3] all testified honestly, credibly, and consistently with the then-existing scientific standards adopted by both [the American Academy of Pediatrics] and [National Association of Medical Examiners], and in

---

[3] Dr. Fardal is a named defendant and was the Deputy Franklin County Coroner at the time.

accordance with the then scientifically prevalent view." (New Trial Mot., attached to the Hospital Defendants' Answer as Exhibit 1, p. 29.) Plaintiff further admitted the Hospital Doctors all diagnosed J.U. and testified "consistent with the then-prevailing medical standards, that [J.U.]'s death was caused by SBS." (*Id.* at p. 20.) Only after following then-existing medical standards of care did the Hospital Defendants suspect child abuse. These suspicions led the physicians to notify government officials about their suspicions, as required under Ohio's mandatory child abuse reporting statute.[4]

Plaintiff now further claims the Hospital Defendants' reports were fabricated because, at the time of J.U.'s death, "various studies had debunked the exact fabricated conclusions drawn by Defendant Physicians," and the Hospital Defendants knew or should have known about these studies and alternative causation theories of SBS-related symptoms. (Compl., ECF No. 1 at PageID 15–16, ¶¶ 69–72.) But as described below, Plaintiff is precluded from relying on such speculative allegations because the entire basis of Plaintiff's successful motion for a new trial was that such evidence was *newly discovered* decades after his conviction and that the Hospital Doctors followed the accepted standards of care at the time regarding the SBS triad of symptoms. Further, Plaintiff directly relied upon his previous admission that the Hospital Doctors all "honestly" diagnosed J.U. in accordance with then-existing standard of care. (*See, e.g.*, New Trial Mot., pp. 2, 17, 20, 29.)

### B.      Plaintiff's Criminal Trial

On February 21, 2002, Plaintiff was indicted on five counts, including murder. (Compl., ECF No. 1 at PageID 16, ¶ 76.) After five days of trial, a jury convicted him of all five counts in

---

[4] R.C. 2151.421 requires attorneys, health care professionals, school psychologists, family therapists, coroners, camp counselors, teachers, government employees, and other professionals to report reasonable suspicions of past or threatened physical abuse of a minor, among other requirements. R.C. 2151.421(A)(1)(a)–(b).

2003. *Butts I*, 2004-Ohio-1136, at ¶ 1. At Plaintiff's trial, Dr. Johnson testified about the medical science supporting his conclusion that J.U.'s death was the result of shaking rather than falling to the floor or the cumulative effect of repeated falls. *Id.* at ¶¶ 7–8 (*see* Trial Transcript Excerpts,[5] attached to the Hospital Defendants' Answer as Exhibit 4, at pp. 158–246.) Dr. Groner testified that J.U.'s injuries were not consistent with a fall from standing height, his injuries would have been immediately incapacitating, and several falls could not have caused J.U.'s optical nerve or retinal hemorrhages. *Butts I*, 2004-Ohio-1136, at ¶ 9; (*see* Trial Transcript Excerpts, at pp. 246–81.) Dr. Hauersperger testified about her findings based on the CAT scan and her conclusion that J.U.'s injuries were most consistent with SBS rather than a history of slips and falls. *Butts I*, 2004-Ohio-1136, at ¶ 10; (*see* Trial Transcript Excerpts, at pp. 314–27.) Again, Plaintiff has previously admitted all three witnesses testified "honestly" at his criminal trial in 2003. (New Trial Mot., p. 17.)

Plaintiff's medical witness at trial, Dr. John Plunkett, testified that he did not think J.U. died of SBS. *Butts I*, 2004-Ohio-1136, at ¶ 16. He "admitted that his opinion is contrary to what has been taught in medical schools since 1972, is contrary to the views of the American Pediatric Academy and that an overwhelming majority of pediatricians disagree with his opinion." *Id.* at ¶ 17. The Tenth District Court of Appeals affirmed Plaintiff's conviction on direct appeal, finding "[i]t is not unusual that evidence of shaken baby syndrome may be primarily circumstantial, especially where a child is in the sole custody of one adult at the time the injuries are sustained." *Id.* at ¶ 29.

---

[5] The full transcript is available upon request and can be accessed publicly on the electronic docket of the Tenth District Court of Appeals in the *Butts II* case. *See* Ex. H Trial Transcripts, *State v. Butts*, No. 22AP-763 (10th Dist. Dec. 14, 2022).

### C. Plaintiff's Motions for a New Trial

In April 2019, Plaintiff filed a Motion for Leave to File Delayed Motion for New Trial ("New Trial Motion") based on newly discovered evidence regarding the SBS triad of symptoms. *Butts II*, 2023-Ohio-2670, at ¶ 7. "[Plaintiff] argued that, in the 16 years since his trial, there have been significant developments in the medical community concerning the diagnosis of SBS" that "constitute new evidence that could not have been, with reasonable diligence, discovered at the time of his trial or 120 days after the verdict was rendered." *Id.* At an evidentiary hearing in May 2021, Plaintiff presented expert medical witnesses who testified that "at the time of Mr. Butts's [2003] trial, there was not a significant debate in the medical community regarding whether J.U.'s injuries were necessarily diagnostic of intentional shaking (*i.e.*, SBS). Therefore, possible alternative, non-intentional causes for the injuries resulting in J.U.'s death were not thoroughly considered (*or even known about*) in 2002/2003." *Id.* at ¶ 9 (emphasis added). As the Tenth District summarized the evidence presented at the hearing on Plaintiff's motion for a new trial:

> In stark contrast to 2003, however, there is now a significant debate in the medical community as to whether injuries like J.U.'s are necessarily diagnostic of intentional shaking. (Citations omitted). Moreover, new scientific evidence has expanded the differential diagnosis applicable to J.U.'s injuries. Thus, the medical community's literature and guidance pertaining to the diagnosis of SBS (now referred to as AHT) has changed significantly since Mr. Butts's 2003 trial. It is now the standard practice for medical providers to eliminate the possibility of non-abuse causes of injuries mimicking those believed to be diagnostic of SBS before diagnosing a patient with SBS (now AHT). *This was not the standard practice in 2003 because the medical community's knowledge about the cause of injuries typically observed in SBS cases was significantly more limited than it is today*.
>
> Indeed, Dr. Frasier (the state's proffered expert) conceded that in the years following Mr. Butts's trial, standards and guidance from key organizations— including the American Academy of Pediatrics ("AAP")—about diagnosing SBS (or AHT) *significantly changed* from those that existed in 2002/2003.

*Id.* at ¶¶ 11–12 (emphases added).

As the Franklin County Court explained, "[k]ey to Defendant's argument [for a new trial] [was] the *Consensus Statement on Abusive Head Trauma in Infants and Young Children* (the '2018 Consensus Statement')," which was endorsed by the AAP. (New Trial Order, p. 17.) "The 2018 Consensus Statement advises that, in suspected cases of AHT, a workup must exclude medical disease that can mimic AHT and alternative diagnoses ***must*** be considered before diagnosis of AHT as the cause of injuries believed in 2002/2003 to be virtually unique to intentional shaking." *Butts II*, 2023-Ohio-2670, at ¶ 50 (emphasis in original). To demonstrate the contrast between the drastically changed 2018, and later, new consensus and the old "consensus view through the time of [Plaintiff's] trial," Plaintiff quoted in his Motions for New Trial from *The Third National Conference on Shaken Baby Syndrome: Executive Summary* from 2001, which stated:

> Often referred to as the 'triad,' the consensus continues to be that a collection of (1) damage to the brain, evidenced by severe brain swelling and/or diffuse traumatic axonal injury; (2) bleeding under the membranes which cover the brain, usually subdural and/or subarachnoid bleeding; and, (3) bleeding in the layers of the retina, often accompanied by other ocular damage, when seen in young children or infants, *is virtually diagnostic of severe, whiplash shaking of the head*."

(New Trial Mot., p. 20 (emphasis in original).)

At the May 2021 evidentiary hearing for a new trial, Plaintiff argued "**the trial that took place 20 years ago was the only trial that could take place, given the state of medical science at the time that it occurred**." (New Trial Hearing Transcript Excerpts, attached to the Hospital Defendants' Answer as Exhibit 5,[6] at 16:10–16 (emphasis added).) Plaintiff asked his neuropathologist expert, Dr. Roland Auer, whether Dr. Johnson's trial court testimony in 2003 was "within the mainstream of medical thought" and "generally accepted in the medical community at

---

[6] The full transcript is available upon request and can be accessed publicly on the electronic docket of the Tenth District Court of Appeals in the *Butts II* case. *See* Ex. E Hearing Transcripts, *State v. Butts*, No. 22AP-763 (10th Dist. Dec. 14, 2022).

the time he gave it," to which Dr. Auer responded, "Yes. In 2003 that would have been generally accepted." (*Id.* at 222:16–223:5.) In closing argument, Plaintiff argued, "Unlike 20 years ago, the AAP makes it clear you can't simply look at that triad [of subdural hematoma, swelling of the brain, and retinal hemorrhages] and say abuse." (*Id.* at 767:16–18.)

As Plaintiff explained in his Motions for New Trial, the fringe views of Plaintiff's expert witness at trial in 2003, Dr. Plunkett, "were contrary to the official position of both AAP and [National Association of Medical Examiners] in their 2001 position papers and *[were] accepted by virtually no one in the scientific or medical community*." (New Trial Mot., pp. 8–9.) As Plaintiff further argued (quoting Dr. Auer), "the evidence supporting his motion and a new trial—namely, the shift in understanding of the mechanisms of pediatric injury and death from SBS/AHT—*was not available and could not have been discovered at the time of trial in 2003*." (*Id.*) Maintaining his innocence, and in stark contrast to his current pleading, Plaintiff argued that "based on mistaken literature of early 2003, the state's experts testified honestly but wrongly. Although that testimony was wrong, it was the then-generally accepted view." (*Id.* at p. 17.)

### D. The Franklin County Court's New Trial Order.

In November 2022, after the six-day evidentiary hearing in May 2021, the Franklin County Court granted Plaintiff's Motion for Leave to File Delayed Motion for New Trial and Motion for New Trial in express reliance on Plaintiff's arguments that the science around SBS/AHT had changed drastically since his criminal trial. (New Trial Order, p. 1.) That Court held:

> It is clear to the Court . . . that the medical community consensus differs drastically than that which existed at the time of Defendant's trial. . . . [T]his shift in the medical community's understanding—and thus the evidence in support of Defendant's quest for a new trial—did not begin to occur until well after the verdict[.]

(*Id.* at p. 20.) The Court also found that "[t]he medical tests and images of [J.U.'s] injuries have been available since the time of trial. But more accurate diagnostic analyses of this evidence under new medical community accepted standards was not [] available until recently." (*Id.* at p. 23.) The Court expressly relied on Plaintiff's evidence and arguments that "the shift in understanding of the mechanisms of pediatric injury and death from SBS/AHT [] was not available and could not have been discovered at the time of trial in 2003." (*Id.* at p. 19–20.)

Plaintiff's Motions for New Trial were granted on November 10, 2022. *Butts II*, 2023-Ohio-2670, at ¶ 14. On August 1, 2023, the Tenth District Court of Appeals affirmed the trial court's decision to grant a new trial. *Id.* at ¶ 102. On February 12, 2024, the Court entered a *Nolle Prosequi* order at the request of the State of Ohio, updated via a nunc pro tunc order on February 13, 2024. (*Nolle Prosequi* Nunc Pro Tunc Order, p. 1.) The Franklin County Court "[found] that the indictment in this case ***was supported by probable cause based on evidence that existed at the time*** and that based on the evidence known at this time, the state and law enforcement ***engaged in no misconduct and prosecuted this case in good faith***." (*Id.* (emphases added).)

### E.      Plaintiff's Federal Lawsuit

Despite the Franklin County Court's clear findings that (1) the criminal case against Plaintiff was supported by probable cause and (2) that there was no misconduct in prosecuting the case, Plaintiff now brings this federal constitutional action against the Hospital Defendants, the City of Columbus, Franklin County, and individual government officials. (Compl., ECF No. 1.) For the reasons argued below, Hospital Defendants respectfully move for judgment on the pleadings as to all federal constitutional claims (Counts I through IV), the state law intentional infliction of emotional distress ("IIED") claim (Count VI) raised against Hospital Doctors, and the

-11-

*respondeat superior* claim raised against Columbus Children's Hospital (Count VII). Count V is a *Monell* claim that is not raised against the Hospital Defendants.

## III. LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The standard of review for a Rule 12(c) motion for judgment on the pleadings is identical to the standard for a motion to dismiss under Rule 12(b)(6). *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008). Although a court must take proper factual allegations in the complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (internal quotations omitted). The Court also need not accept as true internally inconsistent or contradictory factual allegations. *See Jiangbo Zhou*, 2020 U.S. Dist. LEXIS 85796, at *11. Further, "[t]o withstand a Rule 12(c) motion for judgment on the pleadings, a complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory." *Barany-Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008) (internal quotations and citation omitted). A district court properly dismisses a claim when the complaint "fail[s] to state a claim upon which relief can be granted." *Obermeyer v. McDonough*, No. 1:23-cv-711, 2024 U.S. Dist. LEXIS 149621, at *11 (S.D. Ohio Aug. 21, 2024).

"A court considering a motion for judgment on the pleadings considers the pleadings and the exhibits attached thereto." *Ross v. PennyMac Loan Servs. LLC*, 761 F. App'x 491, 494 (6th Cir. 2019). Importantly, "a court may take judicial notice of other court proceedings without converting the motion into one for summary judgment." *Buck*, 597 F.3d at 816; *see Watkins v. Columbus City Schs.*, No. 2:19-cv-394, 2020 U.S. Dist. LEXIS 47119, at *13 (S.D. Ohio Mar. 18,

2020) (Sargus, J.) ("Plaintiff's personnel file as well as the records from his termination proceedings and appeal are considered public record and therefore, the Court may consider them when ruling on the motions for judgment on the pleadings without converting them into summary-judgment motions."); *see also* Fed. R. Civ. P. 10(c)); *Roe*, 170 F. Supp. 3d at 1032; *Commer. Money Ctr., Inc.*, 508 F.3d at 336.

## IV.  LAW AND ARGUMENT

All claims against the Hospital Defendants fail as a matter of law for at least four reasons. First, under the doctrine of judicial estoppel, Plaintiff is barred from alleging that the Hospital Doctors fabricated their diagnoses and reports or engaged in any other misconduct because those allegations are entirely in conflict with Plaintiff's own voluminous, repeated, and consistent arguments that lead to the *Nolle Prosequi* order in the criminal matter. The Court should dismiss all claims against the Hospital Defendants on that basis alone. Second, to the extent any claims survive application of this doctrine (they should not), the Hospital Defendants are not state actors and thus cannot be liable for federal constitutional claims under 42 U.S.C. § 1983. Third, Plaintiff's state law claims (which sound in malicious prosecution or medical malpractice rather than IIED) are insufficiently pled. Fourth, Plaintiff's state law claims are barred by the statute of limitations. Each of these arguments are independently dispositive of Plaintiff's claims. All Plaintiff's claims against the Hospital Defendants should be dismissed <u>with</u> prejudice.[7]

---

[7] Dismissal with prejudice is appropriate here because Plaintiff's allegations of a conspiracy to frame him for murder based on a "fabricated" SBS diagnosis are completely delegitimized by, and fundamentally incompatible with, his prior positions in the Franklin County Court that Hospital Doctors "honestly" diagnosed J.U. in accordance with then-existing standards of care. *Han v. Hankook Tire Co.*, 799 F. App'x 347, 350 (6th Cir. 2020) (affirming dismissal of all plaintiff's claims with prejudice based on judicial estoppel at the pleadings stage because "the application of judicial estoppel [went] directly to the merits of [the plaintiff's] claims").

A.      **Judicial estoppel bars Plaintiff from claiming misconduct by Hospital Doctors.**

Plaintiff essentially alleges that the Hospital Doctors "falsely" diagnosed J.U. with SBS as part of a conspiracy to frame him for murder, in direct contradiction to his prior position that the diagnosis was a genuine and honest application of then-existing scientific medical standards of care. (*See* Compl., ECF No. 1 at PageID 11–16, 19, 21, 23, ¶¶ 53, 57, 59, 66, 67, 70–71, 72, 99, 108, 122.) Plaintiff's new version of the facts *directly* contradicts the version that Plaintiff used in his Motions for New Trial, which the Franklin County Court relied upon to grant Plaintiff a new trial. Thus, Plaintiff's new allegations are as procedurally improper as they are absurd on their face, and Plaintiff's Complaint does not warrant any inferences in his favor. Applying judicial estoppel, this Court should dismiss all Plaintiff's claims with prejudice.

"The doctrine of judicial estoppel bars a party from (1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position 'either as a preliminary matter or as part of a final disposition.'" *Browning v. Levy*, 283 F.3d 761, 775 (6th Cir. 2002) (quotation omitted). "Although there is no set formula for assessing when judicial estoppel should apply, it is well-established that at a minimum, a party's later position must be clearly inconsistent with its earlier position . . . ." *Lorillard Tobacco Co. v. Chester, Willcox & Saxbe, LLP*, 546 F.3d 752, 757 (6th Cir. 2008) (citations and quotations omitted). "A court should also consider whether the party has gained an unfair advantage from the court's adoption of its earlier inconsistent statement." *Id.* (citing *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)).

Applying these factors, judicial estoppel clearly bars Plaintiff from asserting that Hospital Defendants falsified their medical findings to frame Plaintiff in contradiction to his previous position that Hospital Doctors "honestly" applied the then-existing medical standards of care

-14-

regarding SBS/AHT. (*See* New Trial Mot., pp. 17, 20, 29.) Likewise, Plaintiff's admission that the medical standard of care has changed precludes Plaintiff from arguing that the Hospital Doctors engaged in misconduct by following the then-applicable standard of care.

### 1. Plaintiff's current positions are clearly inconsistent with his prior positions.

In his Motions for New Trial and the new trial evidentiary hearing, Plaintiff's position was clear and unequivocal: the State's witnesses, including all three Hospital Doctors, "honestly" treated, assessed, and diagnosed J.U. in absolute accordance with the *only* generally accepted medical standard of care at the time. *See supra* Sections II.B, II.C. Plaintiff "argued that, in the 16 years since his trial, there have been significant developments in the medical community concerning the diagnosis of SBS" that "constitute new evidence that *could not have been, with reasonable diligence, discovered at the time of his trial.*" *Butts II*, 2023-Ohio-2670, at ¶ 7 (emphasis added). He also argued that the views of Dr. Plunkett (his sole witness contesting mainstream SBS understandings at trial in 2003) "were contrary to the official position of both AAP and NAME in their 2001 position papers and [were] accepted by *virtually no one in the scientific or medical community.*" (New Trial Mot., pp. 8–9.) At the new trial hearing, Plaintiff purposefully elicited the testimony of Dr. Auer that Dr. Johnson's testimony (which matched that of Dr. Hauersperger and Dr. Groner) was "within the mainstream of medical thought" and "generally accepted in the medical community at the time he gave it" in 2003. (New Trial Hearing Transcript Excerpts, at 222:16–223:5.) Ultimately, Plaintiff successfully moved for a new trial on the *sole* basis that potential alternative (or "differential") diagnoses based on the SBS triad of symptoms was newly discovered evidence that could not have reasonably been discovered at the time of his trial. *See generally Butts II*, 2023-Ohio-2670.

Plaintiff now asserts diametrically opposite claims. For example, Plaintiff alleges:

- "By the time J.U. was admitted to the ER, extensive scientific research had credibly called into question the association between symptoms like J.U.'s including the so-called triad of symptoms, as indicative of SBS." (Compl., ECF No. 1 at PageID 15, ¶ 70.)
- "[V]arious studies had debunked the exact fabricated conclusions drawn by Defendant Physicians." (*Id.* at 15, ¶ 71.)
- Hospital Doctors concluded that J.U.'s injuries were the result of shaking, "though [they were] aware at the time of alternative causes of the injuries and research and scientific papers that questioned the validity of such findings in regard to shaken baby syndrome." (*Id.* at 12, ¶ 57; *see also id.* at 11, 13, ¶¶ 53, 59.)
- Hospital Doctors "knew or should have known that, absent credible evidence, J.U.'s injuries were not immediately indicative of SBS/AHT." (*Id.* at 16, ¶ 72.)
- Hospital Doctors "knew that J.U.'s injuries could have been caused by a fall or were possibly the result of natural causes and that the injuries were sustained well prior to the afternoon of J.U.'s collapse." (*Id.* at 15, ¶ 67.)

Plaintiff's contradictions jump off the page. Before the state trial court and appellate court, he argued that the Hospital Doctors correctly followed the then-accepted medical standard of care, and "honestly" diagnosed and testified about J.U. in accordance with the only reasonable diagnosis at the time based on then-existing science. But in this lawsuit, he alleges the Hospital Doctors made "fabricated conclusions" and somehow should have diagnosed alternative causes of J.U.'s SBS triad symptoms even though "virtually no one" in the scientific community at the time would have done so or even would have known that alternative causes were feasible. *See Butts II*, 2023-Ohio-2670, at ¶ 9.

In fact, Plaintiff directly admitted in his New Trial Motions that the state's expert witnesses, including all three Hospital Doctors, "relied on knowledge formed by their training in medical school, *as well as the generally accepted medical views* on [SBS] propagated by both the AAP and NAME." (New Trial Mot., p. 11 (emphasis added).) He also claimed and argued that the state's medical witnesses "testified honestly, credibly, and consistently with then-existing

-16-

scientific standards." (*Id.* at p. 29.) Plaintiff's newfound contrary position that Hospital Doctors knew or should have known that "J.U.'s injuries were not immediately indicative of SBS/AHT," that they "falsified" or "fabricated" their reports and any similar allegations (and his claims dependent upon them) are an impermissible, exploitative, and "improper use of judicial machinery" that is barred by judicial estoppel. *New Hampshire*, 532 U.S. at 750.

### 2. The Franklin County Court indisputably relied on Plaintiff's prior position to grant Plaintiff a new trial.

The Franklin County Court granted Plaintiff's Motions for New Trial in express agreement with Plaintiff's core argument that the new evidence around SBS/AHT "would demand the State's experts in a new trial testify differently than they did during [Plaintiff's] 2003 trial, so a jury could return a different verdict." (New Trial Order, pp. 18–19.) In its New Trial Order, the Court extensively recounted and agreed with Plaintiff's evidence and arguments, including his reliance on the 2018 Consensus Statement (and contrary medical community positions at the time of his trial), the expert testimony of Dr. Auer and others, and the ways in which expert testimony on both sides would change if the trial were held again in 2022. (*Id.* at pp. 19–26.)

Accepting Plaintiff's evidence and arguments, the Franklin County Court concluded, "the medical community consensus differs drastically than that which existed at the time of [Plaintiff]'s trial," and this new evidence "could not in the exercise of due diligence have been discovered before the trial." (*Id.* at 20, 23.) Ultimately the court granted Plaintiff a new trial because "[t]he shift in the opinion of the medical and forensic communities since [Plaintiff's] conviction constitutes newly discovered evidence which makes it probable that a jury might not convict [Plaintiff] if he were tried today." (*Id.* at p. 26.) The Franklin County Court's Order granting Plaintiff a new trial was the final disposition of his Motions for New Trial: the Motions were

granted, Plaintiff was released from prison, and new trial proceedings were initiated, all before charges against him were ultimately dismissed.

### 3. Plaintiff should not be permitted to make assertions contrary to what he alleged in the prior proceedings.

Plaintiff cannot obtain a new trial and release from prison in his criminal proceedings based on one position and then seek damages based on completely contrary allegations and arguments in another lawsuit. To put it bluntly, if Plaintiff had argued (without supporting evidence) in his Motions for New Trial that Hospital Doctors *falsified* their reports rather than testifying honestly in accordance with then-existing science, the Franklin County Court undoubtedly would have denied his Motions, and he would likely still be in prison. It was only by asserting that science changed that Plaintiff was able to secure a new trial and, ultimately, his release from prison.

In his Complaint, Plaintiff is "deliberately changing positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 750 (internal quotations and citation omitted). Judicial estoppel is designed to prevent such improper maneuvers. Accordingly, Plaintiff must be held to his prior position that Defendants followed the then-accepted medical standards of care and "honestly" diagnosed J.U. with SBS in accordance with then-existing science. Such allegations do not state a claim for violation of constitutional rights under § 1983 or under Ohio law. Therefore, this Court should dismiss all Plaintiff's claims with prejudice.

This Court has applied judicial estoppel before. For instance, this Court held that the State of Ohio was judicially estopped from claiming that it would execute three individuals using a drug protocol that included potassium chloride because in a previous appeal before the Sixth Circuit, the State represented it would not use that drug, and the Sixth Circuit relied on that representation to hold the appeal moot. *In re Ohio Execution Protocol Litig.*, No. 2:11-cv-1016, 2016 U.S. Dist. LEXIS 174933, at *45 (S.D. Ohio Dec. 19, 2016) (Sargus, J.). Additionally, this Court held that a

-18-

party was judicially estopped from asserting a defense of failure to meet contractual obligations where the same party took a contrary position in a different lawsuit, the previous court accepted that position, and the party would unfairly benefit from the contrary positions in each case. *Williamson v. Recovery Ltd. P'ship*, No. 2:06-CV-292, 2011 U.S. Dist. LEXIS 59584, at *62–72 (S.D. Ohio June 3, 2011) (Sargus, J.). The Court should do the same here.

### B.      The Hospital Defendants are immune from civil liability.

Beyond judicial estoppel, Plaintiff's claims against the Hospital Defendants are further barred under two types of immunity. First, as mandatory reporters, the Hospital Doctors are legally required to report suspected child abuse, which they did here. This cannot form the basis for state law liability. Second, the Hospital Doctors are entitled to testimonial immunity for their trial testimony for both state and federal law claims.

#### 1.      The Hospital Doctors are immune under state law for following mandatory reporting requirements.

Under Ohio law, physicians and other professionals are mandatory reporters of suspected child abuse. R.C. 2151.421(A)(1)(a)–(b). The same statute affords civil immunity to persons who make or participate in such a report as a result of mandatory reporting obligations and does not impose a requirement of good faith. R.C. 2151.421(H)(1)(a)(i) (affording immunity to mandatory reporters, even absent good faith). Although state law immunities generally do not apply to claims under 42 U.S.C. § 1983, state law immunities still govern Plaintiff's state law claims. *See Wenk v. O'Reilly*, 783 F.3d 585, 599–600 (6th Cir. 2015) (citing *Felder v. Casey*, 487 U.S. 131, 139 (1988)). Under Ohio law, "professionals listed in R.C. 2151.421(A)(1)(b) [including 'health care professional(s)'] are not required to make the report to the proper authorities with good faith," and they are immune from civil liability for doing so even absent good faith. *Liedtke v. Carrington*, 145 Ohio App. 3d 396, 401 (8th Dist. 2001). An exception exists where professionals deviate from

-19-

applicable standards of care, which Plaintiff previously admitted did not happen here. *See* R.C. 2151.421(H)(1)(b); (New Trial Mot., p. 11.)

Plaintiff's state law claims are based on the Hospital Doctors allegedly making "fabricated" reports to law enforcement regarding suspected child abuse, but they are immune from civil suit for such reports, even if those reports had not been made in good faith (of course, they were made in good faith, as the New Trial Court properly determined). Accordingly, as a matter of law, Ohio's statutory reporting immunity bars Plaintiff's state law claims for IIED and *respondeat superior*.

**2.      The Hospital Doctors are absolutely immune for their trial testimony.**

Additionally, the Hospital Doctors are immune from federal or state liability regarding Plaintiff's allegations that they provided false testimony at Plaintiff's trial. (Compl., ECF No. 1 at PageID 19, ¶ 99.) "[A]ll witnesses—police officers as well as lay witnesses—are absolutely immune from civil liability based on their trial testimony in judicial proceedings." *Briscoe v. LaHue*, 460 U.S. 325, 328 (1983) (internal citation omitted). "A witness is entitled to testimonial immunity 'no matter how egregious or perjurious that testimony was alleged to have been.'" *Moldowan v. City of Warren*, 578 F.3d 351, 390 (6th Cir. 2009) (quoting *Spurlock v. Satterfield*, 167 F.3d 995, 1001 (6th Cir. 1999)). "Moreover, 'the mere fact that plaintiffs may allege a conspiracy to render false testimony, as opposed to simply alleging that one person testified falsely at trial, does not waive absolute testimonial immunity.'" *Id.* (quoting *Spurlock* at 1001). Accordingly, the Hospital Doctors are immune from any liability (federal or state) for their testimony at trial, even if it was false and part of a conspiracy, as improperly and implausibly alleged.

**C.      Plaintiff's federal constitutional claims all fail as a matter of law.**

To the extent any of Plaintiff's relevant allegations or claims survive application of judicial

estoppel or immunity, they still fail as a matter of law. Plaintiff brings four claims under 42 U.S.C.

§ 1983 that the Hospital Defendants violated his constitutional rights: due process (deprivation of

Fourteenth Amendment fair trial right), deprivation of liberty without probable cause (*i.e.*,

malicious prosecution under the Fourth and/or Fourteenth Amendments), failure to intervene, and

conspiracy. (Compl., ECF No. 1 at PageID 19–24, ¶¶ 97–127.) These claims all fail for one simple

reason: claims under § 1983 can only be brought against state actors, and the Hospital Doctors are

not state actors. Plaintiff pleads the conspiracy claim as a mechanism to allege the Hospital Doctors

should be treated as state actors, but clear Sixth Circuit authority forecloses his arguments as a

matter of law.

**1.      The Hospital Doctors are not state actors as a matter of law.**

The Fourth and Fourteenth Amendments to the U.S. Constitution restrict government

action, and 42 U.S.C. § 1983 provides a civil right of action where state actors violate the

Constitution. Thus, to prevail on any claim under § 1983 against the Hospital Doctors, Plaintiff

would have to prove that the Hospital Doctors "acted under color of state law and that their actions

caused the violation of a federal right." *Thomas v. Nationwide Children's Hosp.*, 882 F.3d 608,

612 (6th Cir. 2018). In very limited circumstances not present here, private actors can be

considered state actors for the purpose of § 1983. As the Sixth Circuit has explained,

> Private action, it is true, may still count as state action under discrete circumstances,
> such as when the State exercises "coercive power" over the private entity, the State
> provides "significant encouragement, either overt or covert" to the private entity,
> or the private actor operates as a "willful participant in joint activity with the State
> or its agents." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S.
> 288, 296, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001) (quotation omitted). But the
> frequent reality that the State regulates private entities or cooperates with them does
> not transform private behavior into state behavior. *Jackson v. Metro. Edison Co.*,

-21-

419 U.S. 345, 350, 95 S. Ct. 449, 42 L. Ed. 2d 477 (1974); *Marie v. Am. Red Cross*, 771 F.3d 344, 363 (6th Cir. 2014).

*Thomas*, 882 F.3d at 612.

### a. The Sixth Circuit firmly rejects Plaintiff's theories of state-actor liability.

The *Thomas* decision relates to a very similar § 1983 case involving Nationwide Children's Hospital ("NCH") and individual doctors as defendants. In *Thomas*, the Sixth Circuit affirmed a decision of this Court dismissing the plaintiff's § 1983 claims because the Hospital and doctors were not state actors.[8] Although the decision in *Thomas* was on a motion for summary judgment, the holdings of law in *Thomas* and other Sixth Circuit authority establish that, as a matter of law, Plaintiff's state-actor allegations regarding Hospital Doctors (insofar as the allegations are not already barred by judicial estoppel or contradicted by the record) do not state a state-actor claim on the pleadings.

The plaintiffs in *Thomas* (parents of three infants) alleged that NCH and multiple physicians violated their Fourth and Fourteenth Amendment rights by conducting diagnostic testing on the infants based on reported injuries and suspected child abuse. *Id.* at 610–12. The Court first established that "Nationwide, its doctors, and its affiliates are private entities. They are not organs of the State, and their employees do not work for the State." *Id.* at 612. The Sixth Circuit then held that NCH and its doctors were not state actors because (1) the doctors acted in accordance with medical standards of care; (2) their actions were not the result of state coercion and were legally authorized without police direction; and (3) mandatory reporting requirements and

---

[8] This Court granted NCH's and the individual doctor defendants' Motion for Summary Judgment because the evidence did not support the allegations of a constitutional violation, and thus this Court did not reach the state actor issue. *Thomas v. Nationwide Children's Hosp.*, No. 2:14-cv-01236, 2017 U.S. Dist. LEXIS 79115, at *33 (S.D. Ohio May 19, 2017) (Sargus, J.). The Sixth Circuit agreed and affirmed this Court on that basis and on the additional basis that the hospital and doctors were not state actors. *Thomas*, 882 F.3d 608 at 612–16.

investigatory interactions with law enforcement do not turn private doctors into state actors. *Id.* at 612–14.

Here, as in *Thomas*, as private doctors who performed their typical duties at a private hospital, the Hospital Doctors clearly are not government employees or agents. (*See* Compl., ECF No. 1 at PageID 5–6, ¶¶ 19, 23.) Plaintiff's Complaint does not contend otherwise. Rather, Plaintiff hangs his hat on the conclusory claim that the Hospital Doctors "were state actors insofar as they engaged with the Defendant Officers in conducting the investigation[,]" arrest, and conviction of Plaintiff, and that they were "given the authority by Defendant Officers to identify a murder caused by 'non-accidental head trauma.'" (*Id.* at 5, ¶ 19.) Not only are these conclusory statements contradicted by the facts alleged in Plaintiff's Complaint, the well-documented trial court record, and published court opinions, but they also fail as a matter of law for several reasons.

First, private medical doctors are not state actors when their actions are taken as part of the medical standard of care, rather than at the direction of government or law enforcement. *Thomas*, 882 F.3d at 612. As established above, Plaintiff has directly admitted on the record in court proceedings that Hospital Doctors "honestly" followed generally accepted medical standards of care at the time in evaluating and diagnosing J.U. in 2002. Plaintiff is judicially estopped from now alleging that the Hospital Doctors incorrectly followed the direction of law enforcement, rather than the then-existing standard of care.

Second, the Complaint lacks any specific allegation that any government official coerced, overpowered, ordered, or otherwise directed Hospital Doctors to diagnose J.U. with SBS. Rather, Plaintiff vaguely claims that Hospital Doctors "were given the authority" to "identify a murder" by intentional abuse and that they jumped to conclusions "at the behest of Defendant Officers." (Compl., ECF No. 1 at PageID 5, 16, ¶¶ 19, 72.) But elsewhere, Plaintiff alleges Hospital Doctors

-23-

examined J.U., performed testing, began to author reports, and only then informed officers about their findings, without any government direction or orders. (*See id.* at 8–9, 11, 13, ¶¶ 39–41, 52–59.) Plaintiff seemingly cannot decide in which direction this imaginary alleged conspiracy flowed—were the doctors directing law enforcement, or was law enforcement directing the doctors? Neither, as it turns out, based on the remainder of Plaintiff's allegations. Such conclusory and contradictory allegations do not support a reasonable inference of state coercion and state action under a state compulsion, public function, or nexus theory of state action, even accepting those allegations as true. *See Thomas*, 882 F.3d at 612–13 (finding that allegations that doctors developed suspicions of child abuse before reporting those suspicions to the police contradicts allegations that state actors ordered the doctors to act).

Third, private doctors are not converted into state actors for following state law requirements to report suspected child abuse to government authorities under R.C. 2151.421. *Id.* at 613. The mandatory state law duty to report suspected child abuse, which "also applies to attorneys, teachers, school psychologists, and day care employees, among others . . . does not make [the hospital] and its doctors state actors any more than it makes private school teachers, private attorneys, and private day-care facilities state actors." *Id.* Additionally, "[p]roviding information to the police, responding to questions about a crime, and offering witness testimony at a criminal trial does not expose a private individual to liability for actions taken 'under color of law.'" *Moldowan*, 578 F.3d at 399. This is true even if the private actor defendant lies when providing the information to police. *See Weser v. Goodson*, 965 F.3d 507, 517 (6th Cir. 2020) (holding that "even if [the private actor defendant] deliberately lied in her statements about [the arrestee plaintiff], that would not show that her conduct was fairly attributable to the state or that she was participating in a joint action with state agents"). Thus, Plaintiff's allegations that Hospital

-24-

Defendants "conspired with [government defendants] by sharing [their] conclusions that J.U. had been shaken," "falsified" their reports and conclusions, and any similar allegations, as a matter of law, do not sufficiently plead state action. (*See* Compl., ECF No. 1 at PageID 5, 12, 16, ¶¶ 19, 58, 72, 74.)

**b.      Plaintiff's conspiracy claim is insufficiently pleaded and does not provide a basis for state-actor liability.**

Additionally, Plaintiff cannot establish state action through his conspiracy theory allegations. Plaintiff falls far short of the specificity pleading requirements for conspiracy claims. To state a claim of civil conspiracy under § 1983, the Plaintiff must show "that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." *Memphis, Tenn. Area Local, Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004) (quoting *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)). Further, "[t]o survive a motion to dismiss, a conspiracy claim 'must be pled with some degree of specificity. . . .'" *Blue v. Lane*, 767 F. Supp. 2d 860, 868 (S.D. Ohio 2011) (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987)). "[V]ague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983." *Gutierrez*, 826 F.2d at 1538; *see Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 564 (6th Cir. 2011) (affirming dismissal of a § 1983 conspiracy claim where the complaint alleged defendants "conferr[ed] with one another at different points . . . but it does not contain any more specific allegations of a plan or agreement to violate his constitutional rights").

Plaintiff alleges that Dr. McManus and Dr. Hauersperger assessed J.U. upon arriving at the hospital, determined that his symptoms were indicative of SBS, and informed police officers of their suspicions. (Compl., ECF No. 1 at PageID 8–9, 11–12, ¶¶ 39–40, 52–57.) Dr. Johnson and

Dr. Groner assessed J.U. further, agreed with the other medical professionals' preliminary findings, and wrote notes and reports consistent with their findings. (*Id.* at 12–13, ¶¶ 56–59.) Even accepting as true Plaintiff's allegation that the Hospital Doctors "understood their reports were to assist the Defendant Officers' criminal investigation and to assist in pinpointing Plaintiff as the perpetrator[,]" (*Id.* at 14, ¶ 66), such allegations are not enough to allege a conspiracy. *See Dressler v. Rice*, 739 F. App'x 814, 823 n.6 (6th Cir. 2018) (holding that "asking police to arrest someone" is not "enough to constitute a conspiracy between the private and state actors"); *Thomas*, 882 F.3d at 612–13 (holding that compliance with state law reporting requirements does not create state action). Of course, when following the mandatory reporting law, the Hospital Doctors would know and understand that their reports may be used in criminal investigations. But that does not make them state actors under *Thomas*. *See Thomas*, 882 F.3d at 613.

Further, under well-established 6th Circuit authority, even allegations that a private actor "fabricated evidence or withheld exculpatory evidence" and provided that information to the police is insufficient to subject the private actor to liability under a § 1983 conspiracy theory. *Weser*, 965 F.3d at 517 (6th Cir. 2020) (citing *Moldowan*, 578 F.3d at 366, 399); *see Dressler*, 739 F. App'x at 823 (holding that a private party is not liable in conspiracy under § 1983 for allegedly providing false information to police about an alleged crime, asking for police assistance, and asking police to arrest the person, where the person was later found not guilty of alleged crimes); *Gillispie v. City of Miami Twp.*, No. 3:13-cv-416, 2020 U.S. Dist. LEXIS 172735, at *135–36 (S.D. Ohio Sept. 21, 2020) (collecting additional cases). Plaintiff cannot claim that the Hospital Doctors fabricated their reports in view of his prior admissions, but regardless, these allegations also do not constitute state action.

-26-

A very similar case dismissed at the pleadings stage in this Court provides guidance here. *See Neterkeht v. Longworth*, No. 1:12-cv-695, 2013 U.S. Dist. LEXIS 99788 (S.D. Ohio July 17, 2013) (Litkovitz, M.J.), *adopted and affirmed*, 2013 U.S. Dist. LEXIS 114097 (S.D. Ohio Aug. 13, 2013) (Dlott, J.). In *Neterkeht*, a plaintiff brought federal civil rights claims for false arrest, malicious prosecution, and conspiracy against police officers, a prosecuting attorney, government officials, and Cincinnati Children's Hospital and its doctors after a jury acquitted him of sexual assault in a criminal trial. *Id.* at *1–8. The plaintiff alleged the private doctors "conspired with other defendants to falsify medical documents and fabricate medical opinions to make it appear as though plaintiff had committed a crime, and then agreed to introduce perjured testimony into the record at his criminal trial[.]" *Id.* at *13. The Court dismissed the conspiracy claim because it was only supported by conclusory facts and dismissed all other constitutional claims for lack of state coercion or nexus. *Id.* at *12–16. The Court held that the doctors were not "acting under color of state law when they medically examined the purported victim of sexual abuse and prepared medical reports based on the results of their examination." *Id.* at *13. The Court further held that,

> [D]efendants' performance of medical examinations and generation of medical reports are not activities traditionally reserved to the state; and there are no allegations showing that the medical functions of Children's Hospital and its employees are entwined with those of the state such that the Children's Hospital defendants could be deemed state actors who acted under color of state law . . . .

*Id.* at *13–14.

The same is true here. Plaintiff's allegations in the Complaint essentially mirror those made by the plaintiff in *Neterkeht*. Plaintiff alleged Hospital Doctors made "fabricated conclusions" as part of a conspiracy to frame him for a crime, just as in *Neterkeht*. (Compl., ECF No. 1 at PageID 15, ¶ 71.) And here, as in *Neterkeht*, "[t]here is no plausible factual basis for plaintiff's theory challenging [Hospital Doctors'] medical opinions as fabrications." 2013 U.S. Dist. LEXIS 99788,

at *15. Accordingly, Plaintiff's failure to allege sufficient facts to support a state-actor theory of liability is fatal to this conspiracy claim.

### 2. Plaintiff otherwise fails to state any federal claim under § 1983.

As explained above, Plaintiff's constitutional claims all fail under judicial estoppel and for lack of state action, and Plaintiff's constitutional claim for civil conspiracy (Count IV) should be dismissed for failure to state a claim. Furthermore, Plaintiff's additional constitutional claims all fail to state a claim as a matter of law.

### a. Deprivation of Right to a Fair Trial.

As to the Hospital Doctors, Plaintiff alleges deprivation of his right to a fair trial due to "fabricated false reports, false statements, [and] false testimony . . . ." (Compl., ECF No. 1 at PageID 19, ¶ 99.) As set forth in Section IV.A, *supra*, judicial estoppel bars the argument that the Hospital Doctors falsified their reports, rather than following the only appropriate medical and scientific standards at the time of J.U.'s death. Further, the Hospital Doctors are absolutely immune from liability for mandatory reporting and for trial testimony, *see* Section IV.B, *supra*. Plaintiff does not allege any other involvement by the Hospital Doctors in Plaintiff's trial. Accordingly, Plaintiff does not state a claim for a due process violation against the Hospital Defendants. *See Alexander v. Edwards*, No. 2:25-cv-1168, 2026 U.S. Dist. LEXIS 26201, at *21 (S.D. Ohio Feb. 9, 2026) (Jolson, M.J.) (dismissing with prejudice implausible due process conspiracy claims), *adopted and aff'd*, 2026 U.S. Dist. LEXIS 55199 (Watson, J.).

### b. Malicious Prosecution / Deprivation of Liberty without Probable Cause.

Federal courts recognize § 1983 claims for malicious prosecution under the Fourth Amendment, rather than the Fourteenth Amendment. Such claims may be asserted either as a matter of wrongful institution of legal process (the more common type) or based on continued

-28-

detention without probable cause (although some courts do not call such claims "malicious prosecution"). *Jackson v. City of Cleveland*, 925 F.3d 793, 820 n.15 (6th Cir. 2019). It is unclear under which theory Plaintiff intends to make his claim under Count Two, but for the purposes of the Hospital Doctors, it does not matter.

Like any § 1983 claim, a federal malicious prosecution claim cannot be brought against a non-state actor. Again, the law dooms Plaintiff's claims as to the Hospital Doctors. Regardless, the elements would not be met. "A malicious-prosecution claim has four elements: '(1) that a criminal prosecution was initiated against the plaintiff and that the defendant ma[d]e, influence[d], or participate[d] in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty . . . apart from the initial seizure; and (4) that the criminal proceeding must have been resolved in the plaintiff's favor.'" *Jackson*, 925 F.3d at 820 (quoting *Mills v. Barnard*, 869 F.3d 473, 479–80 (6th Cir. 2017)).

As stated above, Plaintiff's allegations as to falsified reports made to frame Plaintiff are barred by judicial estoppel. Regardless, their reports to government officials were due to the mandatory suspected child abuse reporting law, which does not convert them into state actors. Such conduct does not state a claim for malicious prosecution; rather, it describes reporting according to a state law duty in accordance with accepted medical standards of care. *See Thomas*, 882 F.3d at 612–13. Furthermore, the Franklin County Court declared that Plaintiff's prosecution was supported by probable cause, and the claim fails on that independent basis. *See* Section II.D, *supra*, citing *Nolle Prosequi* Nunc Pro Tunc Order.

-29-

### c. Failure to Intervene.

The basis of Plaintiff's claim under Count Three is unclear. It appears Plaintiff alleges Hospital Defendants "stood by without intervening to prevent the misconduct." (Compl., ECF No. 1 at PageID 22–23, ¶ 117.) Plaintiff offers no cognizable theory under which a private medical doctor has a duty to intervene in alleged misconduct relating to the prosecution of a suspected child abuser based on then-generally accepted scientific diagnoses. Typically, such claims relate to a police officer's failure to intervene in the use of excessive force. *See Hightower v. City of Columbus*, No. 2:12-cv-437, 2013 U.S. Dist. LEXIS 159681, at *39 (S.D. Ohio Nov. 7, 2013). No plausible inference arises that Hospital Doctors had any duty to intervene in the process, much less that any cognizable failure-to-intervene theory exists in this context.

### D. Plaintiff's state law claims all fail as a matter of law.

Plaintiff brings an IIED claim under Ohio law against Hospital Doctors (Count VI) and an ancillary *respondeat superior* claim against the Hospital (Count VII), alleging the Hospital is liable for Hospital Doctors' IIED torts. Plaintiff's state law claims fail as a matter of law first because his relevant factual allegations are barred by the doctrine of judicial estoppel, as set forth above. Second, Plaintiff's IIED claim is also barred by a one-year statute of limitations that ran out in February 2025, because the claim actually sounds in malicious prosecution, rather than IIED. And third, Plaintiff otherwise fails to sufficiently plead extreme and outrageous conduct. Plaintiff's dependent *respondeat superior* claim falls with the IIED claim for the same reasons.

### 1. Judicial estoppel bars Plaintiff's state law claims.

As with Plaintiff's federal claims, the Court should apply the doctrine of judicial estoppel to bar Plaintiff from asserting state law claims that are clearly inconsistent with representations he made in prior court proceedings that the Franklin County Court relied on to grant him a new trial.

Although his IIED claim is devoid of any factual allegations and merely recites the elements of IIED (and thus the Court need not accept those allegations as true), it can be inferred that Plaintiff's IIED claim is based on the same conduct alleged above: that Hospital Doctors "fabricated" J.U.'s SBS diagnosis and set him up to be framed for murder. (*See* Compl., ECF No. 1 at PageID 25–26 ¶¶ 133–36.) For the reasons stated above, Plaintiff is barred from arguing that Hospital Doctors fabricated their findings and reports and instead must be held to his prior position that Defendants honestly followed the then-accepted medical standards of care. The Court can dismiss the IIED claim and the dependent *respondeat superior* claim with prejudice on that basis alone.

### 2. Plaintiff's IIED claims are barred by the statute of limitations.

Under Ohio law, "[t]ypically, the statute of limitations for a claim of intentional infliction of emotional distress is four years." *Templeton v. Brandt*, No. 1:20-cv-34, 2021 U.S. Dist. LEXIS 67328, at *23 (S.D. Ohio Apr. 7, 2021) (Cole, J.) (quoting *Lee v. Lucas*, No. 1:10-cv-151, 2011 U.S. Dist. LEXIS 125756, at *4 (N.D. Ohio Oct. 31, 2011)). "But, when the acts giving rise to the claim 'would support another tort, the statute of limitations for that other tort governs the claim for intentional infliction of emotional distress.'" *Id.* (quoting *Lee*, 2011 U.S. Dist. LEXIS 125756, at *4). The purpose of this rule is to prevent a plaintiff from evading a statute of limitations for the true underlying tort by instead contorting the facts to plead an IIED claim. *Id.* Federal courts routinely reject such thinly veiled attempts by plaintiffs to bypass binding statutes of limitations through creative misnomer pleading.

Plaintiff's Complaint clearly sounds in malicious prosecution, rather than IIED. Ohio courts recognize that a malicious prosecution action may be brought against a private individual, so long as Plaintiff otherwise proves all elements of malicious prosecution as to that person. *See Barbara Mills v. City of Westlake*, 2016-Ohio-5836, ¶ 29 (8th Dist.). Under Ohio law, malicious

prosecution requires (1) the malicious institution or continuance of a prior proceeding; (2) lack of probable cause for that proceeding; and (3) termination of the prior proceeding in the claimant's favor. *Ayers v. City of Cleveland*, No. 1:12-cv-753, 2013 U.S. Dist. LEXIS 25992, at *44 (N.D. Ohio Feb. 25, 2013). As pleaded, Plaintiff's Complaint tracks those elements much more so than an IIED claim. Plaintiff's sole articulated basis for his IIED claim is that Hospital Doctors "fram[ed] Plaintiff for crimes he did not commit . . . ." (Compl., ECF No. 1 at PageID 25, ¶ 134.) That represents a textbook (albeit fatally flawed here) attempt to plead a common law malicious prosecution claim.

An Ohio law claim for malicious prosecution carries a one-year statute of limitations, and the claim accrues when the prosecution terminates in the plaintiff's favor. *See Lee*, 2011 U.S. Dist. LEXIS 125756, at *12. Here, the criminal charges against Plaintiff were dismissed via a *nolle prosequi* order on February 12, 2024 (corrected *nunc pro tunc* on February 13, 2024); thus, the limitations period for malicious prosecution therefore expired on February 12 or 13, 2025. (*See* Compl., ECF No. 1 at PageID 17, ¶ 82; *Nolle Prosequi* Nunc Pro Tunc Order.) No wonder, then, why Plaintiff did not plead such a claim: Plaintiff filed the Complaint on January 15, 2026, nearly one year outside of the applicable limitations period. (Compl., ECF No. 1.) Thus, on the face of the Complaint, any IIED claim that sounds in malicious prosecution—as does Plaintiff's claim here—is unquestionably untimely. Accordingly, Plaintiff's state law claims should be dismissed on this independent basis. To the extent Plaintiff's Complaint could be generously construed to actually attempt to set forth a state law malicious prosecution claim, such a claim would also, of course, fail because it would be barred by the same statute of limitations.

The U.S. District Court for the Northern District of Ohio reached a very similar holding in a closely analogous case. *See Ayers*, 2013 U.S. Dist. LEXIS 25992. In *Ayers*, the plaintiff had been

-32-

convicted of murder, but the Sixth Circuit vacated his conviction based on a Sixth Amendment violation, and the state declined to re-prosecute. *Id.* at *12–13. The plaintiff brought federal constitutional claims for violations of due process, malicious prosecution, failure to intervene, conspiracy, and state law claims, including IIED. *Id.* at *14–42. The Court held that the IIED claim sounded in malicious prosecution and thus was governed by Ohio's one-year statute of limitations for such claims. *Id.* at *48–49; *see also Templeton*, 2021 U.S. Dist. LEXIS 67328, at *22–24 (holding the plaintiff's IIED claim was actually controlled by one-year statute of limitations for false imprisonment and assault because the IIED claim "arises out of the same conduct" as those claims, and therefore dismissing the "IIED" claim). The Court also held that the claim accrued upon termination of the prosecution. *Ayers*, 2013 U.S. Dist. LEXIS 25992, *48–49.

Here, just as in *Ayers*, Plaintiff attempts to disguise his state law malicious prosecution claim as an IIED claim to avoid the fatal statute of limitations for malicious prosecution claims. This is not a matter of Plaintiff's discretion over how to plead his case. This is a matter of clear Ohio law and federal court precedent that such wool-over-the-eyes acts should not be permitted. Unlike in *Ayers¸* Plaintiff's claim is *not* timely as a malicious prosecution claim. He missed the statute's February 2025 deadline by almost a full year. Accordingly, this Court should dismiss the IIED claim against Hospital Doctors and the ancillary *respondeat superior* claim against the Hospital.[9]

---

[9] In the alternative, Plaintiff's IIED claim sounds in medical negligence, as Plaintiff alleges the Hospital Doctors failed to adhere to the appropriate standard of care. Such a claim also fails for a variety of reasons, including: (1) it falls outside the one-year statute of limitations under R.C. 2305.113(A); (2) it falls outside the four-year statute of repose under R.C. 2305.113(C); and (3) Plaintiff does not have standing as a non-parent caregiver to assert a medical negligence claim on behalf of J.U. because he is not a personal representative of J.U.'s estate. *See White v. Sheridan*, 2022-Ohio-2418, ¶¶ 25–27 (10th Dist.).

-33-

### 3. Even if Plaintiff's state law claims are not barred, he fails to plead IIED.

Finally, Plaintiff's Complaint does not sufficiently state a claim for IIED against the Hospital Doctors. Pleading an IIED claim under Ohio law is an extremely high bar that Plaintiff cannot and does not meet. "[I]t is not enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." *Kanu v. Univ. of Cincinnati*, 2018-Ohio-4969, ¶ 13 (10th Dist.) (quoting *Mendlovic v. Life Line Screening of Am., Ltd.*, 2007-Ohio-4674, ¶ 47 (8th Dist.)). Rather, "[l]iability is found only where the conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* (citing *Yeager v. Local Union 20, Teamsters*, 6 Ohio St.3d 369, 374–75 (1983)). A trial court may dismiss a claim for intentional infliction of emotional distress, where the alleged conduct does not, as a matter of law, reach the level of extreme and outrageous conduct. *Morrow v. Reminger & Reminger Co. LPA*, 2009-Ohio-2665, ¶ 48 (10th Dist.). For the purposes of a motion to dismiss an IIED claim, "whether conduct is 'extreme and outrageous' is initially a question of law for the court." *Stakich v. Russo*, 2021-Ohio-1098, ¶ 27 (8th Dist.).

Here, based on Plaintiff's own representations in judicial proceedings, the Hospital Doctors, with no prior connection to Butts, used their medical judgment to render a diagnosis within the standard of care at the time and reported the same to the police, as required by law. This is not extreme and outrageous. *See, e.g.*, *Perkins v. Lavin*, 98 Ohio App. 3d 378 (finding that providing medical care within the standard of care did not meet the standard of "extreme and outrageous"). Further, accusing an individual of a crime—even falsely—is generally not sufficient

to demonstrate extreme and outrageous conduct. *Dunina v. Stemple*, 2008-Ohio-2064, ¶ 14 (2d Dist.) (falsely accusing individual of telephone harassment not extreme and outrageous conduct); *Hardie v. Shady Hollow Country Club*, No. 1995CA00298, 1996 Ohio App. LEXIS 2956, at *12 (5th Dist. June 17, 1996) (falsely accusing individual of sexual harassment insufficient to constitute extreme and outrageous conduct); *Georgin v. Georgin*, 2022-Ohio-4328, ¶ 41 (12th Dist.) (holding that initiating a police report and cooperating with a police investigation do not rise to the level of extreme and outrageous conduct necessary to support a claim of intentional infliction of emotional distress).

Plaintiff fails to set forth a claim for IIED, even if the scant, non-contradictory facts alleged in the Complaint are accepted as true. Accordingly, even if the Court does not dismiss Plaintiff's state law claims on the basis of judicial estoppel, mandatory reporter immunity, or the statute of limitations, they should still be dismissed on this independent basis.

## V.    CONCLUSION

Plaintiff spent about 20 years in prison for a crime that he claims he did not commit. Even if true (which no court has affirmatively declared), Plaintiff does not get to take private sector doctors who were just doing their jobs in accordance with then-accepted medical standards and drag them into a federal civil rights lawsuit. Plaintiff himself used the Hospital Doctors' admittedly "honest" adherence to then-applicable standards of medicine and science (opposed "*by virtually no one*" at the time, in Plaintiff's own words) to secure a new trial 20 years later. As a matter of basic judicial equity and fairness, Plaintiff is estopped from now claiming in this Court that Hospital Doctors somehow "fabricated" those same reports by simply applying then-accepted standards.

Furthermore, under clear Sixth Circuit authority, the Hospital Defendants are not state actors, and thus federal constitutional claims under § 1983 are not cognizable against them. Finally,

-35-

Plaintiff cannot creatively plead around a binding statute of limitations that bars his state law claims. Accordingly, the Hospital Defendants move for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) and respectfully ask this Court to dismiss all claims against them with prejudice.

Respectfully submitted,

*/s/ Martha Brewer Motley*
Martha Brewer Motley (0083788) (trial attorney)
William G. Porter (0017296)
Michael T. Fahy (0103907)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Phone: (614) 464-5626
wgporter@vorys.com
mbmotley@vorys.com
mtfahy@vorys.com

*Counsel for Defendants Columbus Children's Hospital, Dr. Charles Johnson, Dr. Jonathan Groner, and Dr. Karla Hauersperger*

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2026, I electronically filed the foregoing with the Clerk of the U.S. District Court for the Southern District of Ohio using the CM/ECF system, which will send notifications of such filing to the CM/ECF participants registered to receive service.

*/s/Michael T. Fahy*
Michael T. Fahy