**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| Alan J. Butts, | Case No. 2:26-cv-00051 |
| Plaintiff, | Judge Edmund A. Sargus, Jr. |
| v. | Magistrate Judge Chelsey M. Vascura |
| City of Columbus, *et al.*, | |
| Defendants. | |

**MOTION FOR JUDGMENT ON THE PLEADINGS OF DEFENDANTS CITY OF COLUMBUS, JOHN WEIS, TIM KELLER, MICHAEL HOLBROOK, MARILYNN SEAMANS, STEVEN EPPERT, AND WAYNE GOSS**

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, Defendants City of Columbus, John Weis, Tim Keller, Michael Holbrook, Marilynn Seamans, Steven Eppert, and Wayne Goss respectfully move this Court for a judgment on the pleadings in this action and for an order dismissing, with prejudice, any claims Plaintiff has attempted to assert against them.

A memorandum supporting this motion is attached.

Respectfully submitted,

/s/ Westley M. Phillips
Westley M. Phillips (0077728) – Lead
Aaron D. Epstein (0063286)
David J. Dirisamer (0092125)
Alana V. Tanoury (0092265)
Sarah N. Feldkamp (0099464)
City of Columbus, Department of Law
77 N. Front Street, Columbus, Ohio 43215
(614) 645-7385 / (614) 645-6949 (fax)
adepstein@columbus.gov
wmphillips@columbus.gov
djdirisamer@columbus.gov
avtanoury@columbus.gov
snfeldkamp@columbus.gov

*Attorneys for The City Defendants*

**TABLE OF CONTENTS**

I. Introduction ........................................................................................................ 8

II. Factual Alegations .............................................................................................. 9

    A. J.U.'s Death ............................................................................................. 9

    B. Plaintiff's Criminal Case ...................................................................... 14

III. Law and Argument ........................................................................................... 15

    A. Legal Standard ...................................................................................... 15

    B. Judicial Estoppel .................................................................................. 16

Under the doctrine of judicial estoppel, Plaintiff is barred from alleging that the Defendant Doctors fabricated their diagnoses and reports or engaged in other misconduct because those allegations are directly in conflict with Plaintiff's arguments that led to the *nolle prosequi* order in Plaintiff's criminal matter. Accordingly, the Plaintiff is barred from alleging that the City Defendants either knew or should have known that the diagnoses and reports of the Defendant Doctors were either fabricated or incorrect in any way. Primary Sources: *New Hampshire v. Maine*, 532 U.S. 742 (2001); *State v. Butts*, 2023-Ohio-2670 (10th Dist.).

        1. Plaintiff's Prior and Later Positions Are Clearly Inconsistent .................. 17

            a. Plaintiff's prior position ................................................................ 17

                (1) Plaintiff's criminal trial ...................................................... 17

                (2) Plaintiff's motions for a new trial ...................................... 18

                (3) Summary of Plaintiff's prior position .............................. 21

            b. Plaintiff's later (current) position ................................................. 22

        2. The Franklin County Court of Common Pleas Accepted Plaintiff's Prior Position ..................................................................................................... 22

        3. The Defendants Would be Unfairly Disadvantaged By This Court Accepting Plaintiff's Later, Inconsistent Position ................................... 23

    C. Federal Claims Against the Defendant Officers ..................................... 24

        1. Qualified Immunity ................................................................................. 24

        2. The Elements of Plaintiff's Federal Claims ............................................ 25

            a. Due Process Claims ....................................................................... 25

3

        (1)     Allegations of false trial testimony ................................... 26

        (2)     Reckless investigation allegation ..................................... 26

        (3)     Allegations of withheld and destroyed evidence .............. 27

        (4)     Allegations of fabricated and false evidence .................... 28

    b.     Malicious Prosecution Claims ...................................................... 30

    c.     Failure to Intervene Claims........................................................... 30

    d.     Civil Conspiracy Claims ............................................................... 31

   3.     Qualified Immunity Analysis...................................................................... 32

    a.     Detective Weis ............................................................................. 32

Detective Weis is entitled to qualified immunity because Plaintiff has failed to plead facts showing either that (1) Detective Weis violated a federal statutory or constitutional right, or that (2) the unlawfulness of his conduct was clearly established at the time. (Primary source: *Pearson v. Callahan*, 555 U.S. 223 (2009)). His acts as pled do not constitute a due process violation. (Primary sources: *Brady v. Maryland*, 373 U.S. 83 (1963); *Clark v. Anthony Abdallah*, 131 F.4th 432 (6th Cir. 2025)). Nor do they constitute malicious prosecution. (Primary source: *Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019)). Nor do they constitute a failure to intervene and prevent a constitutional violation. (Primary source: *Sheffey v. City of Covington*, 564 F. App'x 783 (6th Cir. 2014)). Nor do they constitute participation in a civil conspiracy to interfere with Plaintiff's civil rights. (Primary source: *Robertson v. Lucas*, 753 F.3d 606 (6th Cir. 2014). Nor was Plaintiff's conspiracy claim pled with some degree of specificity. (Primary source: *Blue v. Lane*, 767 F. Supp. 2d 860 (S.D. Ohio 2011)).

        (1)     Plaintiff's due process claim against Weis ....................... 34

        (2)     Plaintiff's malicious prosecution claim against Weis ....... 36

        (3)     Plaintiff's failure to intervene claim against Weis............ 36

        (4)     Plaintiff's civil conspiracy claim against Weis................. 37

    b.     Detective Seamans ....................................................................... 38

Detective Seamans is entitled to qualified immunity because Plaintiff has failed to plead facts showing either that (1) Detective Seamans violated a federal statutory or constitutional right, or that (2) the unlawfulness of her conduct was clearly established at the time. (Primary source: *Pearson v. Callahan*, 555 U.S. 223 (2009)). Her acts as pled do not constitute a due process violation. (Primary sources: *Brady v. Maryland*, 373 U.S. 83 (1963); *Clark v. Anthony Abdallah*, 131 F.4th 432 (6th Cir. 2025)). Nor do they constitute malicious prosecution. (Primary source: *Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019)). Nor do they constitute a failure to

intervene and prevent a constitutional violation. (Primary source: *Sheffey v. City of Covington*, 564 F. App'x 783 (6th Cir. 2014)). Nor do they constitute participation in a civil conspiracy to interfere with Plaintiff's civil rights. (Primary source: *Robertson v. Lucas*, 753 F.3d 606 (6th Cir. 2014). Nor was Plaintiff's conspiracy claim pled with some degree of specificity. (Primary source: *Blue v. Lane*, 767 F. Supp. 2d 860 (S.D. Ohio 2011)).

c.      Officer Keller ................................................................................... 38

Officer Keller is entitled to qualified immunity because Plaintiff has failed to plead facts showing either that (1) Officer Keller Goss violated a federal statutory or constitutional right, or that (2) the unlawfulness of his conduct was clearly established at the time. (Primary source: *Pearson v. Callahan*, 555 U.S. 223 (2009)). His acts as pled do not constitute a due process violation. (Primary sources: *Brady v. Maryland*, 373 U.S. 83 (1963); *Clark v. Anthony Abdallah*, 131 F.4th 432 (6th Cir. 2025)). Nor do they constitute malicious prosecution. (Primary source: *Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019)). Nor do they constitute a failure to intervene and prevent a constitutional violation. (Primary source: *Sheffey v. City of Covington*, 564 F. App'x 783 (6th Cir. 2014)). Nor do they constitute participation in a civil conspiracy to interfere with Plaintiff's civil rights. (Primary source: *Robertson v. Lucas*, 753 F.3d 606 (6th Cir. 2014). Nor was Plaintiff's conspiracy claim pled with some degree of specificity. (Primary source: *Blue v. Lane*, 767 F. Supp. 2d 860 (S.D. Ohio 2011)).

(1)      Plaintiff's due process claim against Keller ...................... 39

(2)      Plaintiff's malicious prosecution claim against Keller ..... 39

(3)      Plaintiff's failure to intervene claim against Keller .......... 40

(4)      Plaintiff's civil conspiracy claim against Keller .............. 40

d.      Officer Holbrook ...................................................................... 40

Officer Holbrook is entitled to qualified immunity because Plaintiff has failed to plead facts showing either that (1) Officer Holbrook violated a federal statutory or constitutional right, or that (2) the unlawfulness of his conduct was clearly established at the time. (Primary source: *Pearson v. Callahan*, 555 U.S. 223 (2009)). His acts as pled do not constitute a due process violation. (Primary sources: *Brady v. Maryland*, 373 U.S. 83 (1963); *Clark v. Anthony Abdallah*, 131 F.4th 432 (6th Cir. 2025)). Nor do they constitute malicious prosecution. (Primary source: *Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019)). Nor do they constitute a failure to intervene and prevent a constitutional violation. (Primary source: *Sheffey v. City of Covington*, 564 F. App'x 783 (6th Cir. 2014)). Nor do they constitute participation in a civil conspiracy to interfere with Plaintiff's civil rights. (Primary source: *Robertson v. Lucas*, 753 F.3d 606 (6th Cir. 2014). Nor was Plaintiff's conspiracy claim pled with some degree of specificity. (Primary source: *Blue v. Lane*, 767 F. Supp. 2d 860 (S.D. Ohio 2011)).

(1)      Plaintiff's due process claim against Holbrook ................ 42

(2)      Plaintiff's malicious prosecution claim against Holbrook 42

(3)    Plaintiff's failure to intervene claim against Holbrook..... 42

(4)    Plaintiff's civil conspiracy claim against Holbrook.......... 43

e.    Detective Eppert......................................................................... 43

Detective Eppert is entitled to qualified immunity because Plaintiff has failed to plead facts showing either that (1) Detective Eppert violated a federal statutory or constitutional right, or that (2) the unlawfulness of his conduct was clearly established at the time. (Primary source: *Pearson v. Callahan*, 555 U.S. 223 (2009)). His acts as pled do not constitute a due process violation. (Primary sources: *Brady v. Maryland*, 373 U.S. 83 (1963); *Clark v. Anthony Abdallah*, 131 F.4th 432 (6th Cir. 2025)). Nor do they constitute malicious prosecution. (Primary source: *Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019)). Nor do they constitute a failure to intervene and prevent a constitutional violation. (Primary source: *Sheffey v. City of Covington*, 564 F. App'x 783 (6th Cir. 2014)). Nor do they constitute participation in a civil conspiracy to interfere with Plaintiff's civil rights. (Primary source: *Robertson v. Lucas*, 753 F.3d 606 (6th Cir. 2014). Nor was Plaintiff's conspiracy claim pled with some degree of specificity. (Primary source: *Blue v. Lane*, 767 F. Supp. 2d 860 (S.D. Ohio 2011)).

(1)    Plaintiff's due process claim against Eppert...................... 44

(2)    Plaintiff's malicious prosecution claim against Eppert .... 45

(3)    Plaintiff's failure to intervene claim against Eppert ......... 45

(4)    Plaintiff's civil conspiracy claim against Eppert .............. 45

f.    Detective Goss ........................................................................... 46

Detective Goss is entitled to qualified immunity because Plaintiff has failed to plead facts showing either that (1) Detective Goss violated a federal statutory or constitutional right, or that (2) the unlawfulness of his conduct was clearly established at the time. (Primary source: *Pearson v. Callahan*, 555 U.S. 223 (2009)). His acts as pled do not constitute a due process violation. (Primary sources: *Brady v. Maryland*, 373 U.S. 83 (1963); *Clark v. Anthony Abdallah*, 131 F.4th 432 (6th Cir. 2025)). Nor do they constitute malicious prosecution. (Primary source: *Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019)). Nor do they constitute a failure to intervene and prevent a constitutional violation. (Primary source: *Sheffey v. City of Covington*, 564 F. App'x 783 (6th Cir. 2014)). Nor do they constitute participation in a civil conspiracy to interfere with Plaintiff's civil rights. (Primary source: *Robertson v. Lucas*, 753 F.3d 606 (6th Cir. 2014). Nor was Plaintiff's conspiracy claim pled with some degree of specificity. (Primary source: *Blue v. Lane*, 767 F. Supp. 2d 860 (S.D. Ohio 2011)).

(1)    Plaintiff's due process claim against Goss........................ 46

(2)    Plaintiff's malicious prosecution claim against Goss ....... 47

(3)    Plaintiff's failure to intervene claim against Goss............ 47

(4)      Plaintiff's civil conspiracy claim against Goss ................ 48

D.      Federal Claims Against the City ..................................................................48

Plaintiff's federal claims against the City fail because he does not plead facts showing either that a constitutional violation occurred or that the alleged constitutional violation occurred because of a policy or custom of the City. Primary source: *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

1.      No Underlying Constitutional Violation.................................................... 49

2.      No Improper Municipal Policy .................................................................. 50

3.      No Official Policy or Legislative Enactment............................................ 52

4.      No Final Decision-Maker Approval .......................................................... 52

5.      No Inadequate Training or Supervision..................................................... 53

6.      No Custom of Tolerance or Acquiescence ................................................ 54

E.      Ohio State Law Claims Against the Defendant Officers ........................................55

1.      Ohio State Law Tort Immunity................................................................. 55

The Defendant Officers are immune from liability for Plaintiff's Ohio state-law tort claims. Primary Source: O.R.C. § 2744.03(A)(6)

2.      Intentional Infliction of Emotional Distress ............................................ 56

Plaintiff's IIED claims fail as a matter of law because Plaintiff does not plead facts showing that any of the Defendant Officers' acts were so extreme and outrageous as to go beyond all possible bounds of decency and considered utterly intolerable in a civilized community. Primary source: *Sobolewski v. Ford Motor Co.*, 2025 U.S. App. LEXIS 25482 (6th Cir., Sept. 30, 2025)

3.      Plaintiff's IIED Claims Are Barred by the Statute of Limitations............ 57

Plaintiff's IIED claim is time-barred because his allegations track the elements of a malicious prosecution claim more so than an IIED claim. Primary source: Templeton v. Brandt, No. 1:20-cv-34, 2021 U.S. Dist. LEXIS 67328 (S.D. Ohio Apr. 7, 2021)

F.      Ohio State Law Claims Against the City ..............................................................58

The City is entitled to immunity for Plaintiff's state-law claim against it. Primary Source: O.R.C. § 2744.02.

IV.   Conclusion ....................................................................................................... 60

**MEMORANDUM IN SUPPORT**

## I.    INTRODUCTION

Plaintiff has sued, among others, Defendants City of Columbus, John Weis, Tim Keller, Michael Holbrook, Marilynn Seamans, Steven Eppert, and Wayne Goss (collectively "The City Defendants"), under 42 U.S.C. § 1983 and Ohio law, claiming that the City Defendants and others engaged in an unlawful civil conspiracy to withhold, falsify, and destroy evidence, and thereby wrongfully caused Plaintiff to be criminally convicted of murdering his girlfriend's two-year-old son J.U. (Complaint, ECF No. 1 ¶¶ 1-2, 6-7, 14, 97-140). As shown below, Plaintiff's complaint makes very serious allegations of police misconduct without alleging sufficient facts to support such claims.

Plaintiff's complaint asserts seven counts. The first four counts are brought under 42 U.S.C. § 1983 against each of the individual defendants. Count I is a Fourteenth Amendment due process claim. (*Id*. ¶¶ 97-105). Count II is captioned "Deprivation of Liberty Without Probable Cause," (*i.e.*, malicious prosecution) and invokes both the Fourth and Fourteenth Amendments. (*Id*. ¶¶ 106-115). Count III asserts liability for an alleged failure to intervene. (*Id*. ¶¶ 116-120). Count IV alleges a conspiracy to deprive Plaintiff of his Constitutional rights. (*Id*. ¶¶ 121-127). Count V seeks to impose liability on the City pursuant to *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658 (1978) for the alleged constitutional violations asserted in Counts I-IV. (*Id*. ¶¶ 128-132). Count VI is an Ohio state-law tort claim brought against the individual defendants for an alleged intentional infliction of emotional distress. (*Id*. ¶¶ 133-136). Finally, Count VII is an Ohio state-law tort claim brought against the City (and others) pursuant to the doctrine of *respondeat superior*. (*Id*. ¶¶ 137-140).

8

II.     **FACTUAL ALEGATIONS**

    A.     **J.U.'S DEATH**

Plaintiff alleges that at all relevant times, Defendants John Weis ("Detective Weis"), Tim Keller ("Officer Keller"), Michael Holbrook ("Officer Holbrook"), Marilynn Seamans ("Detective Seamans"), Steven Eppert ("Detective Eppert"), and Wayne Goss ("Detective Goss") (collectively, "the Defendant Officers") were officers and employees of the Columbus Police Department. (Complaint, ECF No. 1 ¶ 18).

On February 13, 2002, Plaintiff was watching his girlfriend's two-year-old son, J.U. (Complaint, ECF No. 1 ¶ 6). Plaintiff alleges J.U. fell suddenly and admits to gently shaking him after the fall. (*Id.* ¶¶ 24–26). Plaintiff called 911, and police and paramedics arrived. (*Id.* ¶¶ 26–27, 31). Officers Keller and Holbrook arrived on scene first and observed Plaintiff standing near J.U., who was lying on the floor. (*Id.* ¶ 27). Plaintiff ran to the door and beckoned them in. (*Id.*). Plaintiff explained to Officers Keller and Holbrook that J.U. had fallen, hit his head, and stopped breathing. (*Id.* ¶ 29). Plaintiff told Officers Keller and Holbrook that J.U. had been standing up when J.U. threw his arms forward, toppled backwards without warning, and hit his head on the floor. (*Id.* ¶ 30). Officer Keller began giving J.U. mouth-to-mouth resuscitation and gave paramedics "the clear" to come into the home at 4:47 p.m. (*Id.* ¶ 31). J.U. had no heartbeat and was not receiving oxygen to his brain. (*Id.*). The paramedics worked to revive J.U. for 30 minutes. (*Id.*).

Plaintiff said J.U. had been suffering from a minor cold in the previous few days and might have received a small amount of children's cough syrup that morning. (*Id.* ¶ 32). Plaintiff searched for the cough medicine bottle, accompanied by Officer Holbrook. (*Id.*). Neither Officer Keller nor Officer Holbrook noticed any marks or signs of violence on J.U. and neither officer observed anything out of the ordinary or suspicious in the home. (*Id.* ¶ 33). Officer Holbrook heard Plaintiff

tell paramedics multiple times what had happened, each time consistent with what he had explained to Officers Keller and Holbrook when they first arrived. (*Id.* ¶ 34). Eventually, Homicide Detectives Weis and Seamans arrived at the home. (*Id.* ¶ 36).

J.U. was placed on life support and transported to what was then called Columbus Children's Hospital. (*Id.* ¶ 35). The Defendant Officers would not allow Plaintiff to go to the hospital. (*Id.* ¶ 43). Instead, Officers Keller and Holbrook transported him in the back of a patrol car to the Columbus Police Station. (*Id.*). Eventually, Detective Weis and Officer Holbrook interrogated Plaintiff, who they referred to as "the male suspect" in the "shaken baby case" to dispatch. (*Id.* ¶ 45). No lawyer was present. (*Id.*). At the conclusion of questioning, Officers Keller and Holbrook took Plaintiff back home. (*Id.* ¶ 47). They refused to take him to the hospital or to update him on J.U.'s condition. (*Id.*).

Less than 15 minutes after J.U. had arrived, Detectives Eppert and Goss responded to Children's Hospital. (*Id.* ¶ 39). There, Dr. Ellen McManus informed the detectives that the "victim had bilateral subdural hemorrhaging indicative of 'shaken baby' syndrome" ("SBS"). (*Id.*). Plaintiff alleges that Dr. McManus jumped to this conclusion without first conducting any diagnostic testing. (*Id.*). Plaintiff does not allege that either Detective Eppert or Detective Goss knew or should have known that Dr. McManus jumped to her conclusion without first conducting any diagnostic testing or that they knew or should have known that her conclusion was anything but accurate.

Detective Eppert noted that a nurse told him that it was "the opinion of the medical staff that the victim's air supply had been shut off for approximately five (5) minutes before the medics arrived." (*Id.* ¶ 41). Detectives Eppert and Goss interviewed J.U.'s mother Beth at the hospital. (*Id.* ¶ 42). Beth informed the detectives that for the past week, J.U. had been sick, acting dizzy

"quite a bit," and had fallen "quite a lot." (*Id.*). Beth further told the detectives that she had no reason to think Plaintiff abused J.U. (*Id.*).

At the hospital, Dr. Karla Hauersperger assumed emergency care over J.U. (*Id.* ¶ 52). She ordered a CAT scan and found J.U. had retinal hemorrhages, bleeding around the brain, and brain swelling. (*Id.* ¶ 53). Accordingly, she concluded J.U. sustained a non-accidental head injury, most consistent with SBS. (*Id.*). Plaintiff alleges that she reached this conclusion without considering J.U.'s medical history and without diagnostic testing. (*Id.*). Plaintiff also alleges that she was aware, at the time, of alternate causes of the injuries and of research and scientific papers that questioned the validity of such findings in regard to SBS. (*Id.* ¶ 53). Plaintiff does not allege that any of the City Defendants either knew or should have known any of these things or that they knew or should have known that Dr. Hauersperger's conclusion was anything but accurate.

At 10:50 p.m., Detective Weis successfully obtained a search warrant for Plaintiff's apartment, stating in the affidavit that Plaintiff "acknowledged shaking the child 'a little bit.'" (*Id.* ¶ 48). In the affidavit, Weis also stated that "Dr. Karla Hauersberger advised J.U.'s CAT scan revealed bilateral subdural hemorrhaging and a percussion injury to the liver, spleen, and kidneys." (*Id.*). Plaintiff does not allege that Detective Weis either knew or should have known that this information was anything but accurate.

Based on the findings of retinal and subdural hemorrhages, consulting physician Dr. Charles Johnson also concluded J.U.'s injuries were the result of non-accidental head injury. (*Id.* ¶ 57). Dr. Jonathan Groner reviewed J.U.'s care records and concluded J.U.'s "principal" diagnosis was "shaken baby syndrome." (*Id.* ¶ 59.) Plaintiff alleges Dr. Groner did not rule out other potential causes of J.U.'s injuries. (*Id.*). Plaintiff does not allege that any of the City Defendants either knew or should have known that there were other potential causes of J.U.'s injuries.

11

There is no dispute that under Ohio law, physicians and other professionals are mandatory reporters of suspected child abuse. O.R.C. 2151.421(A)(1)(a)–(b). Plaintiff alleges that on the morning of February 14, 2002, Dr. Johnson conspired with Detective Weis by sharing his conclusions that J.U. had been shaken, knowing there were other possible causes of J.U.'s injuries, knowing he should have taken J.U.'s history of illness and falls with impact to the head into account, and knowing it was biomechanically impossible to exert enough force to cause such injuries in a 30-pound child by shaking. (Complaint, ECF No. 1 ¶ 58). Plaintiff does not allege that Detective Weis either knew or should have known any of these things or that he knew or should have known that Dr. Johnson's conclusions were anything but accurate.

J.U. was removed from life support on February 14, 2002 and pronounced dead at 5:10 p.m. (*Id.* ¶ 60). Thereafter, Defendant Dr. Patrick Fardal, forensic pathologist at the Franklin County Coroner's Office, conducted J.U.'s autopsy. (*Id.* ¶ 61). Plaintiff alleges that Detective Weis and Dr. Johnson were present during the autopsy and consulted with Dr. Fardal before the examination, telling him their theory that J.U. died from shaken baby syndrome. (*Id.*). Plaintiff alleges that the Defendants suppressed all evidence of this conversation, which, had it been disclosed, would have provided a basis for Plaintiff to build a defense through the support of expert witnesses. (*Id.*). Plaintiff does not allege that Detective Weis either knew or should have known that J.U. died from anything other than shaken baby syndrome.

Dr. Fardal further obtained J.U.'s "history" by reviewing the police reports in the case. (*Id.* ¶ 62). Plaintiff does not allege that Detective Weis or any other officer either knew or should have known that the police reports contained any false information or other inaccuracies. Plaintiff alleges that based on false information, Dr. Fardal concluded that J.U.'s death was a homicide due to non-accidental head trauma. (*Id.* ¶ 63). Plaintiff does not allege that Detective Weis or any other

12

officer either knew or should have known that Dr. Fardal had received false information or that his conclusion was anything but accurate. Dr. Fardal also noted that J.U. was "allegedly shaken by another person" as "how injury occurred." (*Id.*). Again, Plaintiff does not allege that Detective Weis or any other officer either knew or should have known that Dr. Fardal's conclusion was anything but accurate. Plaintiff alleges that Dr. Fardal found no injury to J.U.'s neck, liver, spleen, or kidneys, refuting Dr. Hauersberger's findings documented in Detective Weis' search warrant affidavit. (*Id.* ¶ 64). Likewise, he found no injuries on J.U.'s arms, legs, trunk, or ribs. (*Id.*).

Dr. Fardal found J.U. was suffering from pneumonia. (*Id.* ¶ 65). Plaintiff alleges that Dr. Fardal was aware that acute pneumonia could cause the same symptoms as those of SBS, but he ignored that so he could fabricate a SBS diagnosis. Plaintiff also alleges that Dr. Fardal was aware of the studies at the time that seriously called into question the validity of an SBS diagnosis altogether. (*Id.*). Again, Plaintiff does not allege that Detective Weis or any other officer either knew or should have known that Dr. Fardal's SBS diagnosis was fabricated or that Dr. Fardal was aware of the studies at the time that seriously called into question an SBS diagnosis altogether.

Plaintiff alleges that based on the fabricated determination of shaken baby syndrome, which pointed to Plaintiff as the only possible perpetrator, Detective Weis obtained an arrest warrant for Plaintiff for murder, stating J.U.'s injuries "were not sustained in a fall and occurred within minutes of a 'non-accidental head trauma.'" (*Id.* ¶ 74). Plaintiff does not allege that Detective Weis either knew or should have known that the determination of SBS was fabricated. Plaintiff alleges that the warrant cited directly to the fabricated determinations of Drs. Johnson and Fardal. (*Id.*). Plaintiff does not allege that Detective Weis, or any of the other City Defendants, either knew or should have known that the determinations of Drs. Johnson and Fardal were either "fabricated" or incorrect in any way.

As stated above, there is no dispute that under Ohio law, physicians and other professionals are mandatory reporters of suspected child abuse. Plaintiff alleges that the doctors understood their reports were to assist with the criminal investigation of Plaintiff. (Complaint, ECF No. 1 ¶ 66). Plaintiff further claims that the Hospital Defendants' reports were fabricated because, at the time of J.U.'s death, "various studies had debunked the exact fabricated conclusions drawn by Defendant Physicians" and the Hospital Defendants knew or should have known about these studies and alternative causation theories of SBS-related symptoms. (*Id*. ¶¶ 69–72). Plaintiff does not allege that any of the City Defendants either knew or should have known about these studies and alternative causation theories of SBS-related symptoms. Nor does Plaintiff allege that any of the City Defendants ordered, directed, or requested any of the medical procedures identified above or the finding of shaken baby syndrome.

### B.        PLAINTIFF'S CRIMINAL CASE

On February 21, 2002, Plaintiff was indicted on five counts, including murder. (*Id*. ¶ 76). Plaintiff was tried in 2003 in the Franklin County Court of Common Pleas. (*Id*. ¶ 16). At trial, the prosecution presented the testimony of Officers Keller and Holbrook (and Drs. Johnson, Groner, Fardal, and Hauersperger, among others). (*Id.* ¶ 77). Plaintiff does not make any allegations about either officer's testimony. Plaintiff alleges that he was convicted of murder "[a]s a direct result of Defendants' misconduct." (*Id.* ¶ 78). On May 16, 2003, Plaintiff was sentenced to 15 years to life imprisonment in the Ohio Department of Corrections. (*Id.* ¶ 79).

On October 10, 2022, Plaintiff was granted a new trial following a six-day evidentiary hearing. (*Id.* ¶ 80). On December 8, 2022, Plaintiff was released on bond after spending over 20 years in prison. (*Id.* ¶ 81). On February 13, 2024, the court, on the State's motion to *nolle prosequi*, entered a *nunc pro tunc* order. (*Id.* ¶ 82).

14

## III. LAW AND ARGUMENT

### A. LEGAL STANDARD

The Federal Rules of Civil Procedure provide that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The legal standard for adjudicating a Rule 12(c) motion is the same as that for adjudicating a Rule 12(b)(6) motion. *Sharaydeh v. Warren County, Ohio*, 730 F. Supp. 3d 692, 695 (S.D. Ohio 2024) (Barrett, J.) (citing *Lindsay v. Yates*, 498 F.3d 434, 437 n.5 (6th Cir. 2007)). Accordingly, the Court must "construe the complaint in the light most favorable to the nonmoving party, accept the well-pled factual allegations as true, and determine whether the moving party is entitled to judgment as a matter of law." *Barany-Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008) (quoting *Com. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007)). The court "need not accept the plaintiff's legal conclusions or unwarranted factual inferences as true." *Id.* (quoting *Com. Money Ctr.*, 508 F.3d at 336). To withstand a Rule 12(c) motion for judgment on the pleadings, "a complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory." *Id.* (quoting *Com. Money Ctr.*, 508 F.3d at 336).

"[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555).

When evaluating a motion for judgment on the pleadings, a court can consider the pleadings and any written exhibits attached to the pleadings. *See McGath v. Hamilton Loc. Sch. Dist.*, 848 F. Supp. 2d 831, 836 (S.D. Ohio 2012) (Graham, J.). Although allegations in the complaint are the primary focus, a court may also consider "matters of public record, orders [and] items appearing in the record of the case." *Id.* (quoting *Barany-Snyder*, 539 F.3d at 332). Courts can consider relevant public records that are attached as exhibits to defendants' answers. See Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *Roe v. Amazon.com*, 170 F. Supp. 3d 1028, 1032 (S.D. Ohio 2016) ("In considering a motion for judgment on the pleadings, a court considers the pleadings, which consist of the complaint, the answer, and any written instruments attached as exhibits." (citing Fed. R. Civ. P. 12(c); Fed. R. Civ. P. 7(a) Fed. R. Civ. P. 10(c))); *Com. Money Ctr.*, 508 F.3d at 336 ("A court may consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment."). And "[a]lthough typically courts are limited to the pleadings when faced with a motion under [to dismiss], a court may take judicial notice of other court proceedings without converting the motion into one for summary judgment." *Buck v. Thomas M. Cooley Law Sch.*, 597 F.3d 812, 816 (6th Cir. 2010)).

## B.  JUDICIAL ESTOPPEL

Judicial estoppel is an equitable doctrine invoked to preserve the integrity of our judicial system. *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001). Generally speaking, the doctrine serves to prevent a party from engaging in "cynical gamesmanship" by arguing and prevailing on one position before one court, and then arguing the opposite position before another. *Lorillard Tobacco Co. v. Chester, Willcox & Saxbe, LLP*, 546 F.3d 752, 757 (6th Cir. 2008) (internal citations omitted). For judicial estoppel to apply, three features should be present: (1) the party's prior and later positions are clearly inconsistent; (2) the earlier court accepted the prior position;

16

and (3) the opposing party would be unfairly disadvantaged by the subsequent court accepting the party's later, inconsistent position. *New Hampshire*, 532 U.S. at 750-51 (internal quotation marks and citations omitted); *see also Lorillard Tobacco Co.*, 546 F.3d at 757 (citing *Excel Energy, Inc. v. Smith (In re Commonwealth Inst. Sec.)*, 394 F.3d 401, 406 (6th Cir. 2005)). Those features are present here for the following reasons.

### 1. Plaintiff's Prior and Later Positions Are Clearly Inconsistent

#### a. Plaintiff's prior position

The background of Plaintiff's prior position is documented in Ohio Tenth District Court of Appeals decisions regarding Plaintiff's criminal trial and the grant of a new trial. *See State v. Butts*, 2004-Ohio-1136 (10th Dist.) (direct appeal, "Butts I"); *State v. Butts*, 2023-Ohio-2670 (10th Dist) (appeal of decision granting new trial, "Butts II").

#### (1) Plaintiff's criminal trial

At Plaintiff's criminal trial, Dr. Johnson testified about the medical science supporting his conclusion that J.U.'s death was the result of shaking rather than falling to the floor or the cumulative effect of repeated falls. Butts I, 2004-Ohio-1136, at ¶¶ 7–8. Dr. Groner testified that J.U.'s injuries were not consistent with a fall from standing height, his injuries would have been immediately incapacitating, and several falls could not have caused J.U.'s optical nerve or retinal hemorrhages. *Id.* at ¶ 9. Dr. Hauersperger testified about her findings based on the CAT scan and her conclusion that J.U.'s injuries were most consistent with SBS rather than a history of slips and falls. *Id.* at ¶ 10. Dr. Fardal testified that he believed that J.U.'s injuries lead to the conclusion that the cause was shaken baby or shaken impact syndrome, where the child hits something while being shaken. *Id.* at ¶ 11. The information about prior falls by J.U. did not alter Dr. Fardal's opinion regarding the cause of the injuries because there was no evidence of any significant head trauma from prior falls. *Id.*

17

Plaintiff's medical witness Dr. John Plunkett testified that he did not think that J.U. died of shaken baby syndrome because Plaintiff would need to generate 2,400 pounds of force to cause such injuries based on J.U.'s weight of 30 pounds. *Id.* at ¶ 16. Rather, he believes that the brain swelling was the result of hypoxia, which was very long in this case. *Id.* The police had been dispatched at 4:36 p.m., as the result of a 911 hang-up call and arrived approximately three to five minutes later. *Id.* The paramedics waited until the police officers indicated the scene was safe before entering, per normal procedure. *Id.* It took 12 minutes from the dispatch until the paramedics began working on J.U. *Id.* The epinephrine that was administered to start J.U.'s heart requires three minutes to elapse between doses, and J.U. received six doses before his heart responded. *Id.* J.U.'s heart also stopped again during the Medflight. *Id.*

On cross-examination, Dr. Plunkett admitted that his opinion is contrary to what has been taught in medical schools since 1972, is contrary to the views of the American Pediatric Academy and that an overwhelming majority of pediatricians disagree with his opinion. *Id.* at ¶ 17.

After citing the foregoing, the Tenth District Court of Appeals affirmed Plaintiff's conviction on direct appeal, finding "[i]t is not unusual that evidence of shaken baby syndrome may be primarily circumstantial, especially where a child is in the sole custody of one adult at the time the injuries are sustained." *Id.* at ¶ 29.

*(2)     Plaintiff's motions for a new trial*

The Tenth District Court of Appeals explained the Plaintiff's prior position as follows. On April 5, 2019, Plaintiff moved the trial court for leave to file a delayed motion for a new trial and presented arguments and evidence in support of his contemporaneously filed new trial motion (collectively, the "2019 Motions"). *Butts II*, 2023-Ohio-2670, at ¶ 7. Plaintiff argued that, in the 16 years since his trial, there have been significant developments in the medical community concerning the diagnosis of SBS. *Id.* These developments, Plaintiff contended, constitute new

18

evidence that could not have been, with reasonable diligence, discovered at the time of his trial or 120 days after the verdict was rendered. *Id.* Plaintiff asserted this new evidence creates a strong probability of a different result at trial. *Id.* Thus, Plaintiff argued he is entitled to a new trial under Crim.R. 33(A)(6). *Id.*

In May/June 2021, the trial court held an evidentiary hearing on Plaintiff's 2019 Motions. *Id.* at ¶ 8. Over the course of six days, the parties presented evidence and testimony from four medical experts. *Id.* Plaintiff's proffered experts were neuropathologist Dr. Roland Auer, pediatric radiologist Dr. Julie Mack, and pathologist Dr. Michael Laposata. *Id.* The state proffered one expert witness in opposition, pediatrician Dr. Lori Frasier. *Id.*

The defense experts explained that, at the time of Plaintiff's trial, there was not a significant debate in the medical community regarding whether J.U.'s injuries were necessarily diagnostic of intentional shaking (*i.e.*, SBS). *Id.* at ¶ 9. Therefore, possible alternative, non-intentional causes for the injuries resulting in J.U.'s death were not thoroughly considered (or even known about) in 2002/2003. *Id.*

At Plaintiff's 2003 trial, the sole defense witness, Dr. Plunkett, challenged the validity of the SBS diagnosis by the state's experts. *Id.* at ¶ 10. Dr. Plunkett testified that non-abuse causes for J.U.'s injuries were instead indicated by J.U.'s medical records, lack of significant neck injury, and historical information provided by J.U.'s mother and Plaintiff about J.U.'s fall, illness, and abnormal behaviors in the week preceding his death. *Id.* Dr. Plunkett told the jury that, in his opinion, shaking a two-year-old child would not cause the injuries J.U. sustained. *Id.* But, at the time of trial, Dr. Plunkett's testimony would have been considered a fringe medical opinion. *Id.* Indeed, arguing there was no debate on SBS diagnosis standards in the medical community and equating Dr. Plunkett to a transient quack was precisely the trial prosecutor's strategy in

19

undermining Plaintiff's defense. *Id.* This strategy was fatal to Plaintiff's defense, as his convictions were almost exclusively predicated on medical testimony elicited from the state's four medical experts. *Id.*

The evidence presented at the hearing on Plaintiff's motion for a new trial was summarized by the Tenth District as follows:

> In stark contrast to 2003, however, there is now a significant debate in the medical community as to whether injuries like J.U.'s are necessarily diagnostic of intentional shaking. (*See, e.g.*, May 17, 2021 Hearing Tr. Vol. I at 38-39, 53-88; May 18, 2021 Hearing Tr. Vol. II at 175-237; May 19, 2021 Hearing Tr. Vol. III at 322-47, 403-04; May 20, 2021 Hearing Tr. Vol. IV at 468-70; May 25, 2021 Hearing Tr. Vol. V at 697-723; June 2, 2021 Hearing Tr. Vol. VI at 737-39.) Moreover, new scientific evidence has expanded the differential diagnosis applicable to J.U.'s injuries. Thus, the medical community's literature and guidance pertaining to the diagnosis of SBS (now referred to as AHT) has changed significantly since [Plaintiff's] 2003 trial. It is now the standard practice for medical providers to eliminate the possibility of non-abuse causes of injuries mimicking those believed to be diagnostic of SBS before diagnosing a patient with SBS (now AHT). This was not the standard practice in 2003 because the medical community's knowledge about the cause of injuries typically observed in SBS cases was significantly more limited than it is today.

*Id.* at ¶ 11.

> Indeed, Dr. Frasier (the state's proffered expert) conceded that in the years following [Plaintiff's] trial, standards and guidance from key organizations— including the American Academy of Pediatrics ("AAP")—about diagnosing SBS (or AHT) significantly changed from those that existed in 2002/2003. Notwithstanding the advances in the field over the past two decades, however, Dr. Frasier nonetheless maintained that she arrived at the same conclusions today that the treatment team did in 2002 when she reviewed all relevant records. (*See, e.g.*, Hearing Tr. Vol. V at 573-74, 606-07, 671-91. *See generally*, *id*. at 602-71.)

*Id.* at ¶ 12.

In addition to this proffered expert testimony, counsel for the parties presented arguments at the 2021 hearing and filed post-hearing briefs summarizing their arguments based on the experts' hearing testimony. *Id.* at ¶ 13. Notably, Plaintiff argued in his Motions for New Trial that "based on mistaken literature of early 2003, the state's experts testified honestly but wrongly.

Although that testimony was wrong, it was the then-generally accepted view." (Mots. For New Trial, ECF No. 40-1, p. 17). Plaintiff argued, "the evidence supporting his motion and a new trial— namely, the shift in understanding of the mechanisms of pediatric injury and death from SBS/AHT—was not available and could not have been discovered at the time of trial in 2003." (*Id.*). As Plaintiff explained in his Motions for New Trial, the fringe views of Plaintiff's expert witness at trial in 2003, Dr. Plunkett, "were contrary to the official position of both AAP and [National Association of Medical Examiners] in their 2001 position papers and [were] accepted by virtually no one in the scientific or medical community." (*Id*. at pp. 8–9) (citations omitted). And at the May 2021 evidentiary hearing for a new trial, Plaintiff argued "the trial that took place 20 years ago was the only trial that could take place, given the state of medical science at the time that it occurred." (Mots. for New Trial Hearing Tr., ECF No. 40-5, p. 16:10–16:16).

### (3)      *Summary of Plaintiff's prior position*

Thus, Plaintiff's prior position was as follows:

1.      Based on mistaken literature of early 2003, Drs. Johnson, Groner, Hauersperger, and Fardal testified honestly but wrongly. Although that testimony was wrong, it was the then-generally accepted view.

2.      The shift in understanding of the mechanisms of pediatric injury and death from SBS/AHT was not available and could not have been discovered at the time of trial in 2003.

3.      The fringe views of Plaintiff's expert witness at trial in 2003, Dr. Plunkett (*i.e.*, that non-abuse causes for J.U.'s injuries were indicated and that shaking a two-year-old child would not cause the injuries J.U. sustained), were contrary to the official position of both AAP and National Association of Medical Examiners in their 2001 position papers and were accepted by virtually by no one in the scientific or medical community.

4.      It is now the standard practice for medical providers to eliminate the possibility of non-abuse causes of injuries mimicking those believed to be diagnostic of SBS before diagnosing a patient with SBS (now AHT). This was not the standard practice in 2003 because the medical community's knowledge about the cause of injuries typically observed in SBS cases was significantly more limited than it is today.

### b.     Plaintiff's later (current) position

Plaintiff's current position is as follows:

1.     Dr. Hauersperger concluded J.U. sustained a non-accidental head injury, most consistent with SBS. She was aware, at the time, of alternate causes of the injuries and of research and scientific papers that questioned the validity of such findings in regard to SBS.

2.     Dr. Groner reviewed J.U.'s care records and concluded J.U.'s "principal" diagnosis was "shaken baby syndrome." Dr. Groner did not rule out other potential causes of J.U.'s injuries.

3.     Dr. Johnson conspired with Detective Weis by sharing his conclusions that J.U. had been shaken, knowing there were other possible causes of J.U.'s injuries, knowing he should have taken J.U.'s history of illness and falls with impact to the head into account, and knowing it was biomechanically impossible to exert enough force to cause such injuries in a 30-pound child by shaking.

4.     Dr. Fardal was aware that acute pneumonia could cause the same symptoms as those of SBS, but he ignored that so he could fabricate a SBS diagnosis.

5.     Dr. Fardal was aware of the studies at the time that seriously called into question the validity of an SBS diagnosis altogether.

Plaintiff's prior and later positions are clearly inconsistent. All of Plaintiff's claims in this lawsuit are based upon his new position. Thus, the first factor for judicial estoppel is satisfied.

### 2.     The Franklin County Court of Common Pleas Accepted Plaintiff's Prior Position

The second factor for judicial estoppel is also satisfied because the Franklin County Court of Common Pleas accepted Plaintiff's prior position.

The Franklin County Court granted Plaintiff's Motions for New Trial in express agreement with Plaintiff's core argument that the new evidence around SBS/AHT "would demand the State's experts in a new trial testify differently than they did during [Plaintiff's] 2003 trial, so a jury could return a different verdict." (New Trial Order, ECF No. 40-2, pp. 18-19). Accepting Plaintiff's evidence and arguments, the Franklin County Court concluded, "the medical community

22

consensus differs drastically than that which existed at the time of Defendant's trial" and this new evidence "could not in the existence of due diligence have been discovered before the trial." (*Id.* at 20, 23). Ultimately, the court granted Plaintiff a new trial because "the shift in the opinion of the medical and forensic communities since [Plaintiff's] conviction constitutes newly discovered evidence which makes it probable that a jury might not convict [Plaintiff] if he were tried today." (*Id.* at p. 26).

Plaintiff's Motions for New Trial was granted on November 10, 2022. *Butts* II, 2023-Ohio-2670, at ¶ 14. On August 1, 2023, the Tenth District Court of Appeals affirmed the trial court's decision to grant a new trial. *Id.* at ¶ 102. On February 12, 2024, the Court entered a *nolle prosequi* order at the request of the State of Ohio, updated via a *nunc pro tunc* order on February 13, 2024. (*Nolle Prosequi Nunc Pro Tunc* Order, ECF No. 40-3, p. 1). The Franklin County Court "[found] that the indictment in this case was supported by probable cause based on evidence that existed at the time and that based on the evidence known at this time, the state and law enforcement engaged in no misconduct and prosecuted this case in good faith." (*Id.*).

### 3.  The Defendants Would be Unfairly Disadvantaged By This Court Accepting Plaintiff's Later, Inconsistent Position

The third factor of judicial estoppel, "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped," is also satisfied. *New Hampshire*, 532 U.S. at 751. This civil lawsuit is entirely based on Plaintiff's allegation that the Defendant Doctors conspired with the Defendant Officers to frame Plaintiff for the murder of J.U. by falsely concluding that J.U. died of SBS, knowing that there were other likely causes of J.U.'s death. This is an extremely serious allegation to make, and it is entirely untrue, as demonstrated by Plaintiff's own arguments presented to the Franklin County Court of Common Pleas. There, Plaintiff argued that "based on mistaken literature of early 2003,

23

Drs. Johnson, Groner, Hauersperger, and Fardal testified honestly but wrongly. Although that testimony was wrong, it was the then-generally accepted view."

If Plaintiff's current allegations are true, then his prior allegations were not. If this is the case, then Plaintiff, who a jury convicted of murdering a two-year old child, was granted a new trial and released from prison due to inaccurate statements and misleading arguments made to the Franklin County Court of Common Pleas and Ohio's Tenth District Court of Appeals. Plaintiff should not be further rewarded for that type of behavior in this civil lawsuit. Allowing Plaintiff to reverse course would both provide him an unfair advantage and undermine the integrity of this litigation.

For these reasons, Plaintiff should be judicially estopped from making assertions contrary to what he alleged in the prior proceedings.

### C. FEDERAL CLAIMS AGAINST THE DEFENDANT OFFICERS

#### 1. Qualified Immunity

Qualified immunity is a judicially created doctrine that shields government officials "from liability for civil damages [under § 1983] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Where, as here, a government official raises a qualified-immunity defense, "it is the plaintiff's burden to show that the [official is] not entitled to qualified immunity." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013) (citation omitted).

To overcome the presumption of qualified immunity at the pleadings stage, a plaintiff must plead facts showing that (1) the official violated a federal statutory or constitutional right, and (2) the unlawfulness of the official's conduct was "clearly established at the time," such that every reasonable person in the official's position would have known that what he is doing violates that

24

right. *See Reed v. Campbell Cnty.*, 80 F.4th 734, 742 (6th Cir. 2023) (citations omitted); *Kennedy v. Cincinnati*, 595 F.3d 327, 336 (6th Cir. 2010); *Enoch v. Hogan*, 728 F. App'x 448, 452-53 (6th Cir. 2018).

A right is "clearly established" if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 403-04 (6th Cir. 2007); *Chappell v. Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). "While a case need not be directly on point for a right to be clearly established at the time of the violation, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *King v. Rockford*, 97 F.4th 379, 390 (6th Cir. 2024) (quoting *Kisela v. Hughes*, 584 U.S. 100 (2018) (per curiam)). Courts should grant qualified immunity unless, "on an objective basis, it is obvious that no reasonably competent officer would have [acted in the same manner]; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (citation omitted) ("When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'"). To rebut the presumption of qualified immunity, the plaintiff must define the clearly established right with precision and in a "particularized context," rather "than at a high level of generality or on the basis of a broad historical proposition." *Baynes v. Cleland*, 799 F.3d 600, 612-13 (6th Cir. 2015).

When more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately. *See Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017).

### 2. The Elements of Plaintiff's Federal Claims

#### a. Due Process Claims

Plaintiff's due process claims are predicated on his allegation that "the Individual

Defendants conducted a reckless investigation, withheld exculpatory evidence, withheld impeachment evidence, destroyed evidence, and fabricated false reports, false statements, false testimony, and other evidence. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued." (Complaint, ECF No. 1 ¶ 99).

### (1) Allegations of false trial testimony

"[A]ll witnesses—police officers as well as lay witnesses—are absolutely immune from civil liability based on their trial testimony in judicial proceedings." *Briscoe v. LaHue*, 460 U.S. 325, 328 (1983). "A witness is entitled to testimonial immunity 'no matter how egregious or perjurious that testimony was alleged to have been.'" *Moldowan v. City of Warren*, 578 F.3d 351, 390 (6th Cir. 2009) (quoting *Spurlock v. Satterfield*, 167 F.3d 995, 1005–06 (6th Cir. 1999)). "Moreover, 'the mere fact that plaintiffs may allege a conspiracy to render false testimony, as opposed to simply alleging that one person testified falsely at trial, does not waive absolute testimonial immunity.'" *Id*. (quoting *Spurlock* at 1005–06). Therefore, Plaintiff's allegation that the defendants offered "false testimony" does not state a claim under § 1983 upon which relief can be granted. He cannot establish a due process violation based upon this theory for any of the individual officers.

### (2) Reckless investigation allegation

Regarding Plaintiff's allegation that the defendants "conducted a reckless investigation," "there is no constitutionally protected right to the manner in which a criminal investigation is conducted." *Garner v. Harrod*, 656 F. App'x 755, 760 (6th Cir. 2016). Therefore, even if the Complaint contained sufficient facts to establish that the investigation was recklessly performed (it does not), an 'incompetent or negligent investigation' is insufficient to establish a constitutional violation." *Id*. at 761 (quoting *Seigel v. City of Germantown*, 25 F. App'x 249, 250 (6th Cir. 2001)). Therefore, Plaintiff's allegation that the defendants conducted a reckless investigation does not

26

state a claim under § 1983 upon which relief can be granted. He cannot establish a due process violation based upon this theory for any of the individual officers.

(3)     Allegations of withheld and destroyed evidence

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Prosecutors are not the only state actors bound by *Brady*, and "police can commit a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material." *Moldowan,* 578 F.3d at 379.

*Brady* claims have three elements: "[1] the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

A police officer's responsibility to turn over potentially exculpatory evidence to the prosecutor's office is "limited": "*Brady* requires a police officer to disclose evidence to the prosecutor only when its exculpatory value is 'apparent' to the officer . . . that is, when the officer is aware that the evidence 'could form a basis for exonerating a defendant.'" (Citations omitted.) *D'Ambrosio v. Marino*, 747 F.3d 378, 389-90 (6th Cir. 2014) (quoting *Arizona v. Youngblood¸*488 U.S. 51, 58 (1988)).

If the evidence is not only suppressed but destroyed, a constitutional violation can result if the destroyed evidence "both possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 488-89 (1984). If the evidence is only potentially useful to a defendant, there is no due process

27

violation unless the defendant can show bad faith on the part of the police. *Youngblood*, 488 U.S. at 57-58.

Plaintiff's allegation that the City Defendants "…withheld exculpatory evidence, withheld impeachment evidence, [and] destroyed evidence…" will be analyzed below for each individual officer.

### (4) Allegations of fabricated and false evidence

The fabrication of evidence is not a constitutional violation in and of itself. *Adams v. Lexington-Fayette Urb. Cnty. Govt.*, 154 F.4th 501, 511 (6th Cir. 2025) (citations omitted). Instead, it is the use of fabricated evidence "to some end" that can violate constitutional rights. *Id*. Fabrication claims can arise under either the Fourth or the Fourteenth Amendment. *Clark v. Anthony Abdallah*, 131 F.4th 432, 447 (6th Cir. 2025).

"The Fourth Amendment is violated when probable cause rests on fabricated evidence presented to a grand jury or to a judge determining probable cause." *Id*. (citing *King v. Harwood*, 852 F.3d 568, 588-90 (6th Cir. 2017)); *see also Robertson v. Lucas*, 753 F.3d 606, 616 n.5 (6th Cir. 2014) ("A Fourth Amendment claim for fabrication of evidence lies where a defendant knowingly manufactures probable cause, thereby effecting a seizure"). "Because Fourth Amendment claims turn crucially on the lack of probable cause, a law-enforcement defendant may defeat liability by showing that, notwithstanding the fabricated evidence, probable cause supported detention." *Clark*, 131 F.4th at 447. So "when demonstrably untainted proof adequately supports a seizure, the mere existence of fabricated evidence does not constitute a Fourth Amendment violation." *Hoskins v. Knox Cty.*, Case No. 6:17-CV-84, 2020 U.S. Dist. LEXIS 52257, *68 (E.D. Ky. March 23, 2020) (citing *Robertson*, 753 F.3d at 616, n.5). As the court in *Hoskins* explained, "[t]he distinction is primarily one of causation: in the first scenario, the fabricated evidence undeniably *causes* the seizure, but in the second, seizure follows as a lawful

28

consequence of legitimate evidence, which can elicit no reasonableness-based objection." *Hoskins* at \*68.

A plaintiff "'must establish: (1) a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or omitted information was material to the finding of probable cause' to overcome an investigating officer's entitlement to immunity." *Khalil v. Wilson*, Case No. 21-12577, 2025 U.S. Dist. LEXIS 91982, \*16 (E.D. Mich. May 14, 2025) (quoting *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003)). The inclusion of "wrong or incomplete information" in police reports does not constitute fabrication. *See Anderson v. Knox Cty.*, Case No. 22-5280, 2023 U.S. App. LEXIS 17970, \*5 ("fabrication means more than just wrong information—it means evidence offered 'knowingly' or in bad faith") (citations omitted); *Sutherby v. Sukach*, Case No. 1:25-cv-01127, 2025 U.S. Dist. LEXIS 267463, \*37 (W.D. Tenn. Dec. 30, 2025).

"The Due Process Clause of the Fourteenth Amendment is also 'violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury.'" *Jackson v. City of Cleveland*, 925 F.3d 793, 815 (6th Cir. 2019) (quoting *Gregory v City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006)). "[T]he relevant question is not whether the fabricated evidence was *shown* to the jury; it is whether the statement *affected* the decision of the jury." *Jackson*, 925 F.3d at 816 (emphasis in original). "For example, a fabricated search warrant affidavit, used to obtain evidence later shown to the jury, can form the basis for a fabrication-of-evidence suit," or "fabricated evidence that 'is used as [the] basis for a criminal charge' can form the basis for a § 1983 claim because, absent that evidence, there would have been no jury." *Id.* (quoting *Halsey v. Pfeiffer*, 750 F.3d 273, 294 n.19 (3d Cir. 2014)).

29

Plaintiff's allegation that the City Defendants "…fabricated false reports [and made] false statements …" will be analyzed below for each individual officer.

### b. Malicious Prosecution Claims

Plaintiff's malicious prosecution claims are predicated on his allegation that "the Individual Defendants made, influenced and/or participated in the decision to prosecute Plaintiff for these crimes, for which prosecution there was no probable cause, and which caused Plaintiff to suffer a deprivation of liberty." (Complaint, ECF No. 1 ¶ 108).

Federal courts recognize § 1983 claims for malicious prosecution under the Fourth Amendment, rather than the Fourteenth Amendment. *Jackson*, 925 F.3d at 820 n.14. A malicious-prosecution claim has four elements: (1) that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) that the criminal proceeding must have been resolved in the plaintiff's favor. *Id.* at 820 (quoting *Mills v. Barnard*, 869 F.3d 473, 479–80 (6th Cir. 2017)).

Plaintiff's malicious prosecution allegations will be analyzed below for each individual officer.

### c. Failure to Intervene Claims

Plaintiff's failure to intervene claims are predicated on his allegation that "during the constitutional violations described above, one or more of the Individual Defendants stood by without intervening to prevent the misconduct, despite having a reasonable opportunity to do so." (Complaint, ECF No. 1 ¶ 117).

A police officer can be liable under § 1983 when he or she fails to intervene and prevent constitutional violations. To plausibly state a failure-to-intervene claim, a plaintiff must show that

30

a defendant "(1) observed or had reason to know that [constitutional harm] would be or was [taking place], and (2) had both the opportunity and the means to prevent the harm from occurring." *Sheffey v. City of Covington*, 564 F. App'x 783, 793 (6th Cir. 2014) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). A defendant cannot be held liable, however, unless there was "a realistic opportunity to intervene and prevent harm." *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 640 (6th Cir. 2013) (citing *Ontha v. Rutherford Cty., Tenn.*, 222 F. App'x 498, 507 (6th Cir. 2007)).

Plaintiff's allegation that the City Defendants failed to intervene and prevent constitutional violations will be analyzed below for each individual officer.

### d.  Civil Conspiracy Claims

To set forth a federal claim for conspiracy to interfere with civil rights, a plaintiff must show "that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused the injury." *Robertson*, 753 F.3d at 622 (punctuation modified). "To establish a conspiracy under a Section 1983 claim, a plaintiff must first demonstrate a constitutional deprivation." *Bauss v. Plymouth Twp.*, 233 F. App'x 490, 496 (6th Cir. 2007) (punctuation modified).

"To survive a motion to dismiss, a conspiracy claim 'must be pled with some degree of specificity.'" *Blue v. Lane*, 767 F. Supp. 2d 860, 868 (S.D. Ohio 2011) (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538. (6th Cir. 1987)). "[V]ague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983" *Gutierrez*, 826 F.2d at 1538; *see Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 564 (6th Cir. 2011) (affirming dismissal of a § 1983 conspiracy claim where the complaint alleged defendants "conferr[ed] with one another at different points…but it does not contain any more specific allegations of a plan or

31

agreement to violate his constitutional rights.").

Plaintiff's allegation that the City Defendants conspired to interfere with Plaintiff's civil rights will be analyzed below for each individual officer.

### 3.     Qualified Immunity Analysis

Even accepting the Complaint's allegations as true, the Defendant Officers are entitled to qualified immunity on each of Plaintiff's federal claims for the following reasons.

#### a.     Detective Weis

As stated above, Plaintiff alleges J.U. fell suddenly and admits to gently shaking him after the fall. (Complaint, ECF No. 1 ¶¶ 24–26).

Plaintiff makes the following allegations about Detective Weis. Detective Weis and Detective Seamans arrived at the home. (*Id.* ¶ 36). Detective Weis and Officer Holbrook interrogated Plaintiff, who they referred to as "the male suspect" in the "shaken baby case" to dispatch. (*Id.* ¶ 45). No lawyer was present. (*Id.*).

At 10:50 p.m., Detective Weis successfully obtained a search warrant for Plaintiff's apartment, stating in the affidavit that Plaintiff "acknowledged shaking the child 'a little bit.'" (*Id.* ¶ 48). In the affidavit, Detective Weis also stated that "Dr. Karla Hauersberger advised J.U.'s CAT scan revealed bilateral subdural hemorrhaging and a percussion injury to the liver, spleen, and kidneys." (*Id.*). Plaintiff does not allege that Detective Weis either knew or should have known that this information was anything but accurate.

Plaintiff alleges that on the morning of February 14, 2002, Dr. Johnson conspired with Detective Weis by sharing his conclusions that J.U. had been shaken, knowing there were other possible causes of J.U.'s injuries, knowing he should have taken J.U.'s history of illness and falls with impact to the head into account, and knowing it was biomechanically impossible to exert enough force to cause such injuries in a 30-pound child by shaking. (*Id.* ¶ 58). Plaintiff does not

allege that Detective Weis either knew or should have known any of these things or that he knew or should have known that Dr. Johnson's conclusions were anything but accurate.

Thereafter, Dr. Fardal, forensic pathologist at the Franklin County Coroner's Office, conducted J.U.'s autopsy. (*Id.* ¶ 61). Detective Weis and Dr. Johnson were present during the autopsy and consulted with Dr. Fardal before the examination, telling him their theory that J.U. died from shaken baby syndrome. (*Id.*). Plaintiff alleges the defendants suppressed all evidence of this conversation, which, had it been disclosed, would have provided a basis for Plaintiff to build a defense through the support of expert witnesses. (*Id.*). Plaintiff does not allege that Detective Weis either knew or should have known that J.U. died from anything other than shaken baby syndrome. Dr. Fardal found no injury to J.U.'s neck, liver, spleen, or kidneys, refuting Dr. Hauersberger's findings documented in Weis' search warrant affidavit. (*Id.* ¶ 64). Likewise, he found no injuries on J.U.'s arms, legs, trunk, or ribs. (*Id.*).

Plaintiff alleges that based on the fabricated determination of SBS, which pointed to Plaintiff as the only possible perpetrator, Detective Weis obtained an arrest warrant for Plaintiff for murder, stating J.U.'s injuries "were not sustained in a fall and occurred within minutes of a 'non-accidental head trauma.'" (*Id*. ¶ 74). Plaintiff does not allege that Detective Weis either knew or should have known that the determination of SBS was fabricated. Plaintiff alleges that the warrant cited directly to the fabricated determinations of Drs. Johnson and Fardal. (*Id.*). Plaintiff does not allege that Detective Weis either knew or should have known that the determinations of Drs. Johnson and Fardal were either "fabricated" or incorrect in any way.

Based on the foregoing, Plaintiff has failed to plead facts showing either that (1) Detective Weis violated a federal statutory or constitutional right, or that (2) the unlawfulness of his conduct was clearly established at the time.

*(1)    Plaintiff's due process claim against Weis*

Regarding Plaintiff's due process claim, Plaintiff has failed to plead facts showing that Detective Weis did anything during the investigation of this matter that would have constituted a violation of Plaintiff's rights. Plaintiff alleges that Detective Weis interrogated Plaintiff with Officer Holbrook. But he does not allege that Detective Weis did anything during that interrogation that would have constituted a violation of Plaintiff's rights.

Regarding Plaintiff's allegation that in his search warrant affidavit, Detective Weis stated that "Dr. Karla Hauersberger advised J.U.'s CAT scan revealed bilateral subdural hemorrhaging and a percussion injury to the liver, spleen, and kidneys," Plaintiff does not allege that Detective Weis either knew or should have known that this information was anything but accurate.

Regarding Plaintiff's allegation that Dr. Johnson conspired with Detective Weis by sharing his conclusions that J.U. had been shaken, knowing there were other possible causes of J.U.'s injuries, knowing he should have taken J.U.'s history of illness and falls with impact to the head into account, and knowing it was biomechanically impossible to exert enough force to cause such injuries in a 30-pound child by shaking, Plaintiff does not allege that Detective Weis either knew or should have known any of these things or that he knew or should have known that Dr. Johnson's conclusions were anything but accurate.

Regarding Plaintiff's allegation that Detective Weis and Dr. Johnson were present during the autopsy and consulted with Dr. Fardal before the examination, telling him their theory that J.U. died from shaken baby syndrome, Plaintiff does not allege that Detective Weis either knew or should have known that J.U. died from anything other than shaken baby syndrome. Accordingly, regarding Plaintiff's allegation that "[d]efendants suppressed all evidence of this conversation, which, had it been disclosed, would have provided a basis for Plaintiff to build a defense through the support of expert witnesses," the alleged exculpatory value of this information would not have

34

been apparent to a reasonable officer. None of Plaintiff's allegations support an argument that Detective Weis should have been aware that such evidence could form a basis for exonerating Plaintiff. Nothing regarding that conversation would have put a reasonable officer on notice that the doctors' shaken baby syndrome conclusion was wrong in any way.

Regarding Plaintiff's allegation that based on false information, Dr. Fardal concluded that J.U.'s death was a homicide due to non-accidental head trauma, and that J.U. was allegedly shaken by another person, Plaintiff does not allege that Detective Weis knew or should have known that Dr. Fardal had received false information or that his conclusion was anything but accurate.

Regarding Plaintiff's allegation that Dr. Fardal was aware that acute pneumonia could cause the same symptoms as those of SBS, but he ignored that so he could fabricate a SBS diagnosis, or that Dr. Fardal was aware of the studies at the time that seriously called into question the validity of an SBS diagnosis altogether, Plaintiff does not allege that Detective Weis knew or should have known any of these things.

Regarding Plaintiff's allegation that Detective Weis obtained an arrest warrant for Plaintiff for murder, stating J.U.'s injuries "were not sustained in a fall and occurred within minutes of a 'non-accidental head trauma,'" with the warrant citing directly to the "fabricated" determinations of Drs. Johnson and Fardal, Plaintiff does not allege that Detective Weis either knew or should have known that the determinations of Drs. Johnson and Fardal were either "fabricated" or incorrect in any way.

Plaintiff does not allege that Detective Weis otherwise withheld or destroyed evidence or fabricated and created false evidence. Plaintiff does not allege that Detective Weis testified at trial.

Therefore, Plaintiff has failed to plead facts showing that Detective Weis violated Plaintiff's due process rights under any theory of liability. And Plaintiff has failed to plead facts

35

showing that the unlawfulness of Detective Weis' conduct was clearly established at the time. Accurately reporting what mandatory reporting doctors concluded in police reports, search warrant affidavits, and arrest warrant affidavits did not constitute unlawful conduct that was clearly established in February of 2002. Thus, regarding Plaintiff's due process claim, Detective Weis is entitled to qualified immunity and judgment on the pleadings.

(2)     *Plaintiff's malicious prosecution claim against Weis*

Regarding Plaintiff's malicious prosecution claim, Plaintiff has failed to plead facts showing that Detective Weis lacked probable cause for Plaintiff's prosecution. The doctors' conclusions provided probable cause to charge Plaintiff, who was watching J.U. at the time of the incident. (Complaint, ECF No. 1 ¶¶ 6, 26-29, 66). Plaintiff does not allege that Detective Weis had any reason to doubt the doctors' conclusions. Nor does Plaintiff allege that Detective Weis misreported what he was told by the doctors. And as stated above, Plaintiff has failed to plead facts showing that the unlawfulness of Detective Weis' conduct was clearly established at the time. Thus, regarding Plaintiff's malicious prosecution claim, Detective Weis is entitled to qualified immunity and judgment on the pleadings.

(3)     *Plaintiff's failure to intervene claim against Weis*

Regarding Plaintiff's failure to intervene claim, Plaintiff has failed to plead facts showing that Detective Weis (1) observed or had reason to know that constitutional harm would be or was taking place, and (2) had both the opportunity and the means to prevent the harm from occurring. Notably, Plaintiff does not allege that Officer Holbrook did anything improper during Plaintiff's interrogation that Detective Weis would have observed and had the opportunity and means to stop. Plaintiff also does not allege that Detective Weis either knew or should have known that the doctors' conclusions were anything but accurate. Therefore, Plaintiff has failed to plead facts showing that Detective Weis' acts would constitute a failure to intervene and prevent a

36

constitutional violation. Likewise, Plaintiff has failed to plead facts showing that the unlawfulness of Detective Weis' conduct was clearly established at the time. Thus, regarding Plaintiff's failure to intervene claim, Detective Weis is entitled to qualified immunity and judgment on the pleadings.

*(4)      Plaintiff's civil conspiracy claim against Weis*

Regarding Plaintiff's civil conspiracy claim, Plaintiff has not pled with some degree of specificity facts showing that: (1) a single plan existed, (2) Detective Weis and others shared a conspiratorial objective to deprive Plaintiff of his constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused Plaintiff's alleged injury.

Plaintiff does allege that "Dr. Johnson conspired with Detective Weis" by sharing his conclusions that J.U. had been shaken, knowing there were other possible causes of J.U.'s injuries, knowing he should have taken J.U.'s history of illness and falls with impact to the head into account, and knowing it was biomechanically impossible to exert enough force to cause such injuries in a 30-pound child by shaking. But Plaintiff does not allege that *Detective Weis* either knew or should have known any of these things or that he knew or should have known that Dr. Johnson's conclusions were anything but accurate. And Plaintiff does not allege that Detective Weis was part of a single plan and shared a conspiratorial objective to deprive Plaintiff of his constitutional rights. Therefore, Plaintiff has failed to plead facts showing that Detective Weis participated in a civil conspiracy to deprive Plaintiff of his constitutional rights.

Likewise, it was not clearly established in February of 2002 that an officer participates in an unconstitutional civil conspiracy by accurately reporting what mandatory reporting doctors state in police reports, search warrant affidavits, and arrest warrant affidavits. Thus, regarding Plaintiff's civil conspiracy claim, Detective Weis is entitled to qualified immunity and judgment on the pleadings.

37

### b.        Detective Seamans

The only allegation Plaintiff makes regarding Detective Seamans is that she "arrived at the home." (Complaint, ECF No. 1 ¶ 36). Therefore, Plaintiff has failed to plead facts showing either that (1) Detective Seamans violated a federal statutory or constitutional right, or that (2) the unlawfulness of her conduct was clearly established at the time.

Detective Seaman's arrival at the home does not constitute a due process violation under any of Plaintiff's theories. Nor does it constitute a malicious prosecution. Nor does it constitute a failure to intervene. Nor does it constitute participation in a civil conspiracy to deprive Plaintiff of his constitutional rights. Furthermore, it was not clearly established as of the date of the incident that Detective Seaman's arrival at the home would constitute a violation of Plaintiff's statutory or constitutional rights.

Thus, regarding Plaintiff's federal claims, Detective Seamans is entitled to qualified immunity and judgment on the pleadings.

### c.        Officer Keller

Plaintiff makes the following allegations about Officer Keller. Officers Keller and Holbrook arrived on scene first and observed Plaintiff standing near J.U., who was lying on the floor. (Complaint, ECF No. 1 ¶ 27). Plaintiff ran to the door and beckoned them in. (*Id*.). Plaintiff explained to Officers Keller and Holbrook that J.U. had fallen, hit his head, and stopped breathing. (*Id*. ¶ 29). Plaintiff told Officers Keller and Holbrook that J.U. had been standing up when J.U. threw his arms forward, toppled backwards without warning, and hit his head on the floor. (*Id.* ¶ 30). Officer Keller began giving J.U. mouth-to-mouth resuscitation and gave paramedics "the clear" to come into the home at 4:47 p.m. (*Id.* ¶ 31). J.U. had no heartbeat and was not receiving oxygen to his brain. (*Id.*). The paramedics worked to revive J.U. for 30 minutes. (Id.). Officer Keller did not notice any marks or signs of violence on J.U. and did not observe anything out of

the ordinary or suspicious in the home. (*Id.* ¶ 33).

The Defendant Officers would not allow Plaintiff to go to the hospital. (*Id.* ¶ 43). Instead, Officers Keller and Holbrook transported him in the back of a patrol car to the Columbus Police Station. (*Id.*). At the conclusion of questioning, Officers Keller and Holbrook took Plaintiff back home. (*Id.* ¶ 47). They refused to take him to the hospital or to update him on J.U.'s condition. (*Id.*). At trial, the prosecution presented the testimony of Officer Keller, among others. (*Id.* ¶ 77).

Based on the foregoing, Plaintiff has failed to plead facts showing either that (1) Officer Keller violated a federal statutory or constitutional right, or that (2) the unlawfulness of his conduct was clearly established at the time.

### (1) *Plaintiff's due process claim against Keller*

Plaintiff does not allege that Officer Keller offered false trial testimony. Nor does he allege that Officer Keller played any role in the investigation whatsoever. Nor does he allege that Officer Keller withheld or destroyed evidence or fabricated and created false evidence. Therefore, Plaintiff has failed to plead facts showing that Officer Keller violated Plaintiff's due process rights under any theory of liability. Likewise, Plaintiff has failed to plead facts showing that the unlawfulness of Officer Keller's conduct was clearly established at the time. Thus, regarding Plaintiff's due process claim, Officer Keller is entitled to qualified immunity and judgment on the pleadings.

### (2) *Plaintiff's malicious prosecution claim against Keller*

Regarding Plaintiff's malicious prosecution claim, Plaintiff has failed to plead facts showing that Officer Keller made, influenced, or participated in the decision to prosecute Plaintiff. Nor do Plaintiff's allegations support a lack of probable cause for Plaintiff's prosecution. The doctors' conclusions provided probable cause to charge Plaintiff, who was watching J.U. at the time of the incident. Therefore, Plaintiff has failed to plead facts showing that Officer Keller's acts would constitute the malicious prosecution of Plaintiff. Likewise, Plaintiff has failed to plead facts

39

showing that the unlawfulness of Officer Keller's conduct was clearly established at the time. Thus, regarding Plaintiff's malicious prosecution claim, Officer Keller is entitled to qualified immunity and judgment on the pleadings.

(3)    <em>Plaintiff's failure to intervene claim against Keller</em>

Regarding Plaintiff's failure to intervene claim, Plaintiff has failed to plead facts showing that Officer Keller (1) observed or had reason to know that constitutional harm would be or was taking place, and (2) had both the opportunity and the means to prevent the harm from occurring. Therefore, Plaintiff has failed to plead facts showing that Officer Keller's acts would constitute a failure to intervene and prevent a constitutional violation. Likewise, Plaintiff has failed to plead facts showing that the unlawfulness of Officer Keller's conduct was clearly established at the time. Thus, regarding Plaintiff's failure to intervene claim, Officer Keller is entitled to qualified immunity and judgment on the pleadings.

(4)    <em>Plaintiff's civil conspiracy claim against Keller</em>

Regarding Plaintiff's civil conspiracy claim, Plaintiff has not pled with some degree of specificity facts showing that: (1) a single plan existed, (2) Officer Keller and others shared a conspiratorial objective to deprive Plaintiff of his constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused Plaintiff's alleged injury.

Therefore, Plaintiff has failed to plead facts showing that Officer Keller participated in a civil conspiracy to deprive Plaintiff of his constitutional rights. Likewise, Plaintiff has failed to plead facts showing that the unlawfulness of Officer Keller's conduct was clearly established at the time. Thus, regarding Plaintiff's civil conspiracy claim, Officer Keller is entitled to qualified immunity and judgment on the pleadings.

**d.**    **Officer Holbrook**

Plaintiff makes the following allegations about Officer Holbrook. Officers Holbrook and

40

Keller arrived on scene first and observed Plaintiff standing near J.U., who was lying on the floor. (Complaint, ECF No. 1 ¶ 27). Plaintiff ran to the door and beckoned them in. (*Id*.). Plaintiff explained to Officers Holbrook and Keller that J.U. had fallen, hit his head, and stopped breathing. (*Id*. ¶ 29). Plaintiff told Officers Holbrook and Keller that J.U. had been standing up when J.U. threw his arms forward, toppled backwards without warning, and hit his head on the floor. (*Id*. ¶ 30). Plaintiff said J.U. had been suffering from a minor cold in the previous few days and might have received a small amount of children's cough syrup that morning. (*Id*. ¶ 32). Plaintiff searched for the cough medicine bottle, accompanied by Officer Holbrook. (*Id*.). Officer Holbrook did not notice any marks or signs of violence on J.U. and did not observe anything out of the ordinary or suspicious in the home. (*Id*. ¶ 33). Officer Holbrook heard Plaintiff tell paramedics multiple times what had happened, each time consistent with what he had explained to Officers Keller and Holbrook when they first arrived. (*Id*. ¶ 34).

The Defendant Officers would not allow Plaintiff to go to the hospital. (*Id*. ¶ 43). Instead, Officers Holbrook and Keller transported Plaintiff in the back of a patrol car to the Columbus Police Station. (*Id*.). Eventually, Detective Weis and Officer Holbrook interrogated Plaintiff, who they referred to as "the male suspect" in the "shaken baby case" to dispatch. (*Id*. ¶ 45). No lawyer was present. (*Id*.). At the conclusion of the questioning, Officers Holbrook and Keller took Plaintiff back home. (*Id*. ¶ 47). They refused to take him to the hospital or to update him on J.U.'s condition. (Id.). At trial, the prosecution presented the testimony of Officer Holbrook, among others. (*Id*. ¶ 77).

Based on the foregoing, Plaintiff has failed to plead facts showing either that (1) Officer Holbrook violated a federal statutory or constitutional right, or that (2) the unlawfulness of his conduct was clearly established at the time.

41

(1)     *Plaintiff's due process claim against Holbrook*

Plaintiff alleges that Officer Holbrook interrogated Plaintiff with Detective Weis. But he does not allege that Officer Holbrook did anything during that interrogation that would have constituted a violation of Plaintiff's rights. Plaintiff does not allege that Officer Holbrook offered false trial testimony. Nor does he allege that Officer Holbrook withheld or destroyed evidence or fabricated and created false evidence. Therefore, Plaintiff has failed to plead facts showing that Officer Holbrook violated Plaintiff's due process rights under any theory of liability. Likewise, Plaintiff has failed to plead facts showing that the unlawfulness of Officer Holbrook's conduct was clearly established at the time. Thus, regarding Plaintiff's due process claim, Officer Holbrook is entitled to qualified immunity and judgment on the pleadings.

(2)     *Plaintiff's malicious prosecution claim against Holbrook*

Regarding Plaintiff's malicious prosecution claim, Plaintiff has failed to plead facts showing that Officer Holbrook made, influenced, or participated in the decision to prosecute Plaintiff. Nor do Plaintiff's allegations support a lack of probable cause for Plaintiff's prosecution. The doctors' conclusions provided probable cause to charge Plaintiff, who was watching J.U. at the time of the incident. Therefore, Plaintiff has failed to plead facts showing that Officer Holbrook's acts would constitute the malicious prosecution of Plaintiff. Likewise, Plaintiff has failed to plead facts showing that the unlawfulness of Officer Holbrook's conduct was clearly established at the time. Thus, regarding Plaintiff's malicious prosecution claim, Officer Holbrook is entitled to qualified immunity and judgment on the pleadings.

(3)     *Plaintiff's failure to intervene claim against Holbrook*

Regarding Plaintiff's failure to intervene claim, Plaintiff has failed to plead facts showing that Officer Holbrook (1) observed or had reason to know that constitutional harm would be or was taking place, and (2) had both the opportunity and the means to prevent the harm from

42

occurring. Notably, Plaintiff does not allege that Detective Weis did anything improper during Plaintiff's interrogation that Officer Holbrook would have observed and had the opportunity and means to stop. Therefore, Plaintiff has failed to plead facts showing that Officer Holbrook's acts would constitute a failure to intervene and prevent a constitutional violation. Likewise, Plaintiff has failed to plead facts showing that the unlawfulness of Officer Holbrook's conduct was clearly established at the time. Thus, regarding Plaintiff's failure to intervene claim, Officer Holbrook is entitled to qualified immunity and judgment on the pleadings.

### (4)     Plaintiff's civil conspiracy claim against Holbrook

Regarding Plaintiff's civil conspiracy claim, Plaintiff has not pled with some degree of specificity facts showing that: (1) a single plan existed, (2) Officer Holbrook and others shared a conspiratorial objective to deprive Plaintiff of his constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused Plaintiff's alleged injury. Therefore, Plaintiff has failed to plead facts showing that Officer Holbrook participated in a civil conspiracy to deprive Plaintiff of his constitutional rights. Likewise, Plaintiff has failed to plead facts showing that the unlawfulness of Officer Holbrook's conduct was clearly established at the time. Thus, regarding Plaintiff's civil conspiracy claim, Officer Holbrook is entitled to qualified immunity and judgment on the pleadings.

### e.     Detective Eppert

Plaintiff makes the following allegations about Detective Eppert. Less than 15 minutes after J.U. had arrived, Detective Eppert and Detective Goss responded to Children's Hospital. (Complaint, ECF No. 1 ¶ 39). There, Dr. McManus informed the detectives that the "victim had bilateral subdural hemorrhaging indicative of 'shaken baby' syndrome" ("SBS"). (*Id.*). Dr. McManus jumped to this conclusion without first conducting any diagnostic testing. (*Id.*). Plaintiff does not allege that either Detective Eppert or Detective Goss knew or should have known that Dr.

43

McManus jumped to her conclusion without first conducting any diagnostic testing or that they knew or should have known that her conclusion was anything but accurate.

Detective Eppert noted that a nurse told him that it was "the opinion of the medical staff that the victim's air supply had been shut off for approximately five (5) minutes before the medics arrived." (*Id.* ¶ 41). Detective Eppert and Detective Goss interviewed Beth at the hospital. (*Id.* ¶ 42). Beth informed the detectives that for the past week, J.U. had been sick, acting dizzy "quite a bit," and had fallen "quite a lot." (*Id.*). Beth further told the detectives that she had no reason to think Plaintiff abused J.U. (*Id.*).

Based on the foregoing, Plaintiff has failed to plead facts showing either that (1) Detective Eppert violated a federal statutory or constitutional right, or that (2) the unlawfulness of his conduct was clearly established at the time.

### (1) Plaintiff's due process claim against Eppert

Plaintiff does not allege that Detective Eppert testified at trial. Nor does he allege that that Detective Eppert did anything during the investigation of this matter that would have constituted a violation of Plaintiff's rights. Regarding his allegation that Dr. McManus jumped to her conclusion without first conducting any diagnostic testing, Plaintiff does not allege that Detective Eppert knew or should have known that occurred or that her conclusion was anything but accurate. Plaintiff does not allege that Detective Eppert withheld or destroyed evidence or fabricated and created false evidence. Therefore, Plaintiff has failed to plead facts showing that Detective Eppert violated Plaintiff's due process rights under any theory of liability. Likewise, Plaintiff has failed to plead facts showing that the unlawfulness of Detective Eppert's conduct was clearly established at the time. Thus, regarding Plaintiff's due process claim, Detective Eppert is entitled to qualified immunity and judgment on the pleadings.

44

(2)      *Plaintiff's malicious prosecution claim against Eppert*

Regarding Plaintiff's malicious prosecution claim, Plaintiff has failed to plead facts showing that Detective Eppert made, influenced, or participated in the decision to prosecute Plaintiff other than documenting his conversations with Dr. McManus, the nurse, and J.U.'s mother Beth. Nor do Plaintiff's allegations support a lack of probable cause for Plaintiff's prosecution. The doctors' conclusions provided probable cause to charge Plaintiff, who was watching J.U. at the time of the incident. Therefore, Plaintiff has failed to plead facts showing that Detective Eppert's acts would constitute the malicious prosecution of Plaintiff. Likewise, Plaintiff has failed to plead facts showing that the unlawfulness of Detective Eppert's conduct (that is, documenting his conversations with Dr. McManus, the nurse, and J.U.'s mother Beth) was clearly established at the time. Thus, regarding Plaintiff's malicious prosecution claim, Detective Eppert is entitled to qualified immunity and judgment on the pleadings.

(3)      *Plaintiff's failure to intervene claim against Eppert*

Regarding Plaintiff's failure to intervene claim, Plaintiff has failed to plead facts showing that Detective Eppert (1) observed or had reason to know that constitutional harm would be or was taking place, and (2) had both the opportunity and the means to prevent the harm from occurring. Therefore, Plaintiff has failed to plead facts showing that Detective Eppert's acts would constitute a failure to intervene and prevent a constitutional violation. Likewise, Plaintiff has failed to plead facts showing that the unlawfulness of Detective Eppert's conduct was clearly established at the time. Thus, regarding Plaintiff's failure to intervene claim, Detective Eppert is entitled to qualified immunity and judgment on the pleadings.

(4)      *Plaintiff's civil conspiracy claim against Eppert*

Regarding Plaintiff's civil conspiracy claim, Plaintiff has not pled with some degree of specificity facts showing that: (1) a single plan existed, (2) Detective Eppert and others shared a

45

conspiratorial objective to deprive Plaintiff of his constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused Plaintiff's alleged injury.

Therefore, Plaintiff has failed to plead facts showing that Detective Eppert participated in a civil conspiracy to deprive Plaintiff of his constitutional rights. Likewise, Plaintiff has failed to plead facts showing that the unlawfulness of Detective Eppert's conduct was clearly established at the time. Thus, regarding Plaintiff's civil conspiracy claim, Detective Eppert is entitled to qualified immunity and judgment on the pleadings.

**f.      Detective Goss**

Plaintiff makes the following allegations about Detective Goss. Less than 15 minutes after J.U. had arrived, Detective Goss and Detective Eppert responded to Children's Hospital. (Complaint, ECF No. 1 ¶ 39). There, Dr. McManus informed the detectives that the "victim had bilateral subdural hemorrhaging indicative of 'shaken baby' syndrome" ("SBS"). (*Id.*). Dr. McManus jumped to this conclusion without first conducting any diagnostic testing. (*Id.*). Plaintiff does not allege that either Detective Eppert or Detective Goss knew or should have known that Dr. McManus jumped to her conclusion without first conducting any diagnostic testing or that they knew or should have known that her conclusion was anything but accurate. Detective Goss and Detective Eppert interviewed Beth at the hospital. (*Id.* ¶ 42). Beth informed the detectives that for the past week, J.U. had been sick, acting dizzy "quite a bit," and had fallen "quite a lot." (*Id.*). Beth further told the detectives that she had no reason to think Plaintiff abused J.U. (*Id.*).

Based on the foregoing, Plaintiff has failed to plead facts showing either that (1) Detective Goss violated a federal statutory or constitutional right, or that (2) the unlawfulness of his conduct was clearly established at the time.

*(1)      Plaintiff's due process claim against Goss*

Plaintiff does not allege that Detective Goss testified at trial. Nor does he allege that that

Detective Goss did anything during the investigation of this matter that would have constituted a violation of Plaintiff's rights. Regarding his allegation that Dr. McManus jumped to her conclusion without first conducting any diagnostic testing, Plaintiff does not allege that Detective Goss knew or should have known that occurred or that he knew or should have known that her conclusion was anything but accurate. Plaintiff does not allege that Detective Goss withheld or destroyed evidence or fabricated and created false evidence. Therefore, Plaintiff has failed to plead facts showing that Detective Goss violated Plaintiff's due process rights under any theory of liability. Likewise, Plaintiff has failed to plead facts showing that the unlawfulness of Detective Goss' conduct was clearly established at the time. Thus, regarding Plaintiff's due process claim, Detective Goss is entitled to qualified immunity and judgment on the pleadings.

### (2)    *Plaintiff's malicious prosecution claim against Goss*

Regarding Plaintiff's malicious prosecution claim, Plaintiff has failed to plead facts showing that Detective Goss made, influenced, or participated in the decision to prosecute Plaintiff other than documenting his conversations with Dr. McManus and J.U.'s mother Beth. Nor do Plaintiff's allegations support a lack of probable cause for Plaintiff's prosecution. The doctors' conclusions provided probable cause to charge Plaintiff, who was watching J.U. at the time of the incident. Therefore, Plaintiff has failed to plead facts showing that Detective Goss' acts would constitute the malicious prosecution of Plaintiff. Likewise, Plaintiff has failed to plead facts showing that the unlawfulness of Detective Goss' conduct (that is, documenting his conversations with Dr. McManus and J.U.'s mother Beth) was clearly established at the time. Thus, regarding Plaintiff's malicious prosecution claim, Detective Goss is entitled to qualified immunity and judgment on the pleadings.

### (3)    *Plaintiff's failure to intervene claim against Goss*

Regarding Plaintiff's failure to intervene claim, Plaintiff has failed to plead facts showing

47

that Detective Goss (1) observed or had reason to know that constitutional harm would be or was taking place, and (2) had both the opportunity and the means to prevent the harm from occurring. Plaintiff does not allege that Detective Goss either knew or should have known that the doctors' conclusions were anything but accurate. Therefore, Plaintiff has failed to plead facts showing that Detective Goss' acts would constitute a failure to intervene and prevent a constitutional violation. Likewise, Plaintiff has failed to plead facts showing that the unlawfulness of Detective Goss' conduct was clearly established at the time. Thus, regarding Plaintiff's failure to intervene claim, Detective Goss is entitled to qualified immunity and judgment on the pleadings.

(4)      *Plaintiff's civil conspiracy claim against Goss*

Regarding Plaintiff's civil conspiracy claim, Plaintiff has not pled with some degree of specificity facts showing that: (1) a single plan existed, (2) Detective Goss and others shared a conspiratorial objective to deprive Plaintiff of his constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused Plaintiff's alleged injury.

Therefore, Plaintiff has failed to plead facts showing that Detective Goss participated in a civil conspiracy to deprive Plaintiff of his constitutional rights. Likewise, Plaintiff has failed to plead facts showing that the unlawfulness of Detective Goss' conduct was clearly established at the time. Thus, regarding Plaintiff's civil conspiracy claim, Detective Goss is entitled to qualified immunity and judgment on the pleadings.

## D.      FEDERAL CLAIMS AGAINST THE CITY

Plaintiff also brings claims against the City under 42 U.S.C. § 1983. While a municipality can be sued directly under 42 U.S.C. § 1983 (commonly known as a *Monell* claim), liability cannot be based on a theory of vicarious liability, or *respondeat superior*. *See Monell v. Department of Social Services*, 436 U.S. 658, 690–94 (1978). That is, a "municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *Canton v.*

48

*Harris*, 489 U.S. 378, 385 (1989) (citing *Monell*, 436 U.S. at 694–95). Thus, a plaintiff raising a *Monell* claim under § 1983 must first establish an underlying violation of federal law and then "demonstrate that the alleged federal [law] violation occurred because of a municipal policy or custom." *Burgess*, 735 F.3d at 478; *Stanfield v. Lima*, 727 Fed. App'x 841, 851 (6th Cir. 2018).

"[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." *Bryan County v. Brown*, 520 U.S. 397, 404 (1997). Rather, the "plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Id.* at 404 (emphasis in original); *Griffith v. Franklin County*, 975 F.3d 554, 581 (6th Cir. 2020); *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013). In other words, Plaintiff may not merely complain about some alleged deficiency in the City's policies or customs, but "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bryan County*, 520 U.S. at 404; *Alman*, 703 F.3d at 903; *Triplett-Fazzone v. Columbus*, Case No.2:12-cv-331, 2013 U.S. Dist. LEXIS 110663, *16 (S.D. Ohio Aug. 6, 2013).

In light of the foregoing, *Monell* claims under § 1983 have four essential elements: (1) an underlying constitutional violation by a municipal employee or agent; (2) an improper official municipal policy or custom; (3) a sufficient culpable mental state on the part of the municipality with respect to that policy or custom; and (4) a direct causal link between that municipal policy or custom and the underlying violation at issue. Because Plaintiff has not alleged sufficient facts to establish any of these elements, the City is entitled to a judgment on the pleadings.

### 1.    No Underlying Constitutional Violation

With respect to the first element, a "plaintiff must show harm 'caused by a constitutional violation.' … No constitutional violation means no municipal liability." *Thomas v. Columbus*, 854 F.3d 361, 367 (6th Cir. 2017) (quoting & citing *Lee v. Metropolitan Government*, 432 Fed. App'x

49

435, 449 (6th Cir. 2011)); *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Stevens-Rucker v. Columbus*, 739 Fed. App'x 834, 846 (6th Cir. 2018). Plaintiff's federal claims against the City fail as a matter of law because, as explained above, he has not plead facts showing that any of the Defendant Officers (or any other City employee) committed an underlying constitutional violation.

### 2. No Improper Municipal Policy

With respect to the second element of a *Monell* claim, the Sixth Circuit has long recognized at least four avenues for establishing an improper municipal policy: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Monell*, 436 U.S. at 694); *Pembaur v. Cincinnati*, 475 U.S. 469, 480 (1986); *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997); *Doe v. Claiborne County*, 103 F.3d 495, 507 (6th Cir. 1996)).

These avenues are merely methods for establishing the second element of such claims. That is, they are the means by which a plaintiff asserting a *Monell* claim identifies and establishes some sort of improper municipal policy. Even if Plaintiff had plead facts showing an underlying constitutional violation (he did not) and an improper policy (he did not), Plaintiff must still prove both the third and fourth essential elements of *Monell* liability (*i.e.*, causation and culpability). *See Bryan County*, 520 U.S. at 405. In the context of municipal liability, causation exists only when the purportedly improper policy is the "'moving force of the constitutional violation.'" *Oklahoma City v. Tuttle*, 471 U.S. 808, 820 (1985) (quoting *Polk County v. Dodson*, 454 U.S. 312, 326 (1981)); *Monell*, 436 U.S. at 694; *Canton*, 489 U.S. at 388–89. Moreover, the relevant standard for culpability for municipal liability is that of "deliberate indifference"—a "very high standard of culpability, exceeding 'gross negligence.'" *Ross v. Duggan*, 402 F.3d 575, 590 n.7 (6th Cir. 2004)

50

(emphasis in original) (quoting *Canton*, 489 U.S. at 388–92 & n.7).

When a plaintiff claims that a particular municipal action itself violated federal law or that the municipality has specifically directed its employees to do something that violates federal law (*i.e.*, the first and second avenues for establishing an improper municipal policy), resolving municipal liability issues of culpability and causation is relatively straightforward. *Bryan County*, 520 U.S. at 404. After all, "Section 1983 itself 'contains no state-of-mind requirement independent of that necessary to state a violation' of the underlying federal right." *Id.* at 405 (quoting *Daniels v. Williams*, 474 U.S. 327, 329–30 (1986)). Thus, "proof that a municipality's legislative body or authorized decision maker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably." *Bryan County*, 520 U.S. at 405. Nonetheless, when a plaintiff claims that the municipality has not directly inflicted an injury, but has instead caused and allowed the injury to happen (*i.e.*, the third and fourth avenue to an improper municipal policy), "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* (citing *Canton*, 489 U.S. at 391–92); *Tuttle*, 471 U.S. at 824; *Connick v. Thompson*, 563 U.S. 51, 74 (2011).

As shown above, Plaintiff failed to plead facts showing that the Defendant Officers (or any other City employee) committed an underlying constitutional violation. Still, even if Plaintiff had plead facts sufficient to show such a violation, his *Monell* claim against the City still fails because he failed to plead facts showing any improper municipal policy or custom. Further still, he failed to plead facts showing either the causal connection or the culpability necessary for federal municipal liability.

Plaintiff generally alleges the City implemented unconstitutional policies. (Complaint, ECF No. 1 ¶¶ 21, 103-105, 113-115, 120, 127, 129-130). But Plaintiff's pleading does nothing

51

more than offer labels and conclusions and a formulaic recitation of the elements of a *Monell* claim and tender naked assertions devoid of further factual enhancement. This is not enough to satisfy the pleading requirements to impose *Monell* liability against the City under the *Iqbal*/*Twombly* standard. Accordingly, the City is entitled to summary judgment on the *Monell* claim.

### 3.      No Official Policy or Legislative Enactment

Plaintiff's allegations do not point to any specific improper official policy or legislative enactment as the source of the Defendant Officers' conduct. Thus, Plaintiff failed to plead facts showing that the City had any improper legislative enactments or official policies that caused his alleged constitutional violations.

### 4.      No Final Decision-Maker Approval

In order to establish the existence of an improper municipal policy, a plaintiff can next look to actions taken by municipal officials with final decision-making authority. *See Thomas*, 398 F.3d at 429; *Griffith*, 975 F.3d at 581; *Burgess*, 735 F.3d at 478. Under this theory of municipal liability, "a single decision can constitute a municipal policy or custom, if that decision is made by an official who possesses final authority to establish municipal policy with respect to the action ordered, which means that his decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Stillwagon v. Delaware*, Case No. 2:14-cv-80, 2016 U.S. Dist. LEXIS 44223, *61–62 (S.D. Ohio March 31, 2016) (internal quotations omitted); *Pembaur*, 475 U.S. at 480–81; *Flagg v. Detroit*, 715 F.3d 165, 175 (6th Cir. 2013). "To determine whether final authority to make municipal policy is vested in a particular official, we must resort to state law." *Feliciano v. Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (finding that the Chief of Police was not such a final policymaker as to the purported police department policy at issue). Thus, an "official with final decision making authority ratifies a subordinate's action if the decision maker provides 'affirmative approval of a particular decision made by the subordinate.'" *Stillwagon*,

2016 U.S. Dist. LEXIS 44223, *62 (quoting *Feliciano*, 988 F.2d at 656 (6th Cir. 1993)).

Other than his conclusory allegations in the Complaint, Plaintiff points to no facts that would demonstrate that the actions of the Defendant Officers were taken because of prior or contemporaneous approval by a municipal official with final decision-making authority or that an official with final decision-making authority otherwise ratified the allegedly unconstitutional conduct. Plaintiff's conclusory allegations in his Complaint are insufficient to support a *Monell* claim on this basis.

### 5.      No Inadequate Training or Supervision

Another potential avenue for municipal liability exists where a municipality has a policy of inadequate training or supervision. *See Thomas*, 398 F.3d at 429. While inadequate police training and supervision can serve as an improper policy or custom for purposes of municipal liability, they do so only when the purported failures to train or supervise amount to "deliberate indifference to the rights of persons with whom the police come into contact." *Canton*, 489 U.S. at 388–89; *Meeks v. Detroit*, 727 Fed. App'x 171, 182 (6th Cir. 2018); *Roell v. Hamilton County*, 870 F.3d 471, 487 (6th Cir. 2017); *Brown v. Battle Creek*, 844 F.3d 556, 573 (6th Cir. 2016); *Burgess*, 735 F.3d at 478. To succeed on a failure-to-train or a failure-to-supervise theory of municipal liability, Plaintiff must prove that: (a) the City's training or supervision program was inadequate to the tasks its officers must perform; (b) such an inadequacy was the result of the City's deliberate indifference; and (c) these particular inadequacies were closely related to or did actually cause the plaintiff's injury. *See Canton*, 489 U.S. at 389–91; *Roell*, 870 F.3d at 487; *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989).

Plaintiff fails to plead facts showing that the City's training and/or supervision was in any way deficient. Likewise, he fails plead facts showing any prior instances of purportedly unconstitutional conduct or any purportedly deficient response thereto. Instead, he relies on wholly

53

conclusory allegations devoid of further factual enhancement. And his conclusory allegation that "the Defendant law enforcement officers and medical personnel conspired to frame Alan for J.U.'s death, concocting a false narrative that Alan violently shook and killed J.U…" (Complaint, ECF No. 1 ¶ 7) actually undercuts Plaintiff's claims against the City because it would not be plainly obvious to the municipal entity that its employees would commit such acts.

Plaintiff does not plead facts showing any single instance of unconstitutional conduct by any City police officer, let alone a pattern of such conduct similar to the complained-of alleged conduct to which the City was deliberately indifferent. And he has failed to plead facts showing that a lack of training or supervision was the moving force that caused his alleged constitutional violations. Thus, he cannot sustain a failure-to-train or supervise theory of municipal liability against the City in this case.

### 6. No Custom of Tolerance or Acquiescence

The final available theory of municipal liability is that the City had a custom of tolerance or acquiescence to alleged unconstitutional conduct. The Sixth Circuit has identified four factors that a plaintiff must prove in order to establish a custom of tolerance or acquiescence to alleged unconstitutional conduct:

> "(1) the existence of a clear and persistent pattern of [illegal activity]; (2) notice or constructive notice on the part of the [defendant]; (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the [defendant's] custom was the 'moving force' or direct causal link in the constitutional deprivation."

*Stanfield*, 727 Fed. App'x at 851 (quoting *Thomas*, 398 F.3d at 429); *Doe*, 103 F.3d at 507.

A "failure to investigate" can satisfy this test "if the plaintiff can show that the municipality historically failed to investigate or discipline similar conduct such that the municipality's inaction represents an unofficial custom of tolerance." *Bear v. Delaware County*, Case No. 2:14-cv00043,

54

2016 U.S. Dist. LEXIS 6537, *38 (S.D. Ohio Jan. 20, 2016) (citing *Leach v. Shelby County*, 891 F.2d 1241, 1247–48 (1989), and *Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir. 1985)); *Burgess*, 735 F.3d at 478; *Thomas*, 398 F.3d at 433.

Here, Plaintiff has failed to plead facts showing a clear pattern of illegal activity. Plaintiff has also failed to plead facts showing a historical failure on the part of the City to investigate or discipline regarding "reckless investigations, withheld exculpatory evidence, withheld impeachment evidence, destroyed evidence, and fabricated false reports, false statements, false testimony, and other evidence, or malicious prosecutions, failures to intervene, or conspiracies to violate constitutional rights." Plaintiff's conclusory allegations, without identifying any specific facts or incidents that show a "systematic pattern" of illegal tactics or misconduct, are insufficient to support his claims.

In short, other than generally alleging the City's policies or customs caused his alleged constitutional violations, Plaintiff has failed to plead facts showing an underlying constitutional violation, an unconstitutional policy, that the City was deliberately indifferent, or that a City policy directly caused his alleged constitutional violations. Because Plaintiff has failed to plead facts showing any of these elements, the City is entitled to judgment on the pleadings on the federal municipal liability claims asserted against it.

### E.      OHIO STATE LAW CLAIMS AGAINST THE DEFENDANT OFFICERS

Count VI of Plaintiff's Complaint is an Ohio state-law tort claim brought against the Defendant Officers for an alleged intentional infliction of emotional distress. (*Id*. ¶¶ 133-136).

#### 1.      Ohio State Law Tort Immunity

Statutory immunity shields the Defendant Officers from Plaintiff's Ohio state-law tort claims. Pursuant to O.R.C. § 2744.03(A)(6), City employees are statutorily immune from tort liability unless: (a) their acts or omissions were manifestly outside the scope of their employment

55

or official responsibilities; (b) their acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (c) civil liability is expressly imposed upon them by some other section of the Ohio Revised Code. The statute creates a presumption of immunity, and Plaintiff has the burden of rebutting it with one of those three statutory immunity exceptions. *See Cook v. Cincinnati*, 103 Ohio App. 3d 80, 90 (Ohio App. 1st Dist., 1995). Thus, Plaintiff must allege sufficient facts to establish that one of those three statutory immunity exceptions applies. For the reasons provided in the qualified immunity analysis above, Plaintiff has failed to do so. The Defendant Officers adopt that same analysis here rather than restating it verbatim.

Because the Defendant Officers were acting within the course and scope of their employment and official responsibilities at all relevant times, O.R.C. § 2744.03(A)(6)(a) does not apply. O.R.C. § 2744.03(A)(6)(c) does not apply because there is no provision of the Ohio Revised Code that would otherwise impose liability upon the Defendant Officers for the conduct about which Plaintiff complains. Finally, the facts and analysis discussed above also support the absence of malice, bad faith, wantonness, or recklessness under O.R.C. § 2744.03(A)(6)(b). *See Pollard v. City of Columbus*, 780 F.3d 395, 404 (6th Cir. 2015). Because none of these three immunity exceptions applies to Plaintiff's state-law claims, the Defendant Officers are statutorily immune from tort liability.

### 2. Intentional Infliction of Emotional Distress

Count VI asserts a state-law claim for intentional infliction of emotional distress ("IIED"). Under Ohio law, to plead a claim for the intentional infliction of emotional distress ("IIED"), the plaintiff must allege (1) that the defendant intended to cause him serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of his serious emotional distress. *Sobolewski v. Ford Motor Co.*, 2025 U.S. App. LEXIS 25482, *5 (6th Cir., Sept. 30, 2025). "[T]he law requires conduct that is 'so extreme

56

and outrageous as to go beyond all possible bounds of decency and…considered utterly intolerable in a civilized community.'" *Id.* (quoting *Rice v. Cuyahoga Cnty. Dep't. of Just.*, 2005 Ohio 5337, 970 N.E.2d 470, 482 (Ohio Ct. App. 2005)).

When a police officer acts lawfully, or in accordance with his or her Constitutional obligations, an IIED claim fails as a matter of law. *See, e.g., Rainey v. Perkins Township/Perkins Bd. of Trs.*, No. 3:22-cv-42, 2025 U.S. Dist. LEXIS 186488, at *29 (N.D. Ohio Sept. 23, 2025) ("An individual's arrest, supported by probable cause, does 'not go beyond all possible bounds of decency, nor [is] it utterly intolerable in a civilized community.'" (internal citation and quotation omitted); *Piro v. Franklin Twp.*, 102 Ohio App.3d 130, 143 (Ohio Ct. App. 10th 1995) ("Quite the contrary, arrests of suspected criminals are necessary in keeping the community civilized"); *Williams v. City of Willoughby*, No. 1:25-cv-00898, 2026 U.S. Dist. LEXIS 7864, at *26 (N.D. Ohio Jan. 25, 2026) ("accusing an individual of a crime and investigating an individual suspected of a crime generally are not sufficient, standing alone, to demonstrate extreme and outrageous conduct") (internal citation and quotation omitted).

As demonstrated above, Plaintiff does not plead facts showing that any of the Defendant Officers failed to act in accordance with their Constitutional obligations or that their acts were so extreme and outrageous as to go beyond all possible bounds of decency and considered utterly intolerable in a civilized community. Thus, Plaintiff's IIED claims fail as a matter of law.

### 3. Plaintiff's IIED Claims Are Barred by the Statute of Limitations

When the acts giving rise to an IIED claim would support another tort, the statute of limitations for that other tort governs the claim for intentional infliction of emotional distress. *Templeton v. Brandt*, No. 1:20-cv-34, 2021 U.S. Dist. LEXIS 67328, at *23 (S.D. Ohio Apr. 7, 2021) (Cole, J.) *Id.* (quoting *Lee v. Lucas*, No. 1:10-cv-151, 2011 U.S. Dist. LEXIS 125756, 2011 WL 5361509, at *4 (N.D. Ohio Oct. 31, 2011)). Under Ohio law, malicious prosecution requires

(1) the malicious institution or continuance of a prior proceeding; (2) lack of probable cause for that proceeding; and (3) termination of the prior proceeding in the claimant's favor. *Ayers v. City of Cleveland*, No. 1:12-cv-753, 2013 U.S. Dist. LEXIS 25992, at *44 (N.D. Ohio Feb. 25, 2013). Plaintiff's allegations track those elements much more so than an IIED claim.

An Ohio law claim for malicious prosecution carries a one-year statute of limitations, and the claim accrues when the prosecution terminates in the plaintiff's favor. *See Lee* at *12. In this case, the criminal charges against Plaintiff were dismissed via a *nolle prosequi* order on February 12, 2024 (corrected *nunc pro tunc* on February 13, 2024). The limitations period for malicious prosecution therefore expired on February 12 or 13, 2025 and Plaintiff filed his Complaint on January 15, 2026. Plaintiff's IIED claims should be dismissed as they were filed outside of the applicable limitations period.

**F.     OHIO STATE LAW CLAIMS AGAINST THE CITY**

Count VII of Plaintiff's Complaint is an Ohio state-law tort claim brought against the City (and others) pursuant to the doctrine of *respondeat superior*. (*Id.* ¶¶ 137-140). Tort claims against Ohio political subdivisions themselves are governed by Ohio's Political Subdivision Tort Liability Act. *See* Ohio Rev. Code Ch. 2744. To determine whether a political subdivision is immune, courts employ a three-tiered analysis. *Pelletier v. Campbell*, Case No. 2017-0088, 2018-Ohio-2121, ¶15 (Ohio June 5, 2018); *Argabrite v. Neer*, 149 Ohio St. 3d 349, 358–59 (2016); *Baker v. Wayne County*, 147 Ohio St. 3d 51, 53–54 (2016). In the first tier, Ohio Revised Code § 2744.02(A) grants presumptive tort immunity to the political subdivision for any "injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."

Here, the City is a political subdivision of the State of Ohio, and all of the conduct about which Plaintiffs complain was the conduct of City employees/agents. Moreover, all of the conduct

58

about which Plaintiff complains was connected with the governmental function that is the provision or nonprovision of police services or protection. *See* O.R.C. § 2744.01(C)(2)(a). Finally, Plaintiff is seeking to recover damages for injury, death, and loss to person or property allegedly caused by such conduct. Thus, Ohio Revised Code § 2744.02(A)(1) grants the City presumptive immunity from Plaintiff's state-law claim.

The City's presumptive immunity can be overcome in the second-tier of the analysis, but only if Plaintiff can establish that one of the five statutory immunity exceptions found in Ohio Revised § 2744.02(B) applies. Nonetheless, Ohio Revised Code § 2744.02(B)(1) does not apply because Plaintiff's claims do not involve the negligent operation of a motor vehicle. Second, Ohio Revised Code § 2744.02(B)(2) does not apply because the conduct about which Plaintiff complains was related to a governmental function, not to a proprietary function. Third, Ohio Revised Code § 2744.02(B)(3) does not apply because Plaintiff's claims do not relate to the alleged disrepair of a public road or to any purported obstruction within a public road. Fourth, Ohio Revised Code § 2744.02(B)(4) does not apply because Plaintiff's losses were not incurred upon the grounds of any public building. Finally, Ohio Revised Code § 2744.02(B)(5) does not apply because there is no provision of the Ohio Revised Code that would otherwise impose liability upon the City for the conduct or injuries alleged in Plaintiff's complaint. There is no 2744.02(B) exception to immunity based upon the doctrine of *respondeat superior*. *Bowman v. City of Fairview Park*, 2024 U.S. Dist. LEXIS 8126, *14. Because none of these five second-tier immunity exceptions apply to Plaintiff's state-law tort claims against the City, the City retains its presumptive first-tier immunity.

The third tier of the immunity analysis asks the Court to determine whether the City could raise any of the additional defenses found in Ohio Revised Code § 2744.03 if its immunity were lost during the second-tier of the analysis. Because the City retains its immunity through the second

59

tier in this particular case, there is no need for the Court to consider the third. The City is immune from liability for Plaintiff's state-law tort claims and is thus entitled to judgment on the pleadings.

## IV. CONCLUSION

For the reasons stated above, the City Defendants are entitled to judgment on the pleadings. The City Defendants respectfully request a final judgment in their favor.

Respectfully submitted,

/s/ Westley M. Phillips
Westley M. Phillips (0077728) – Lead
Aaron D. Epstein (0063286)
David J. Dirisamer (0092125)
Alana V. Tanoury (0092265)
Sarah N. Feldkamp (0099464)
City of Columbus, Department of Law
77 N. Front Street, Columbus, Ohio 43215
(614) 645-7385 / (614) 645-6949 (fax)
adepstein@columbus.gov
wmphillips@columbus.gov
djdirisamer@columbus.gov
avtanoury@columbus.gov
snfeldkamp@columbus.gov

*Attorneys for The City Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on **April 24, 2026**, I electronically filed the foregoing with the Clerk of this Court by using the Court's electronic filing system. Copies will be served upon counsel by operation of this Court's electronic filing system on all parties who have filed an appearance in this matter.

/s/ Westley M. Phillips
Westley M. Phillips (0077728)